# EXHIBIT 1



**U.S. Department of Justice**

Civil Rights Division

---

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC  20530*

June 17, 2025

The Honorable Meagan Wolfe
Administrator, Wisconsin Elections Commission
201 W Washington Ave
Madison, WI. 53703
meagan.wolfe@wisconsin.gov
elections@wi.gov

Re: Request for Information Related to HAVA Compliance

Dear Ms. Wolfe:

As you are already aware, we have received several complaints regarding the Wisconsin Election Commission's ("WEC") compliance with the Help America Vote Act ("HAVA") 52 U.S.C. 20901 - 21145. Many of these complaints allege that WEC is failing to comply with the list maintenance procedure requirements of Section 303 of HAVA. To enable the Attorney General to determine if WEC is complying with these requirements, we are requesting the following information:

(1) Describe how Wisconsin's computerized statewide voter registration list ("voter registration list") is coordinated with the databases of other state agencies, as required by HAVA Section 303(a)(1)(A). Provide the name of each state database used for coordination, and describe the procedures used for coordination, as well as how often the databases are coordinated with the voter registration list;

(2) Describe the process by which voters who have been deemed ineligible are removed from the voter registration list pursuant to the list maintenance procedures referenced in HAVA Section 303(a)(2), the number of the voters currently deemed ineligible that remain on the voter registration list, and the basis for not having already removed them from the voter registration list;

(3) Describe how WEC determines who is an "inactive" voter, pursuant to the list maintenance procedures referenced in HAVA Section 303(a)(2), and explain the process for removal of inactive voters from the voter registration list;

(4) Describe the process by which any duplicate voter registrations are identified, including how the State determines what constitutes a duplicate voter registration record, and the process for their removal from the voter registration list under HAVA Section 303(a)(2)(B)(iii);

(5) Describe the process by which voters who have moved outside the state and subsequently registered to vote in another state are identified and removed from the voter registration list under HAVA Section 303(a)(4)(A);

(6) Describe the process by which registrants who are ineligible due to non-citizenship are identified and removed from the voter registration list; and

(7) Please send us the current voter registration list. Please include both active and inactive voters.

Please provide this information within 20 days of the date of this letter. The information and materials may be sent by email to voting.section@usdoj.gov or by FedEx or UPS to:

U.S. Department of Justice, Civil Rights Division
Voting Section
4 Constitution Square
150 M Street NE, Room 8.923
Washington, DC 20002

If you have any questions, please contact Kevin Muench at kevin.muench@usdoj.gov. We very much appreciate your cooperation in our effort to monitor HAVA compliance.

Sincerely,

Maureen Riordan
Voting Section, Acting Chief

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

2

# EXHIBIT 2



# Wisconsin Elections Commission

201 West Washington Avenue | Second Floor | P.O. Box 7984 | Madison, WI 53707-7984
(608) 266-8005 | elections@wi.gov | elections.wi.gov

---

July 2, 2025

Ms. Maureen Riordan                     *VIA U.S. Mail and email to voting.section@usdoj.gov*
U.S. Department of Justice
Voting Section
4 Constitution Square
150 M Street NE, Room 8.923
Washington D.C.  20002

RE: Request for Information Related to HAVA Compliance

Dear Ms. Riordan,

Thank you for your interest in the State of Wisconsin's voter registration database.  This letter is in response to your questions dated June 17, 2025.  We have addressed each question in the paragraphs below.

**QUESTION 1.  Describe how Wisconsin's computerized statewide voter registration list ("voter registration list") is coordinated with the databases of other state agencies, as required by HAVA Section 303(a)(1)(A).  Provide the name of each state database used for coordination, and describe the procedures used for coordination, as well as how often the databases are coordinated with the voter registration list;**

RESPONSE 1.  HAVA Section 303(a)(1)(A), codified at 52 U.S.C. § 21083(a)(1)(A), provides:

**(A) In general**

Except as provided in subparagraph (B), each State, acting through the chief State election official, shall implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State (in this subsection referred to as the "computerized list"), and includes the following:

**(i)** The computerized list shall serve as the single system for storing and managing the official list of registered voters throughout the State.

**(ii)** The computerized list contains the name and registration information of every legally registered voter in the State.

*Wisconsin Elections Commissioners*
Ann S. Jacobs, chair | Marge Bostelmann | Don M. Millis | Carrie Riepl | Robert Spindell | Mark L. Thomsen

---

*Administrator*
Meagan Wolfe

**(iii)** Under the computerized list, a unique identifier is assigned to each legally registered voter in the State.

**(iv)** The computerized list shall be coordinated with other agency databases within the State.

**(v)** Any election official in the State, including any local election official, may obtain immediate electronic access to the information contained in the computerized list.

**(vi)** All voter registration information obtained by any local election official in the State shall be electronically entered into the computerized list on an expedited basis at the time the information is provided to the local official.

**(vii)** The chief State election official shall provide such support as may be required so that local election officials are able to enter information as described in clause (vi).

**(viii)** The computerized list shall serve as the official voter registration list for the conduct of all elections for Federal office in the State.

This response assumes your question refers to subsection (iv), and the relationship between Wisconsin's statewide voter registration database and election administration system ("WisVote") and other Wisconsin state agency databases.

The Wisconsin Elections Commission ("WEC") routinely coordinates with the Wisconsin Department of Transportation ("DOT"), the Wisconsin Department of Corrections ("DOC"), and the Wisconsin Department of Health Services ("DHS"). The WEC may infrequently coordinate with other state agencies for specific purposes. For example, various voter registration list maintenance mailings require coordination with the Wisconsin Department of Administration, Bureau of Publishing and Distribution. However, these interactions do not necessarily involve another agency's "database," and are therefore probably not relevant to your query.

Coordination with Wisconsin DOT occurs to compare voter registration information with DOT records. The online voter registration (OVR) process includes a real-time records check against DOT records. Wis. Stat. § 6.30(5). This OVR check verifies that a voter's name, date of birth, license number, and residency match DMV records. If the OVR DMV check does not match, the voter is not permitted to register online. The OVR process is only available to voters with a Wisconsin DOT product. Registrations received on a paper application, either in person or by mail, are reviewed against DOT records in a separate process. If the voter does not have a Wisconsin driver license or state ID card, the system matches the name, date of birth and the last four digits of their Social Security Number. Finally, the Wisconsin DOT also provides the WEC driver's license signature images in accordance with Wisconsin law. Data is received from Wisconsin DOT daily.

Coordination with Wisconsin DOC occurs regularly to identify individuals convicted of a felony and also those who have completed their sentences. A person is not eligible to vote if they are convicted of a felony and still serving their term of imprisonment or probation for the crime. Wis. Stat. § 6.03(1)(b). The Wisconsin Department of Corrections provides felony conviction information to the WEC pursuant Wis. Stat. § 301.03(20m). Data is received from Wisconsin DOC daily.

Request for Information Related to HAVA Compliance
July 2, 2025
Page 3 of 5

Coordination with Wisconsin DHS occurs to identify recently deceased individuals.  Wisconsin DHS provides the data monthly.

**QUESTION 2.  Describe the process by which voters who have been deemed ineligible are removed from the voter registration list pursuant to the list maintenance procedures referenced in HAVA Section 303(a)(2), the number of voters currently deemed ineligible that remain on the voter registration list, and the basis for not having removed them from the voter registration list;**

RESPONSE 2.  Voters identified as ineligible are inactivated in the database and removed from the voter rolls.  The "voter registration list" contains only registered voters who will appear on poll books and are eligible to vote.  Once a voter is marked as ineligible, they are no longer registered to vote.  In some instances, there may be a time delay between the voter becoming ineligible and an election official learning about the event.  For example, a voter who dies is immediately ineligible to vote, but election officials may not become aware of the death for hours, days, or weeks.

**QUESTION 3.  Determine how WEC determines who is an "inactive" voter, pursuant to the list maintenance procedures referenced in HAVA Section 303(a)(2), and explain the process for removal of inactive voters from the voter registration list;**

RESPONSE 3.  HAVA Section 303(a)(2), codified at 52 U.S.C. § 21083(a)(2), provides:

**(2) Computerized list maintenance**

**(A) In general**

The appropriate State or local election official shall perform list maintenance with respect to the computerized list on a regular basis as follows:

> **(i)** If an individual is to be removed from the computerized list, such individual shall be removed in accordance with the provisions of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg et seq.) [now 52 U.S.C. 20501 et seq.], including subsections (a)(4), (c)(2), (d), and (e) of section 8 of such Act (42 U.S.C. 1973gg–6) [now 52 U.S.C. 20507].

> **(ii)** For purposes of removing names of ineligible voters from the official list of eligible voters—

>> **(I)** under section 8(a)(3)(B) of such Act (42 U.S.C. 1973gg–6(a)(3)(B)) [now 52 U.S.C. 20507(a)(3)(B)], the State shall coordinate the computerized list with State agency records on felony status; and

>> **(II)** by reason of the death of the registrant under section 8(a)(4)(A) of such Act (42 U.S.C. 1973gg–6(a)(4)(A)) [now 52 U.S.C. 20507(a)(4)(A)], the State shall coordinate the computerized list with State agency records on death.

Request for Information Related to HAVA Compliance
July 2, 2025
Page 4 of 5

    **(iii)** Notwithstanding the preceding provisions of this subparagraph, if a State is described in section 4(b) of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg–2(b)) [now 52 U.S.C. 20503(b)], that State shall remove the names of ineligible voters from the computerized list in accordance with State law.

**(B) Conduct**

The list maintenance performed under subparagraph (A) shall be conducted in a manner that ensures that—

    **(i)** the name of each registered voter appears in the computerized list;

    **(ii)** only voters who are not registered or who are not eligible to vote are removed from the computerized list; and

    **(iii)** duplicate names are eliminated from the computerized list.

The HAVA section cited in question 3 does not use the term "inactive voter" and therefore it is unclear what this question is asking. This response assumes you are using the term "inactive voter" interchangeably with "ineligible voter."

Wisconsin law assigns local election officials many voter registration list maintenance responsibilities and provides the WEC only limited authority in specific circumstances. Thus, the WEC is not the sole arbiter of eligibility. Indeed, the Wisconsin Supreme Court has ruled that state law specifically prohibits the WEC from making eligibility determinations in some circumstances.[1]

Chapter 6 of the Wisconsin Statutes specifically details the circumstances and responsibilities for determinations of ineligibility for the following reasons:

- Four consecutive years of inactivity. Wis. Stat. § 6.50(1).
- Moving out of the municipality. Wis. Stat. § 6.50(3).
- Death. Wis. Stat. § 6.50(4).
- Residing in a Condemned Structure. Wis. Stat. § 6.50(5)
- Voter Request. Wis. Stat. § 6.50(6).
- Adjudication of Mental Incompetency. Wis. Stat. §§ 6.03(1)(a), 6.03(3), 54.25.
- Convicted of a Felony, Treason, or Bribery. Wis. Stat. § 6.03(1)(b).
- Duplicate Records. Wis. Stat. § 7.15(1)

**QUESTION 4. Describe the process by which any duplicate voter registrations are identified, including how the State determines what constitutes a duplicate voter registration record, and the process for their removal from the voter registration list under HAVA Section 303(a)(2)(B)(iii);**

RESPONSE 4. The voter registration list is automatically scanned nightly and any potential duplicates are flagged for review. The automated scan reviews first name, last name, middle initial, suffix, date of birth,

---

[1] State of Wis. Ex rel. Timothy Zignego v. Wisconsin Elections Commission, 2021 WI 32.

Request for Information Related to HAVA Compliance
July 2, 2025
Page 5 of 5

address record, and driver's license or state ID number.  Municipal clerks review the potential duplicates and take appropriate action.  Most commonly, duplicates are created when a newer registration record is created, and the clerk will identify the old record and inactivate it.

**QUESTION 5.  Describe the process by which voters who have moved outside the state and subsequently registered to vote in another state are identified and removed from the voter registration list under HAVA Section 3030(a)(4)(A);**

RESPONSE 5. When a Wisconsin election official identifies a voter who has moved out of state, the voter record is marked as ineligible and removed from the voter registration list.  The actual process requires an authorized WisVote user to select the voter record, change the record's eligibility status, and record a reason for the change.  This most commonly occurs when the WEC receives notification from another state elections agency, often through its statutorily-directed membership in the Electronic Registration Information Center. *See* Wis. Stat. § 6.36(1)(ae)

**QUESTION 6.  Describe the process by which registrants who are ineligible due to non-citizenship are identified and removed from the voter registration list;**

RESPONSE 6.  Registrants ineligible due to non-citizenship are identified through the statutory challenge process or through law enforcement reporting.  When a Wisconsin election official (state or local) identifies a voter who is not a U.S. citizen, the voter record is marked as ineligible and removed from the voter registration list.  The actual process requires an authorized WisVote user to select the voter record, change the record's eligibility status, and record a reason for the change.

**QUESTION 7.  Please send us the current voter registration list.  Please include both active and inactive voters.**

RESPONSE 7.  Wisconsin voter data is available through an online portal at https://badgervoters.wi.gov. Wisconsin law requires the Commission to charge a fee for access to voter registration data and makes no exceptions for elected officials, government agencies, journalists, non-profits, academics, or any other group.  *See* Wis. Stat. § 6.36(6) and Wis. Admin Code § EL 3.50.

Sincerely,

Members, Wisconsin Elections Commission

# EXHIBIT 3

| | |
|---|---|
| **From:** | Neff, Eric (CRT) |
| **To:** | elections@wi.gov |
| **Subject:** | Demand for Full Voter Roll from DOJ CRT |
| **Date:** | Tuesday, December 2, 2025 10:54:00 AM |
| **Attachments:** | VRLData Sharing Agreement DOJ-WI.pdf |
| | image001.png |

To the Wisconsin Elections Commission:

Please consider this email a demand to provide within 7 days:

- An electronic copy of the full Wisconsin statewide voter registration list
  - This list is to include, pursuant to the Help America Vote Act, either the last four digits of the social security number, the driver's license number, or both.

This request is for the purpose of ensuring compliance with minimum standards and routine voter registration list maintenance.

If you have any questions, do not hesitate to contact me.

Thanks,

**Eric Neff**
Trial Attorney
Civil Rights Division
Department of Justice
150 M St. NE, Ste. 8-139
Washington, DC 20002
Eric.Neff@usdoj.gov
Cell: 202-532-3628



# EXHIBIT 4



# Wisconsin Elections Commission

201 West Washington Avenue | Second Floor | P.O. Box 7984 | Madison, WI  53707-7984
(608) 266-8005 | elections@wi.gov | elections.wi.gov

---

December 11, 2025

Eric Neff, Esq.                                                    *VIA email to Eric.Neff@usdoj.gov*
Trial Attorney, Civil Rights Division
United States Department of Justice
150 M Street NE, Ste. 8-139
Washington, D.C. 20002
(202) 532-3628

**Re:** December 2, 2025, Correspondence Regarding Wisconsin Statewide Voter Registration List

Attorney Neff,

This letter is the Wisconsin Elections Commission's ("Commission") response to your December 2, 2025, demand for full production of Wisconsin's unredacted statewide voter registration list, including the last four digits of each elector's social security number, each elector's driver's license number, or both. Although the Commission is willing to provide any non-confidential voter registration data or records sought by the United States Department of Justice ("USDOJ") as outlined herein, Wisconsin law explicitly prohibits the Commission from providing the full unredacted voter registration list.

This letter explains what information can and cannot be provided and specifies the current processes by which Wisconsin keeps its voter registration information current and compliant. The Commission, including agency staff, is happy to assist your office in any way that it can.

### *Controlling Wisconsin Law*

State law requires that Wisconsin's official registration list be open for public inspection but prohibits the Commission from disclosing certain personally identifiable information ("PII"). Wis. Stat. § 6.36(1)(b)1.a.

Public voter registration data from the list (such as elector names, most addresses, and election participation history) is readily available to the public for a fee, which is set by state law and the Commission's administrative code. *See* Wis. Stat. § 6.36(6); Wis. Admin. Code § EL 3.50.

The Commission is required to keep certain elector PII confidential. This confidential information includes an elector's date of birth, driver's license number, social security number, addresses of confidential electors, and voting accommodation needs. Wis. Stat. § 6.36(1)(b)1.a. Municipal and county clerks are bound by this same prohibition against disclosing elector PII. *Id*.

*Wisconsin Elections Commissioners*
Ann S. Jacobs, chair | Marge Bostelmann | Don M. Millis | Carrie Riepl | Robert Spindell | Mark L. Thomsen

*Administrator*
Meagan Wolfe

The Commission lacks the legal authority under Wisconsin law to contract for the release of elector PII in the manner demanded in your letter. And having reviewed the December 2, 2025, proposed Memorandum of Understanding and related statutes, the Commission concludes that the cited federal authorities do not override Wisconsin's statutory restrictions on the release of elector PII.

### The Federal Laws Cited do not Override Wisconsin State Law

The Commission wishes to briefly address the federal authority cited in your December 2, 2025, demand letter:

*The National Voter Registration Act ("NVRA")*

Your letter and accompanying materials appear to state that the NVRA, specifically Section 11, provides legal authority for your request. Wisconsin is exempt from the NVRA because it has offered election-day voter registration at polling places on a continuous basis since the NVRA's enactment. *See* 52 U.S.C. § 20503(b)(2); *see also, e.g.*, *Pub. Int. Legal Found., Inc. v. Wolfe*, No. 24-CV-285-JDP, 2024 WL 4891940, at *3 (W.D. Wis. Nov. 26, 2024) ("[B]y its own terms, the NVRA does not apply to Wisconsin."). Accordingly, to the extent that your letter implies that Wisconsin has an obligation to disclose PII under the NVRA, that implication is incorrect. Wisconsin is properly exempt from all NVRA requirements.

*The Help America Vote Act ("HAVA")*

Your letter and accompanying materials cite HAVA, as a whole, as further legal authority for the request. *See* 52 U.S.C. § 20901, *et seq*. It is difficult for the Commission to evaluate a general citation, but on the Commission's review, nothing in HAVA authorizes or requires the release of PII from Wisconsin's voter registration list to your office.

You also cite a specific section of HAVA in your request, the "Attorney General's authority to enforce the Help America Vote Act" codified at 52 U.S.C. § 21111. Section 21111 allows the United States Attorney General to bring a civil action against a state for declaratory and injunctive relief to vindicate the requirements of four cross-referenced provisions that establish "uniform and nondiscriminatory election technology and administration requirements." This provision authorizes the Attorney General to bring enforcement actions; it does not authorize your office to demand confidential data disclosure of which is prohibited under state law.

The Commission's reading of this provision is supported by the plain language of 52 U.S.C. § 21083, which is the only cross-referenced section in 52 U.S.C. § 21111 relating to state registration lists. Section 21083 does not authorize the Attorney General or your office to seek access to such confidential voter data. It grants such access only to a small set of specified officials and only for limited and specific purposes. Congress did not grant list maintenance, audit, or data access authority to the USDOJ when it enacted HAVA.

*Title III of the Civil Rights Act of 1960*

Title III of the Civil Rights Act of 1960 requires election officials to retain certain election materials for a period of 22 months after each federal election. To the extent that your letter invokes Sec. 303 of Title III, the Commission does not consider your December 2 letter to constitute the type of demand, including a statement of the basis and purpose, contemplated by Sec. 303.

*The Privacy Act of 1974*

The Privacy Act of 1974 applies to federal agencies, not state agencies like the Commission. *See, e.g., Clancy v. Fla. Dep't of Corr.*, 782 F. App'x 779, 781 (11th Cir. 2019)[1]. Accordingly, the Commission has no obligation to provide the information requested to the USDOJ under any provision of the Privacy Act.

### *List Maintenance Practices in Wisconsin*

Wisconsin's voter registration list is readily available through the Commission's Badger Voters website (https://badgervoters.wi.gov). Both the Republican Party and the Democratic Party routinely obtain copies of the entire list several times each year. If the USDOJ elects to obtain the list through Badger Voters, it may be helpful to understand the broader framework of list maintenance practices in Wisconsin. Wisconsin's voter administration is largely delegated to the approximately 1,850 municipal and county clerks in the State. Those local election officials are assigned by law many voter registration list maintenance responsibilities and the Commission has only limited authority as to list maintenance in specific circumstances.

The joint effort between state and local election officials enhances the integrity of the system by ensuring responsibilities are distributed across thousands of officials in every city, village, and town, rather than concentrated among a small handful of state employees in the Capitol.

The vast majority of list maintenance work consists of routine updates, and the processes also serve to identify attempts at wrongdoing. Each year, Wisconsin election officials at all levels of government identify and refer to criminal prosecution: felons attempting to vote, double voters, non-citizens, and others trying to circumvent election law.

There are 11 major voter list maintenance processes in the State of Wisconsin.

1.    **Four consecutive years of inactivity, "Four-Year Maintenance"** Wis. Stat. § 6.50(1).

By June 15 of every odd numbered year, the Commission is required to identify registered voters who have not participated in an election for four or more consecutive years. Wis. Stat. § 6.50(1). Thus, this process occurs *every two years*, in the summers of odd-numbered years. The identified voters receive a postcard from the Commission advising them that their voter registration will be suspended if they do not request continuation within 30 days. Wis. Stat. § 6.50(2). Voter requests to continue their registration are sent to their municipal clerk.[1] "Voters who fail to request continuation within 30 days are automatically deactivated on the voter registration list. Wis. Stat. § 6.50(2).

No later than August 1 of each year when Four Year Maintenance postcards go out, the Commission will publish data on the number of postcards that were mailed, the number that were returned as undeliverable, the number of voters who requested to continue their status, and the number of postcards not returned, among other fields. Wis. Stat. § 6.50(2r). This data can be accessed here: https://elections.wi.gov/statistics-data/voter-list-maintenance

2.    **Voters Who Move. Wis. Stat. § 6.50(3).**

Voters who move to a different municipality must re-register to vote. *See* Wis. Stat. § 6.27 (requiring most electors to register before voting in any election). If the municipal clerk reasonably believes a voter has moved to a

---

[1] *See also Hatfield v. Berube*, 714 F. App'x 99, 105-06 (3rd Cir. 2017); *N'Jai v. Pittsburgh Bd. of Public Educ.*, 487 F. App'x 735, 737 (3d Cir. 2012) (per curiam); *Spurlock v. Ashley County*, 281 F. App'x 628, 629 (8th Cir. 2008); *Schmitt v. City of Detroit*, 395 F.3d 327, 331 (6th Cir. 2005); *Perez-Santos v. Malave*, 23 F. App'x 11, 12 (1st Cir. 2001) (per curiam); *Dittman v. California*, 191 F.3d 1020, 1026, 1029 (9th Cir. 1999)

different municipality, they must mail the voter a "30-Day Notice" advising the voter of a pending change in registration status. Wis. Stat. § 6.50(3). If the voter fails to respond, or confirms that they have moved to a different municipality, the municipal clerk may deactivate the voter's registration.

3.     **ERIC Movers.  Wis. Stat. § 6.36(1)(ae)1.**

Wisconsin law requires the state to be a member of the Electronic Registration Information Center (ERIC). Wis. Stat. § 6.36(1)(ae)1. ERIC is a nonprofit, nonpartisan membership organization created by and comprised of its member states and the District of Columbia. ERIC facilities the exchange of information between states to identify voters who move, voters who die, and voters who attempt to vote in more than one state. More information about ERIC is available on their website.

To identify potential movers, ERIC obtains data from a variety of sources, such as the Wisconsin Department of Transportation (WisDOT), other member states' data, and the National Change of Address (NCOA) database from the United States Postal Service. ERIC provides the State of Wisconsin with a list of voters who may have moved each quarter. The list of movers is, in turn, provided to municipal clerks for review.

4.     **Deceased Voters. Wis. Stat. § 6.50(4).**

When a municipality learns that a registered voter has died, the municipal clerk deactivates the voter's registration. Wis. Stat. § 6.50(4). The Commission facilitates the exchange of information between public health officials and local election officials. When the Wisconsin Department of Health Services reports a deceased voter to the Commission, the information is relayed to municipal clerks through a Registration List Alert process. See Wis. Stat. § 6.50(4).

5.     **Voters Residing in a Condemned Structure. Wis. Stat. § 6.50(5).**

The law requires municipal clerks to investigate whether voters are registered at addresses of structures in their municipalities that are condemned for human habitation. If a building has been condemned, it cannot be a residence for voting purposes. *See* Wis. Stat. § 6.50(5).

6.     **Voter Requests for Deactivation.  Wis. Stat. § 6.50(6).**

Voters may voluntarily ask to have their registration deactivated. Wis. Stat. § 6.50(6). Such requests do not result in the deletion of voter information from WisVote—even inactive voter records must be preserved as public records. Wis. Stat. § 19.35(1)(a).

7.     **Voters Adjudicated Incompetent by a Court.  Wis. Stat. §§ 6.03(1)(a), 6.03(3), 54.25.**

Wisconsin competency proceedings are governed by Ch. 54 of the Wisconsin statutes. A person may be disqualified from voting if a court determines they are incapable of understanding the objective of the electoral process and are therefore ineligible to vote. Wis. Stat. § 6.03(1)(a). The grant of a guardianship order alone is not sufficient, and a court must make a specific finding of incompetence to vote under Wis. Stat. § 54.25(2)(c)1.g. Once made, an incompetency determination "shall be communicated in writing by the clerk of court to the election official or agency charged . . . with the responsibility for determining challenges to registration and voting." Wis. Stat. § 54.25(2)(c)1.g.

 Once an individual is adjudicated incompetent to vote, their right to vote can only be restored by a court order.  *See* Wis. Stat. §§ 6.03(1)(a), 6.03(3), 54.25.

4

8.    **Voters Convicted of a Felony/Treason/Bribery.  Wis. Stat. § 6.03(1)(b).**

A person is not eligible to vote if they are convicted of a felony and still serving their term of imprisonment or probation for the crime. Wis. Stat. § 6.03(1)(b). The Wisconsin Department of Corrections provides felony conviction information to the Commission pursuant Wis. Stat. § 301.03(20m) The information is provided to municipalities through two processes: (1) the Registration List Alert process; and (2) the Ineligible Felon List. Registration List Alerts are used by clerks to identify registered voters who have become ineligible to vote due to a felony conviction. The Ineligible Felon List is used by clerks to review new voter registration applications to ensure the applicant is not currently ineligible to vote. Wis. Stat. §§ 6.29(2)(am) (for use during late registration); 6.55(2)(cs) (for use on Election Day); 6.79(2)(dm)(for use on election day); 6.56(3m) (for use during reconciliation).

9.    **Duplicate Voter Records. Wis. Stat. § 7.15(1)**

Duplicate records are a common occurrence because voters who move often register in their new municipality without notifying their old municipality that they have moved. Duplicate records may also be created when a registered voter believes they are not registered and submits a new registration request. In addition to being a good database management practice, reviewing the voter list for duplicates and resolving them is required by the federal Help America Vote Act (HAVA). 52 U.S.C. § 21083(2)(B)(iii). The Registration List Alert process identifies possible duplicate records. When identified, duplicate records are merged into the newest record.

10.    **Online Voter Registration (OVR), DMV Check Processes.  Wis. Stat. § 6.30(5)**

OVR-DMV Checks are required by state law to validate online voter registration requests. Wis. Stat. § 6.30(5). OVR-DMV checks occur automatically when the statewide voter registration system attempts to match data from voters with data from the Wisconsin Department of Transportation. The OVR-DMV check occurs nearly instantly to verify that a voter's name, date of birth, license number, and residency match DMV records. If the OVR-DMV check does not match, the voter is not permitted to register online. Therefore, all records with a source of "Online Registration" passed the OVR-DMV check with a 100% match.

11.    **HAVA DMV Check Process**

HAVA-DMV Checks are comparisons between a voter registration record and a DMV or Social Security record. The checks were created by the federal Help America Vote Act of 2002 ("HAVA"). HAVA § 303(a)(1)(A) codified at 52 U.S.C. § 21083(a)(1)(A).

In Wisconsin, HAVA-DMV checks occur automatically when the statewide voter registration system attempts to match data from voters with data from the Wisconsin Department of Transportation and the Social Security Administration. The checks are run in batches overnight on voters who register on a paper form, whether in person or by mail. This check attempts to match the voter's name, date of birth and driver license (or state ID) number with WI DMV records once the registration information is entered into WisVote by the clerk. If the voter does not have a Wisconsin driver license or state ID card, the system tries to match the name, date of birth and the last four digits of their Social Security Number.

We are pleased to help the USDOJ obtain Wisconsin voter records through the processes permitted by law. Should you have any questions about navigating the Badger Voters website, or about the list maintenance processes

5

described above, please do not hesitate to contact our staff. Our office is available to provide additional clarification or assistance as needed.


Sincerely,

Commission Chair Ann S. Jacobs,
Commissioner Marge Bostelmann,
Commissioner Don M. Millis
Commissioner Carrie Riepl
Commissioner Mark L. Thomsen

# EXHIBIT 5

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| COUNTY OF RICHLAND | ) | FIFTH JUDICIAL CIRCUIT |
| | ) | |
| | ) | Civil Action No. 2025-CP-40-06539 |
| ANNE CROOK, | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| SOUTH CAROLINA ELECTION | ) | |
| COMMISSION A/K/A STATE | ) | |
| ELECTION COMMISSION, | ) | |
| *Defendant,* | ) | |
| | ) | |
| HENRY DARGAN MCMASTER, IN HIS | ) | |
| OFFICIAL CAPACITY AS GOVERNOR | ) | |
| OF THE STATE OF SOUTH | ) | |
| CAROLINA, | ) | |
| *Intervenor-Defendant.* | ) | |

This matter is before the Court on a Motion for Temporary Injunction filed by Plaintiff, Anne Crook. The motion seeks to prevent or limit the Election Commission's dissemination to DOJ of certain information from the South Carolina statewide voter registration list (VRL), containing Plaintiff's personal information. The Court heard this matter on September 26, 2025, and took the matter under advisement. For the reasons stated below, the Motion is **DENIED**.

### Introduction

Plaintiff is requesting an injunction to prevent the South Carolina Election Commission (Election Commission) from releasing any protected election data to the Department of Justice (DOJ) until there is a memorandum of understanding (MOU) between the two parties. Additionally, Plaintiff requests that this Court review any MOU. In the Election Commission's memorandum in opposition, as well as at oral arguments by their counsel, they have stated point-

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

blank that they will not release the data to the DOJ without an MOU between the two government agencies. Additionally, counsel stated that the contents of the MOU would be discussed and voted on in open session by the commissioners. This Court denies the drastic remedy of granting injunction for several reasons.

**First**, Plaintiff has failed to prove she will suffer an irreparable harm because the Election Commission has stated it will not release the data without an MOU containing necessary security safeguards to ensure the proper and confidential use of that data and its transmission.

**Second**, Plaintiff has failed to prove there are no adequate remedies at law because she could avail herself to the state and federal tort claims acts if any data is negligently handled in the future.

**Finally**, Plaintiff is not likely to succeed on the merits for several reasons. **1.** The Election Commission is statutorily authorized to engage in the conduct she seeks to enjoin; specifically, South Carolina law vests the Election Commission with the authority to enter data sharing agreements to disclose securely certain voter registration data. **2.** The "right to privacy" constitutional provision does not encompass the sharing of data between the State and the federal government to secure federal elections. **3.** Requesting this Court to mandate an MOU and to assess its adequacy would improperly entangle the judiciary in the routine operations of the Election Commission, which would offend foundational separation of powers principles. **4.** Federal law likely requires the Election Commission to provide the requested information to DOJ.

## Factual Background

On August 6 and 14, 2025, the Department of Justice Civil Rights Division (DOJ) sent letters to the Election Commission, requesting, in sum, South Carolina's VRL. Specifically, in the second letter, DOJ requested "an electronic copy of the statewide voter VRL[, which] should contain *all fields*, which means, [the] state's VRL must include the registrant's full name, date of birth, residential address, [and] his or her state driver's license number or the last four digits of the registrant's social security number . . . ." *See* Compl. at 7–11 (Letter from Harmeet K. Dhillon, Assistant Attorney General Civil Rights Division to Howard Knapp, then-Executive Director, State Election Commission).

On August 27, 2025, the Election Commission met to address DOJ's requests. Wooten Aff. ¶ 4. Specifically, the Election Commission directed its staff to confer with DOJ about the prospect of entering into a data sharing agreement as authorized by section 7-5-186(C) of the South Carolina Code of Laws. *Id.* After additional communications with DOJ, on September 3, 2025, the Election Commission and DOJ held a conference call to discuss a possible data sharing agreement. *Id.*¶ 5. Based on that conference call, the Election Commission understands that DOJ is currently developing a Memorandum of Understanding (MOU) that identifies the requested information and addresses the security and privacy concerns raised by the Election Commission. *Id.* ¶ 6. The Election Commission has not yet received the MOU. *Id.* The Election Commission has stated that it will not share any data without a proper MOU in place.

Contesting dissemination of the VRL to DOJ, Plaintiff filed a complaint with a request for injunctive relief and a declaratory judgment in Calhoun County. Ultimately, the case was transferred to Richland County and assigned to the Honorable Daniel M. Coble. The Election Commission filed its Answer on September 25, 2025.

### Legal Standard

An injunction is a "drastic" remedy that "ought to be applied with caution." *Strategic Res. Co. v. BCS Life Ins. Co.*, 367 S.C. 540, 544, 627 S.E.2d 687, 689 (2006). A plaintiff "must establish three elements" to obtain a preliminary injunction: (1) irreparable harm, (2) likelihood of success on the merits, and (3) no adequate remedy at law. *Compton v. S.C. Dep't of Corr.*, 392 S.C. 361, 366, 709 S.E.2d 639, 642 (2011).

### 1. Irreparable harm

Plaintiff submits to the Court that she would suffer irreparable harm "if either 1) more of her [personal information] is shared than is permissible under the law or 2) the information is shared without adequate protection." Motion for Temporary Injunction at 11 (Sept. 23, 2025). Transmitting her personal information within the defined confines of an MOU protects against either scenario. Therefore, Plaintiff has failed to identify any sufficient harm—let alone an irreparable harm—she would suffer absent an injunction.

The Election Commission stated in court and in the filings with this Court that they will enter into an MOU with the DOJ that complies with all state law and ensure the protection of any

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

personal information. Additionally, the Election Commission stated that the contents of the MOU would be discussed and voted on at an open hearing. The Election Commission stated in their Memorandum in Opposition to Plaintiff's Motion for a Temporary Injunction:

> Specifically, in recognition of the significant privacy concerns involved, the Election Commission will fulfill its statutory obligations to protect private information and share voter information with DOJ only pursuant to an MOU containing necessary security safeguards to ensure the proper and confidential use of that data and its transmission. Indeed, this explains why the Election Commission has not transmitted the requested information since DOJ first inquired in early August. To appease her concerns, Plaintiff need not look any further than to the MOUs into which the Election Commission routinely perfects when exercising its statutory authority to share voter registration data to carry out its obligation "to maintain accurate voter registration records." *See* Wooten Aff. ¶ 4; S.C. Code Ann. §§ 7-3-20(D)(11), 7-5-186(A). As is standard practice, those MOUs outline the limited purpose for which the shared voter information will be used and the steps taken to protect the confidentiality of that data upon disclosure. For example, such documents ordinarily set forth data use limitations and provide secure transmission protocols and storage and destruction procedures. Any perfected MOU with DOJ should be no different.

Memorandum in Opposition to Plaintiff's Motion for a Temporary Injunction at 5 (Sept. 26, 2025).

Further, Plaintiff's alleged irreparable harm rests on the premise that the Election Commission will not act in good faith or properly carry out the law. Public officials are, absent evidence to the contrary, presumed to act in good faith and follow the laws. *S.C. Jurisprudence*, Evidence § 29 (1999*); see also Toporek v. S.C. State Election Comm'n*, 362 F. Supp. 613 (D.S.C. 1973) (stating that without an evidentiary basis, courts will not assume that state election officials will act arbitrarily in the future). The only evidence in this case is that the Election Commission has acted in good faith in enacting the MOUs with other states to fulfill its statutory duty to maintain accurate voter lists—that is, to prevent voter fraud. Plaintiff has not alleged, and the Court cannot assume, that the Election Commission will do anything other than adhere to state law in any negotiations with DOJ.

## 2. Adequate remedies

Actions for injunctive relief are equitable in nature. *Grosshuesch v. Cramer*, 367 S.C. 1, 4, 623 S.E.2d 833, 834 (2005) (citation omitted). Generally, equitable relief is available only where there is no adequate remedy at law. *Santee Cooper Resort, Inc. v. S.C. Pub. Serv. Comm'n*, 298

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

S.C. 179, 185, 379 S.E.2d 119, 123 (1989). Specifically, "An 'adequate' remedy at law is one which is as certain, practical, complete and efficient to attain the ends of justice and its administration as the remedy in equity." *Id*. In the unlikely event that Plaintiff's private information somehow falls in the hands of a "bad actor" as a result of the Election Commission's fulfillment of its statutory obligations under S.C. Code Ann. § 7-5-186(C) as she hypothesizes, she could avail herself to the state and federal tort claims acts. Such claims are more than adequate vehicles for relief such that an injunction is improper.

**3. Success on the Merits**

*Statutory Authorization*

Because the Election Commission is statutorily authorized to engage in the conduct she seeks to enjoin, Plaintiff cannot possibly establish she is likely to succeed on the merits. More specifically, South Carolina law vests the Election Commission with the authority to enter data sharing agreements to disclose securely certain voter registration data.

The South Carolina Constitution mandates the General Assembly to enact legislation providing for the regulation of elections (article II, section 1), the registration of voters (article II, section 8), and "the fulfillment and integrity of the election process" (article II, section 10). Pursuant to that authority, the General Assembly enacted Title 7 of the South Carolina Code of Laws, in turn establishing the Election Commission to oversee the administration of elections and to maintain fair and fraud-free elections. *See* S.C. Code Ann. § 7-3-10(F) (charging the Election Commission with "promulgat[ing] regulations to establish standardized processes for the administration of elections and voter registration that must be followed by the county boards of voter registration and elections").

To that end, relevant here, section 7-5-186(A) requires the Election Commission to establish and maintain a statewide voter registration database and to "conduct an annual general registration list maintenance program to maintain accurate voter registration records in the statewide voter registration system." S.C. Code Ann. § 7-5-186(A).  Included in that list is the information the Election Commission collects pursuant to its statutory mandate for contents of voter registration applications. In particular, the application (and therefore the VRL) must contain a registrant's name, sex, race, social security number, date of birth, residential address and may

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

also include driver's license numbers, state-issued identification numbers, telephone numbers, email addresses, mailing addresses, location of prior voter registrations, voter registration agencies, and other data incident to voter registrations. S.C. Code Ann. § 7-5-170(2); *see also* S.C. Code Ann. § 7-5-185(B)(5) (requiring the same information for electronic applications for voter registration).

Furthermore, section 7-5-186(C) expressly provides,

> The State Election Commission *may enter into agreements to share information or data* with other states or groups of states, *as the commission considers necessary*, in order to maintain the statewide voter registration database established pursuant to this section. Except as otherwise provided in this subsection, the commission shall ensure that any information or data provided to the commission that is confidential in the possession of the state providing the data remains confidential while in the possession of the commission. *The commission may provide such otherwise confidential information or data to persons or organizations that are engaging in legitimate governmental purposes related to the maintenance of the statewide voter registration database.*

S.C. Code Ann. § 7-5-186(C) (Emphasis added). The plain language of the statute permits the Election Commission to share the requested information with "organizations" such as DOJ. Before perfecting the agreement, the Election Commission determines whether the DOJ MOU meets the state's statutory requirements for disclosure of voter personal information. If it does not, the Election Commission will not enter the agreement or share the VRL.

Much of the Family and Personal Identifying Information Privacy Protection Act is not relevant to this action. For instance, it requires state agencies to have privacy policies and to inform people that collected information might be disclosed, and it prohibits anyone from using personal information obtained from a government agency from using that information for commercial solicitation. *See* S.C. Code Ann. §§ 30-2-20, -40, -50(A). Specific to the section Crook cites in the heading of her motion, section 30-2-20 permits agencies to share personal information to "fulfill a legitimate public purpose." *Id*. § 30-2-20. Surely protecting the voter rolls fits that description. *See id*. § 7-3-10(G) (Commission must "comply with applicable state and federal election law").

Put simply, the statute's plain text authorizes the Election Commission to engage in the conduct Plaintiff hopes to enjoin. *See Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000) ("Under the plain meaning rule, it is not the province of the court to change the meaning of a clear and unambiguous statute.").

**Right to Privacy**

A statute gives a plaintiff the right to sue only if the General Assembly intended to create that right. *Denson v. Nat'l Cas. Co.*, 439 S.C. 142, 151, 886 S.E.2d 228, 233 (2023). "Generally, when a statute does not expressly create civil liability, a duty will not be implied unless the statute was enacted for the special benefit of a private party." *Id*. at 151–52, 886 S.E.2d at 233. Nothing in section 7-5-170 (or section 7-5-186) is for any special benefit of an individual. Instead, these statutes provide the framework how voters register and how the Election Commission handles the voter registration database. Bolstering this conclusion are other parts of Title 7, which expressly provide a person the right to challenge certain Election Commission actions. *See, e.g.*, S.C. Code Ann. §§ 7-5-230(C), 7-5-240.

Because there is no private cause of action conferred under these election statutes, the Plaintiff's standing hinges on whether or not her "right to privacy" has been implicated under South Carolina's Constitution. Article I, section 10 prohibits "unreasonable invasions of privacy." S.C. Const. art. I, § 10. That provision was intended "to take care of the invasion of privacy through modern electronic devices." Committee to Make a Study of the Constitution of South Carolina, 1895, *Minutes of Committee Meeting* 6 (Sept. 15, 1967). It sought "to protect the citizen from improper use of electronic devices, computer data banks, etc." Committee to Make a Study of the Constitution of South Carolina, 1895, *Final Report of the Committee to Make a Study of the South Carolina Constitution of 1895*, at 15 (1969). As originally understood then, this provision has nothing to do with the sharing of data between the State and the federal government to secure federal elections.

This constitutional provision's current jurisprudence is not precisely clear, and there is limited case law on the issue. Therefore, this Court must look to several recent cases to ascertain and interpret the provision in light of the facts of this case. In *Planned Parenthood I*, the South Carolina Supreme Court interpreted the right to privacy as more than merely a search or seizure related protection. However, *Planned Parenthood I* was not directly overruled, but it was clearly supplanted by *Planned Parenthood II*. The first case's two dissenting opinions viewed the right to privacy in a more limited fashion, with Justice James' opinion keeping the provision within the search and seizure framework. *Planned Parenthood II* made it clear that while the majority

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

opinion ruled that the right to privacy encompassed more than the search and seizure context, it did so only for the purposes of that opinion.

> Second, *Planned Parenthood I* is a highly fragmented decision with five separate opinions. …we likewise decline to revisit the fragmented decision regarding the proper scope of the privacy provision. Rather, in the interest of unity, we will assume only for purposes of our analysis and decision **today** that the privacy provision reaches beyond the search and seizure context to include bodily autonomy. Accordingly, we go no further **today** than referencing *Singleton v. State*, which held that the interests protected by the privacy clause extend to bodily autonomy and integrity.

*Planned Parenthood S. Atl. v. State*, 440 S.C. 465, 481, 892 S.E.2d 121, 130 (2023), *reh'g denied* (Aug. 29, 2023) (emphasis added).  The Supreme Court made clear that in that case they were not making a definitive ruling as to the interpretation of the history and meaning of the constitutional provision in question.  *Id.* at 481 n.9 ("We elect not to address those threshold differences: for purposes of our analysis and decision today, we will cast aside a review of the history and relevance of the 1971 amendments to the state constitution that included the privacy provision, including the work of the West Committee.").

Courts will attempt to avoid making legal interpretations when they are unwarranted and superfluous to the ultimate decision.  The judiciary is not in the business of creating business but rather tasked with the simple job of making decisions related to past conduct and stating rules for predictability of future conduct.  It is often not necessary – and usually unproductive – to create more rules, more interpretations, and more disagreements on issues that are not directly impacted by the ultimate decision. However, because the standing of this Plaintiff hinges on whether or not her right to privacy could be violated, this Court must draw an interpretation as to what the constitutional provision means.

This trial court will never say what the law is or what it ought to be – but it will say what it believes the law is as promulgated by the South Carolina Supreme Court and the South Carolina General Assembly.  Following along the lines of the several opinions in *Planned Parenthood I*, in conjunction with prior precedent, this Court does not believe that this provision is implicated with the sharing of election data.  In his well-reasoned and thoroughly analyzed opinion, Justice James walks through the history and times of the constitutional amendments during the 1960s and 1970s, and particularly, how the right to privacy provision came about.  Without quoting verbatim the

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

opinion, this Court notes several passages to explain why it believes the right to privacy does not encompass the voter election data at issue in this case.

First, in a letter from the attorney general to West Committee Staff Consultant Robert H. Stoudemire, the attorney general explains the reason why the right to privacy needed to be added to the constitutional protections:

> In the first paragraph, General McLeod acknowledged that the proposed privacy provision "relate[d] to interception of communication which is generally done by electronic means." Letter from Daniel R. McLeod, S.C. Att'y Gen., to Robert H. Stoudemire, Staff Consultant, Comm. to Make a Study of the S.C. Const. (Oct. 2, 1967), 1967 WL 12658, at *1. He then noted an "additional factor [that] may be taken into consideration" is the "protection of privacy in areas such as information gotten through data processing." *Id.* The letter as a whole speaks solely in terms of "securing individual privacy in the field of data processing" and in terms of protecting against intrusions into privacy occasioned by (1) interception of communication and information by electronic means, (2) mass collection of data, (3) unguarded income tax and health information, and (4) unguarded information stored in computers. *Id.*

*Planned Parenthood S. Atl. v. State*, 438 S.C. 188, 339–40, 882 S.E.2d 770, 851–52 (2023), *reh'g denied* (Feb. 8, 2023).  Second, the final report related to this constitutional provision discusses the purpose of the added language:

> **Section J. Searches and seizures.** The Committee recommends that the historic provision on searches and seizures be retained. In addition, the Committee recommends that the citizen be given constitutional protection from an unreasonable invasion of privacy by the State. This additional statement is designed to protect the citizen from improper use of electronic devices, computer databanks, etc. Since it is almost impossible to describe all of the devices which exist or which may be perfected in the future, the Committee recommends only a broad statement on policy, leaving the details to be regulated by law and court decisions.

*Planned Parenthood S. Atl. v. State*, 438 S.C. 188, 338, 882 S.E.2d 770, 850–51 (2023), *reh'g denied* (Feb. 8, 2023).

But even as expanded in *Singleton v. State*, 313 S.C. 75, 89, 437 S.E.2d 53, 61 (1993), article I, section 10 still does not reach the sharing of the voter registration list. That case holds no more than that this provision might extend to "bodily autonomy and integrity." *Planned Parenthood S. Atl. v. State*, 440 S.C. 465, 481, 892 S.E.2d 121, 130 (2023). This Court would thus break new ground by applying article I, section 10 to the voter registration list—and with no way

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

to reconcile that conclusion with the "intent of [article I, section 10's] framers and the people who adopted it." *State v. Long*, 406 S.C. 511, 514, 753 S.E.2d 425, 426 (2014).

And of course, article I, section 10 "draws the line at *unreasonable* invasions of privacy." *Planned Parenthood S. Atl.*, 440 S.C. at 482, 892 S.E.2d at 131 (emphasis added). So even if this provision were implicated by the sharing of voter registration lists, this provision would be violated only if the Commission would act unreasonably to provide information to the federal government. This Court does not believe there would be an unreasonable invasion of privacy for the Election Commission to turn over its data to the DOJ.

### Separation of Powers

Plaintiff seeks an injunction preventing the Election Commission from sharing any such information absent an "adequate" MOU, subject to review by this Court. This Court cannot supersede the Election Commission's discretion to enter such agreements specifically conferred by statute. In a similar vein, in the first instance, the Election Commission alone is charged with ensuring that an MOU "adequately protects" the rights of the South Carolina electorate, including Plaintiff. Requesting this Court to mandate an MOU and to assess its adequacy would improperly entangle the judiciary in the routine operations of the Election Commission. Such involvement would offend foundational separation of powers principles (article 1, section 8 of the South Carolina Constitution) and undermine the independence of the executive agency by inserting judicial oversight into the Election Commission's discharge of its statutory duties and responsibilities. *State ex rel. McLeod v. McInnis*, 278 S.C. 307, 312, 295 S.E.2d 633, 636 (1982) ("One of the prime reasons for separation of powers is the desirability of spreading out the authority for the operation of the government. It prevents the concentration of power in the hands of too few, and provides a system of checks and balances. The legislative department makes the laws; the executive department carries the laws into effect; and the judicial department interprets and declares the laws.").

### Federal law

Federal law likely requires the Election Commission to provide the requested information to DOJ, and while DOJ has also pointed to the National Voter Registration Act and the Help America Vote Act, Title III alone is sufficient to reach that conclusion. Title III requires that, for

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

22 months after a federal election, a state election official "retain and preserve" "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. Title III has long been understood to "encompass[], among other things, voting registration records," *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985), which is not surprising given the scope of the statutory text. And since HAVA's enactment two decades ago, registration records must include either "the applicant's driver's license number" or "the last four digits of the applicant's social security number." 52 U.S.C. § 21083(a)(5)(A). The Attorney General (or his representative) may demand in writing "[a]ny record or paper" that a state election official must keep under § 20701. *Id*. § 20703. That demand must simply "contain a statement of the basis and the purpose therefor." *Id*.

DOJ's request for South Carolina's voter registration list fits comfortably within this legal framework. For starters, the voter registration list from the 2024 election is a "record" in a state election official's possession "relating to" the "registration" of voters for the 2024 election. *Id*. § 20701. And that registration now includes either a driver's license number or the last four digits of a Social Security number. *Id*. § 21083(a)(5)(A). DOJ made this request "in writing" and explained its "basis" and "purpose" of ensuring that the State was complying with HAVA and the NVRA. *Id*. § 20703; *see* Compl. Exs. 1 & 2 (DOJ letters).

## Conclusion

### *State Sovereignty*

This Court finds that federal law likely preempts state law in this area simply because of how this Court has to frame the issue. This case is about whether a citizen can likely succeed on the merits of challenging a State action in compliance with its own interpretation of federal law. And the State at this point has interpreted the law as requiring compliance with the federal request. It is not framed as the State *challenging* the federal request to a state agency. This Court has grave concerns about federal overreach and encroachment over this State's sovereignty. However, because this Court rules on the issue at hand, it does not discuss this issue further. As stated by Chief Justice John Roberts of the United States Supreme Court:

> Outside the strictures of the Supremacy Clause, States retain broad autonomy in structuring their governments and pursuing legislative objectives. Indeed, the

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

Constitution provides that all powers not specifically granted to the Federal Government are reserved to the States or citizens. Amdt. 10. This "allocation of powers in our federal system preserves the integrity, dignity, and residual sovereignty of the States." *Bond v. United States,* 564 U.S. ——, ——, 131 S.Ct. 2355, 2364, 180 L.Ed.2d 269 (2011). But the federal balance "is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power." *Ibid.* (internal quotation marks omitted).  More specifically, " 'the Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections.' " *Gregory v. Ashcroft,* 501 U.S. 452, 461–462, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991)

*Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 543, 133 S. Ct. 2612, 2623, 186 L. Ed. 2d 651 (2013).

For the reasons stated above, the Motion for Temporary Injunction is **DENIED**.  The Governor's Motion to Dismiss is continued.

**AND IT IS SO ORDERED.**

_____

The Honorable Daniel McLeod Coble

October 1, 2025

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539



Richland Common Pleas

**Case Caption:**     Anne  Crook vs   South Carolina Election Commission , defendant, et
al

**Case Number:**     2025CP4006539

**Type:**               Order/Other


So Ordered

s/ Daniel Coble, 2774


Electronically signed on 2025-10-01 11:10:17     page 13 of 13

# EXHIBIT 6



**U.S. Department of Justice**

Civil Rights Division

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

June 4, 2025

Wisconsin Elections Commission
201 W. Washington Avenue
Madison, WI 53703
elections@wi.gov

The U.S. Election Assistance Commission
633 3rd Street NW, Suite 200
Washington, DC 20001
ckelliher@eac.gov

      Re:   State of Wisconsin elections violation under Help America Vote Act

Election Commissioners,

      As the State of Wisconsin's chief election officials, you are required to follow federal laws, including the Help America Vote Act ("HAVA"). Ensuring election integrity is of the highest degree of importance for my administration at the Civil Rights Division of the Department of Justice. As the Supreme Court has recognized the preservation of the integrity of the election process is a compelling interest. *Brnovich v. Democratic Nat'l Comm.,* 594 U.S. 647, 647 (2021).

      Section 21112 (Sec. 402) of HAVA requires that each state establish a state-based administrative complaint procedure to enable voters to file a complaint regarding a HAVA violation they may observe or experience while voting. Meeting this requirement is a condition of receiving HAVA funding from the federal government. Records indicate that to date, Wisconsin has received over $77,000,000 in federal funding from the U.S. Election Assistance Commission.[1]

Under HAVA, the administrative process is required to be:
(1)   Uniform and nondiscriminatory,
(2)   Allow any person who believes that there is a violation of any provision of subchapter III of HAVA (including a violation which has occurred, is occurring, or is about to occur) to file a complaint,
(3)   If the complainant requests, there shall be a hearing on the record,
(4)   If the state determines that there is a violation, it shall provide an appropriate remedy, and

---

[1]  https://www.eac.gov/funding-levels-by-state

(5)    If the state determines that there is no violation, the state shall dismiss the complaint and publish the results.

Quite surprisingly, we have learned that the Wisconsin Elections Commission has refused to provide any administrative complaint process or hearing regarding HAVA complaints against the Commission.  Rather, Wisconsin has decided to rely on a 2022 state court case opining that the Commission cannot police itself. (See attached letter).

These very actions by the Commission have left complainants alleging HAVA violations by the Commission without any recourse.  The consequences were summarized by a federal judge who opined that the Commission's failure to provide a hearing to those who allege a HAVA complaint against the Commission are left without any decision or interpretation of the law.  With no opportunity or means to appeal, complainants are left stranded with their grievances. *See Wis. Voter All. v. Millis*, 720 F. Supp. 3d 703.

We are hereby notifying the U.S. Election Assistance Commission of Wisconsin's failure to follow federal elections laws.  Your actions justify a bar against the Wisconsin Elections Commission receiving any future funding from the U.S. Election Assistance Commission.

In addition to this formal notification, we fully expect that Wisconsin's Election Commission will immediately come into compliance with all federal election laws, including HAVA, forthwith.  If you have any questions about this letter, please contact Deputy Assistant Attorney General of the Civil Rights Division, Michael Gates, at michael.gates2@usdoj.gov.

Regards,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

Attachment:  2022 WEC letter