## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         Plaintiff,<br><br>   v.<br><br>WISCONSIN ELECTIONS COMMISSION,<br>*et al.*,<br><br>         Defendants. | Civil Action No. 3:25-cv-1036 |

## MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE

## INTRODUCTION

The Department of Justice ("DOJ") recently embarked on an unprecedented nationwide campaign to amass a wide array of highly sensitive personal information on voters in a centralized database. In connection with this effort, DOJ sued the Wisconsin Elections Commission, its administrator, and its commissioners (collectively, "WEC") on December 18, 2025, seeking to compel production of Wisconsin's complete and unredacted voter registration list, which contains sensitive and private information about every voter in Wisconsin. But Wisconsin law permits disclosure of only select categories of information about registered voters. *See* Wis. Stat. § 6.36(1)(b)1.a. Wisconsin election officials may not release data containing "the date of birth, operator's license number, or social security account number of an elector" under that statute except in specific circumstances inapplicable here. *Id.*

The Department of Justice's assault intrudes not only on Wisconsin's constitutional prerogative to maintain and protect its own voter registration list—and the explicit guarantees that Wisconsin has made to voters that their private information will not be shared—but also on the privacy rights of individual Wisconsin voters who have good reason to fear their personal information being handed over to the federal government. This includes the members of the Wisconsin Alliance for Retired Americans and Forward Latino, a Wisconsin non-profit organization (collectively, "Proposed Intervenors"), both of which seek to intervene to protect its members' privacy rights by preventing disclosure of their sensitive personal information to DOJ. Proposed Intervenors also seek to protect their own mission-critical efforts to empower communities worried about retaliation and scrutiny by the federal government. These latter concerns are of particular importance to Forward Latino, which fears the improper dissemination of its members' private voter information will result in its members' wrongful purge from

Wisconsin's voter list or the targeting of its members for denaturalization, a growing Trump administration priority.

Proposed Intervenors are entitled to intervene as a matter of right because they have significant interests that are at serious risk of impairment by the relief sought in this action, and the existing parties do not adequately represent those interests. *See* Fed. R. Civ. P. 24(a). Most significantly, Proposed Intervenors have an interest in ensuring that their members' sensitive and personal information is not improperly disclosed to DOJ. Although WEC has thus far resisted disclosure, WEC does not adequately represent the Proposed Intervenors or their members. As a governmental defendant, WEC must consider "broader public-policy implications" of the issues presented in this suit, while Proposed Intervenors are solely concerned with protecting its members' privacy and voting rights—"full stop." *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 196 (2022) (citing *Trbovich v. United Mine Workers*, 404 U.S. 528, 538–39 (1972)). Unsurprisingly, in cases involving DOJ's nationwide crusade for voter data, other federal courts have already granted intervention as of right to similarly situated intervenors seeking to prevent DOJ from accessing their members' data—including to the Alliance's sister chapters in Michigan and New Mexico. *See United States v. Benson*, No. 1:25-cv-01148, 2025 WL 3520406 (W.D. Mich. Dec. 9, 2025) (granting intervention as of right to Michigan Alliance for Retired Americans); Ex. B (Minute Order, *United States v. Oliver*, No. 1:25-cv-01193 (D.N.M. Dec. 15, 2025), Dkt. No. 9) (granting unopposed motion for intervention as of right to New Mexico Alliance for Retired Americans); *see also United States v. Oregon*, No. 6:25-cv-01666, 2025 WL 3496571 (D. Or. Dec. 5, 2025) (granting intervention as of right to Oregon social welfare organization).

Alternatively, the Proposed Intervenors should be granted permissive intervention under Rule 24(b) to ensure that Wisconsin voters themselves have a voice in this case, the core subject

of which is the disclosure of *their* personal information. At a minimum, the Proposed Intervenors' presence will help to develop the issues and ensure vigorous presentation of arguments that the existing Defendant may be limited in presenting. Those considerations weigh strongly in favor of permissive intervention, as demonstrated by the recent permissive interventions granted to voters and nonprofit organizations in cases where DOJ is similarly seeking other states' voter data. *See* Ex. C (Mins. Of Mot. Hr'g, *United States v. Weber*, No. 25-cv-09149 (C.D. Cal. Nov. 24, 2025), Dkt. No. 70) (granting permissive intervention by oral order); Ex. D (Order, *United States v. Bellows*, No. 1:25-cv00468 (D. Me. Dec. 12, 2025), Dkt. No. 49) (granting intervention to voters).

## BACKGROUND

### I.    Federal law has long made voter list maintenance a state responsibility, consistent with the constitutional separation of powers.

The U.S. Constitution "invests the States with responsibility for the mechanics" of elections, subject to any decision by Congress to "preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997); *see also* U.S. Const. art. I, § 4, cl. 1. As a default matter, the Constitution assigns states the responsibility for determining voter eligibility and maintaining lists of eligible voters. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 17 (2013).

Although Congress has enacted certain laws governing voter registration, these laws augment existing "state voter-registration systems," *id.* at 5, and confirm that states are the custodians of voter registration data. For example, Congress in 1993 enacted the National Voter Registration Act ("NVRA") to serve "two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018); *see also* 52 U.S.C. § 20501(b). The law charges *states*—not the federal government—with "administration of voter registration for elections for Federal office," 52 U.S.C. § 20507(a), including as to maintaining voter lists (subject to strict procedural

3

safeguards), *id.* § 20507(c)–(g). It similarly makes *states* the custodians of voter lists. *See Husted*, 584 U.S. at 761. And "the NVRA does not apply to Wisconsin" at all, because of its longstanding election day registration process. *See Pub. Int. Legal Found., Inc. v. Wolfe*, No. 24-CV-285-JDP, 2024 WL 4891940, at *3 (W.D. Wis. Nov. 26, 2024) (citing 52 U.S.C. § 20503(b)(2)).

In the wake of the 2000 elections, Congress enacted the Help America Vote Act ("HAVA") "to improve voting systems and voter access." *RNC v. N.C. State Bd. of Elections*, 120 F.4th 390, 394 (4th Cir. 2024). Like the NVRA, HAVA regulates how states maintain their voter rolls, requiring them to create a "computerized statewide voter registration list." 52 U.S.C. § 21083(a)(1). It also requires states to "perform list maintenance" consistent with the NVRA. *Id.* § 21083(a)(2). HAVA is abundantly clear that this list is to be "defined, maintained, and administered at the State level." *Id.* § 21083(a)(1)(A) (emphasis added). Indeed, HAVA's legislative history stressed the importance of maintaining our decentralized electoral system to preserving liberty:

> Historically, elections in this country have been administered at the state and local level. This system has many benefits that must be preserved. The dispersal of responsibility for election administration has made it impossible for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome. This leaves the power and responsibility for running elections where it should be, in the hands of the citizens of this country.

H.R. Rep. No. 107-329, pt. 1, at 31–32 (2001).

Consistent with that principle, neither the NVRA nor HAVA tasks the federal government with compiling a federal national voter registration list. Congress has traditionally "left it up to the States to maintain accurate lists of those eligible to vote in federal elections," *Husted*, 584 U.S. at 761, subject only to the specific requirements of HAVA and (in some states but not in Wisconsin) the NVRA, which purposefully operate through the states themselves.

II.  **The Department of Justice has embarked on an unprecedented nationwide campaign to amass personal voter registration data held by the states.**

This spring, DOJ launched a campaign to demand broad and unprecedented access to state voter files, including personal information about each registered voter. To date, DOJ has sent demands to more than forty states, with plans to make similar demands on all fifty.[1] It seeks to use the data to create a national voter database that will, in turn, be used in an attempt to substantiate President Trump's unfounded accusations that millions of non-citizens have voted illegally in recent elections. *See* Barrett & Corasaniti, *supra* note 1. The vast majority of states that have received such demands—including those led by Republican officeholders—have refused to comply, declining to turn over sensitive personal information that is typically protected by state law.[2]

The pressure campaign against Wisconsin began on June 4, 2025, when DOJ sent WEC a letter alleging that Wisconsin was failing to comply with HAVA. Dkt. No. 3-1 at 34–35. DOJ followed with a second letter on June 17, 2025, requesting that WEC answer a myriad of questions and also provide "the current voter registration list," including "both active and inactive voters." Dkt. No. 3-1 at 2–3. WEC responded on July 2, 2025, answering each of the June 17 letter's questions and directing DOJ to an online portal through which voter data is made available to the public. Dkt. No. 3-1 at 5–9. Months later, on December 2, 2025, DOJ sent an email demanding

---

[1] *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Dec. 5, 2025), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information [https://perma.cc/966Z-NS7S]; Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sep. 9, 2025), https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html [https://perma.cc/8VP4-WRXD].

[2] *See* Martinez-Ochoa, O'Connor, & Berry, *supra* note 1 (seven states have given DOJ everything it sought: Arkansas, Indiana, Kansas, Louisiana, Mississippi, Tennessee, and Wyoming).

WEC provide an "electronic copy of the full Wisconsin statewide voter registration list," including "either the last four digits of the social security number, the driver's license number, or both." Dkt. No. 3-1 at 11. WEC responded on December 11, 2025, explaining what data it can and cannot provide under the applicable federal and state laws. Dkt. No. 3-1 at 13–18. DOJ responded with this lawsuit.

### III.    The Department of Justice sues Wisconsin to obtain its voter registration list.

DOJ filed this suit on December 18, 2025, seeking to compel Wisconsin to provide its full and unredacted statewide voter registration list. *See generally* Dkt. No. 1. DOJ frames its suit chiefly as seeking to ensure that Wisconsin is complying with its obligations under HAVA. *Id.* ¶¶ 12–13, 17–23. But DOJ does not bring any claims under HAVA. Instead, its sole claim is brought under Section 303, a Civil Rights-era law that permits DOJ to review certain voting "records and papers which come into [the Secretary's] possession," 52 U.S.C. §§ 20701–20703, for the purpose of enabling investigations "concerning infringement or denial of . . . constitutional voting rights." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).

Congress enacted Section 303 to preserve "the right of all qualified citizens to vote without discrimination on account of race," and specifically to facilitate "investigation[s]" authorized under the Civil Rights Act of 1957, which recalcitrant local officials had frustrated through the destruction of records. H.R. Rep. No. 86-956, at 1944 (1959). This history "leaves no doubt but that [Section 303] is designed to secure a more effective protection of the right to vote." *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961). DOJ *admits* it is not seeking to enforce these laws or investigate the unconstitutional denial of the right to vote. Instead, DOJ claims to be evaluating

Wisconsin's compliance with HAVA. *See* Compl. ¶¶ 10–11.[3] The Civil Rights Act thus has no application here.

And it is notable that, while DOJ asserted HAVA (and NVRA) claims in otherwise nearly identical complaints it brought against a series of other states that similarly have refused to turn over sensitive voter data, DOJ has abandoned those claims in its newest wave of these lawsuits, including this one against Wisconsin.[4] DOJ's change of tactic is an implicit admission that it does not believe it has a basis to pursue these actions under HAVA, and in that regard, DOJ is correct.

---

[3] Even if Section 303 did apply, it does not prohibit states from redacting confidential and sensitive voter information that has nothing to do with investigating the denial of the right to vote, just as they may under the NVRA. *See Voter Reference Found., LLC v. Torrez*, --- F.4th ----, No. 24-2133, 2025 WL 3280300, at *9 n.14 (10th Cir. Nov. 25, 2025); *PILF v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024).

[4] The United States filed eight cases in September, alleging claims under the NVRA, HAVA, and the Civil Rights Act of 1960. *See* Compl., *United States v. Bellows*, No. 25-cv-468 (D. Me. Sep. 16, 2025), Dkt. No. 1; Compl., *United States v. Oregon*, No. 25-cv-1666 (D. Or. Sep. 16, 2025), Dkt. No. 1; Compl., *United States v. Weber*, No. 25-cv-09149 (C.D. Cal. Sep. 25, 2025), Dkt. No. 1; Compl., *United States v. Bd. of Elections of N.Y.*, No. 25-cv-1338 (N.D.N.Y. Sep. 25, 2025), Dkt. No. 1; Compl., *United States v. Benson*, No. 25-cv-1148 (W.D. Mich. Sep. 25, 2025), Dkt. No. 1; Compl., *United States v. Simon*, No. 25-cv-3761 (D. Minn. Sep. 25, 2025), Dkt. No. 1; Compl., *United States v. Scanlan*, No. 25-cv-371 (D.N.H. Sep. 25, 2025), Dkt. No. 1; Compl., *United States v. Pennsylvania*, No. 25-cv-1481 (W.D. Pa. Sep. 25, 2025), Dkt. No. 1.

The fourteen subsequent cases filed in December, including this one, allege only a claim under the Civil Rights Act of 1960. *See* Compl., *United States v. Albence*, No. 25-cv-01453 (D. Del. Dec. 2, 2025), Dkt. No. 1; Compl., *United States v. DeMarinis*, No. 25-cv-03934 (D. Md. Dec. 1, 2025), Dkt. No. 1; Compl., *United States v. Toulouse Oliver*, No. 25-cv-1193 (D.N.M. Dec. 2, 2025), Dkt. No. 1; Compl., *United States v. Amore*, No. 25-cv-00629 (D.R.I. Dec. 2, 2025), Dkt. No. 1; Compl., *United States v. Copeland Hanzas*, No. 25-cv-903 (D. Vt. Dec. 2, 2025), Dkt. No. 1; Compl., *United States v. Hobbs*, No. 25-cv-6078 (W.D. Wash. Dec. 2, 2025), Dkt. No. 1; Compl., *United States v. Griswold*, No. 25-cv-03967 (D. Colo. Dec. 11, 2025), Dkt. No. 1; Compl., *United States v. Nago*, No. 25-cv-00522 (D. Haw. Dec. 11, 2025), Dkt. No. 1; Compl., *United States v. Galvin*, No. 25-cv-13816 (D. Mass. Dec. 12, 2025), Dkt. No. 1; Compl., *United States v. Aguilar*, No. 25-cv-00728 (D. Nev. Dec. 2, 2025), Dkt. No. 1; Compl., *United States v. D.C. Bd. of Elec.*, No. 25-cv-04403 (D.D.C. Dec. 18, 2025), Dkt. No. 1; Compl., *United States v. Raffensperger*, No. 25-cv-00548 (M.D. Ga. Dec. 18, 2025), Dkt. No. 1; Compl., *United States v. Matthews*, No. 25-cv-03398 (C.D. Ill. Dec. 18, 2025), Dkt. No. 1.

HAVA does not require states to disclose voter registration materials to the federal government, and DOJ's Complaint and letter correspondence to the Secretary cite no case law or other authority for the radical proposition that DOJ's authority to enforce HAVA's "uniform and nondiscriminatory" requirements entitles it to unfettered access to state voter registration lists upon demand. 52 U.S.C. § 21111.

## IV.    Sensitive personal information of Proposed Intervenors' members is placed in jeopardy by DOJ's demands.

Wisconsin law protects against unauthorized disclosure of sensitive personal information. *See* Wis. Stat. § 6.36(1)(b)1.a. Proposed Intervenors and their members rely upon Defendants' compliance with this law, and DOJ's attempted data grab threatens their cherished privacy. In addition to defending their privacy interests, Proposed Intervenors have well-founded concerns about DOJ's intended use of their sensitive personal information, particularly because the current presidential administration has repeatedly disregarded privacy protections over sensitive personal data. For example, public reports have indicated that the Department of Government Efficiency placed the security of millions of Social Security numbers at risk through improper maintenance.[5] Recently, the National Archives allegedly released the military records of a New Jersey gubernatorial candidate in violation of the Privacy Act, with the apparent aim of seeking to help her opponent.[6]

---

[5] *See* Nicholas Nehamas, *DOGE Put Critical Social Security Data at Risk, Whistle-Blower Says*, N.Y. Times (Aug. 26, 2025), https://www.nytimes.com/2025/08/26/us/politics/doge-social-security-data.html.

[6] *See* Caroline Vakil, *Sherrill campaign slams release of military records to opponent's ally*, The Hill (Sept. 25, 2025), https://perma.cc/8WZB-994P.

And critically, DOJ is not hiding the ball here. As Assistant Attorney General Harmeet Dhillon recently admitted in an interview regarding these lawsuits: "You're going to see hundreds of thousands of people in some states being removed from the voter rolls."[7]

The administration's demonstrated disdain for the civic participation of naturalized citizens fuels concerns that naturalized citizens will be targeted. For example, President Trump himself has warned that immigrants are an invading force that will "nullify the will of the actual American voters."[8] In January 2025, President Trump issued an executive order purported to halt birthright citizenship guaranteed by the Fourteenth Amendment. *See* Exec. Order No. 14,160, *Protecting the Meaning and Value of American Citizenship*, 90 Fed. Reg. 8449 (Jan. 20, 2025). In March 2025, President Trump issued an executive order that, among other things, would require anyone registering to vote in federal elections to provide documentary proof of citizenship. *See* Exec. Order No. 14,248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 25, 2025). At the same time, U.S. Citizenship and Immigration Services ("USCIS") has announced plans to make the citizenship test more difficult.[9] In June 2025, DOJ made denaturalization of U.S. citizens a top enforcement priority.[10] In early December 2025, dozens of people who had already satisfied the requirements for citizenship were plucked from the line at their naturalization ceremonies in several cities and informed by USCIS that they were no longer

---

[7] @AAGHarmeetDhillon, X.com (Dec. 18, 2025), https://x.com/AAGDhillon/status/2001659823335616795.

[8] James Oliphant, *Trump says Biden's border policies are a 'conspiracy to overthrow' the US*, Reuters (Mar. 3, 2024), https://www.reuters.com/world/us/trump-says-bidens-borderpolicies-are-conspiracy-overthrow-us-2024-03-02.

[9] Ja'han Jones, *Trump admin's proposed changes to citizenship test could slow immigration*, MSNBC (Sep. 8, 2025), https://www.msnbc.com/top-stories/latest/us-citizenship-testchanges-edlow-rcna229941 [https://perma.cc/9AH5-DQ54].

[10] Memorandum, U.S. Dep't of Justice, Civil Division Enforcement Priorities (June 11, 2025), https://www.justice.gov/civil/media/1404046/dl.

eligible.[11] And just this week, USCIS issued guidance to its field offices demanding that they generate 100 to 200 new denaturalization cases a month.[12]

    As a result, the core interests of both the Wisconsin Alliance for Retired Americans and of Forward Latino are threatened by DOJ's brash demands here.

    ***Wisconsin Alliance for Retired Americans.*** The Alliance is a 501(c)(4) nonprofit, social welfare organization and the Wisconsin statewide affiliate of the national Alliance for Retired Americans. Decl. of Ross Winklbauer, Sr. ("Winklbauer Decl.") ¶ 2. It represents nearly 100,000 members across the State of Wisconsin, comprising primarily of retirees from public- and private-sector unions, who are politically active and engaged. *Id.* ¶¶ 2–3. The Alliance is dedicated to ensuring social and economic justice, as well as full civil rights, for all retirees in Wisconsin. *Id.* ¶ 4. Naturally, encouraging political participation is central to its mission. *Id.* ¶¶ 4–5. The Alliance has concerns about DOJ's intended use of its members' sensitive personal voter information. *Id.* ¶¶ 6–8. These concerns are especially acute given the threat that the voter registration process will be weaponized against the Alliance's members by the current presidential administration, *id.* ¶ 9, which has repeatedly disregarded privacy protections over sensitive personal data. The Alliance is further concerned about the substantial intrusion of its members' privacy, which is threatened by the DOJ's attempt to obtain Wisconsin's complete and unredacted voter registration lists. *Id.* ¶¶ 8–11. Many of the Alliance's members, for example, are concerned about the risks of social security fraud, identify theft, and other types of fraud frequently targeted at older Americans. *Id.* ¶ 8. The

---

[11] Billal Rahman, *Fear grips naturalization ceremonies—'Plucked out of line'*, Newsweek (Dec. 8, 2025), https://www.newsweek.com/fear-grips-us-naturalization-ceremonies-plucked-out-of-line-11173755.

[12] Hamed Aleaziz, *Trump Administration Aims to Strip More Foreign-Born Americans of Citizenship*, N.Y. Times (Dec. 17, 2025), https://www.nytimes.com/2025/12/17/us/politics/trump-immigration-citizenship-denaturalization.html.

Alliance fears disclosure of Wisconsin's voter registration list to the DOJ will deter the Alliance's members from engaging in the electoral process and discourage them from registering to vote out of fear that their personal information will be mishandled, or worse, weaponized. *Id.* ¶ 10. This deterrence will harm the Alliance's civic engagement work, by diminishing the effectiveness of those efforts, and thereby impair the organization's mission. *Id.*

**Forward Latino.** With a mission of strengthening democracy and standing up for equality and civil rights, Forward Latino works with Latino communities across the country—including in Wisconsin—to encourage their civic participation. Decl. of Darryl Morin ("Morin Decl.") ¶ 4. Forward Latino views DOJ's efforts to obtain Wisconsin's complete, statewide voter registration list—and all the sensitive, personal information contained within it—as an alarming overreach by the federal government, one that threatens to deter and disenfranchise members of the Latino community, including Forward Latino's members, from civic participation. *Id.* ¶¶ 9–10. This includes, in particular, Forward Latino's members who are naturalized citizens. *Id.* ¶¶ 11–12. Thousands of naturalized citizens in Wisconsin, including Forward Latino's members, lawfully registered to vote after attaining citizenship. *Id.* ¶ 13. However, many of these individuals obtained their driver's license before they became citizens. *Id.* Because Wisconsin does not require newly naturalized citizens to update Department of Transportation records with their citizenship status, state records may not accurately reflect the citizenship status of these eligible voters. *Id.* These voters face a substantial risk that they will be mistakenly purged from the voter rolls. *Id.* Forward Latino also fears this effort will be used to target its members for denaturalization, a growing priority of the Trump administration. *Id.* ¶¶ 11, 15. Under these circumstances, Forward Latino reasonably fears DOJ's demands, particularly if successful, will frustrate Forward Latino's civic engagement and get-out-the-vote efforts of its members, especially those who are naturalized

citizens, who may opt out of registering and voting if they know that the federal government may scrutinize their rights to civic participation. *Id.* ¶¶ 17–18.

## LEGAL STANDARD

Rule 24(a)(2) "is straightforward: the court *must* permit intervention if (1) the motion is timely; (2) the moving party has an interest relating to [the subject matter] at issue in the litigation; and (3) that interest may, as a practical matter, be impaired or impeded by disposition of the case." *Driftless Area Land Conservancy v. Huebsch*, 969 F.3d 742, 746 (7th Cir. 2020). "A proposed intervenor who satisfies these three elements is *entitled* to intervene *unless* existing parties adequately represent his interests." *Id.* (emphasis in original). Courts "construe Rule 24(a)(2) liberally and should resolve doubts in favor of allowing intervention." *Michigan v. U.S. Army Corps of Eng'rs*, No. 10-CV-4457, 2010 WL 3324698, at *2 (N.D. Ill. Aug. 20, 2010). "In accordance with this liberal construction, courts must accept as true the non-conclusory allegations of the motion a proposed intervenor makes." *Elouarrak v. Firstsource Advantage, LLC*, No. 1:19-cv-03666, 2020 WL 291364, at *1 (N.D. Ill. Jan. 21, 2020) (quotation marks omitted).

Courts also have discretion to grant permissive intervention if the movant has "a claim or defense that shares with the main action a common question of law or fact," if doing so will not "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b). Permissive intervention should not be denied solely because a proposed intervenor failed to prove an element of intervention as of right. *Sec. Ins. Co. of Hartford v. Schipporeit, Inc*., 69 F.3d 1377, 1381 (7th Cir. 1995).

## ARGUMENT

**I.    Proposed Intervenors are entitled to intervene as of right under Rule 24(a)(2).**

**A.    This Motion is timely.**

Proposed Intervenors' motion—filed a mere two days after DOJ brought suit and before any case schedule has been set—is plainly timely. To determine timeliness, courts consider "(1) the length of time the intervenor knew or should have known of his interest in the case; (2) the prejudice caused to the original parties by the delay; (3) the prejudice to the intervenor if the motion is denied; (4) any other unusual circumstances." *Lopez-Aguilar v. Marion Cnty. Sheriff's Dep't*, 924 F.3d 375, 388 (7th Cir. 2019) (quotation marks omitted). There has been no delay, and there is no risk of prejudice to the other parties. Indeed, WEC has not even entered an appearance. Proposed Intervenors easily satisfy the timeliness requirement.

**B.    As other courts have recognized in parallel litigation, the Proposed Intervenors have an interest in protecting their members' sensitive and personal information from improper disclosure to DOJ.**

Proposed Intervenors have significant protectable interests in this lawsuit that would be impaired by the improper disclosure of data that DOJ seeks to compel. In assessing whether an interest is "impair[ed] or impede[d]," Fed. R. Civ. P. 24(a)(2), courts "look[] to the practical consequences of denying intervention." *Nat. Res. Def. Council v. Costle*, 561 F.2d 904, 909 (D.C. Cir. 1977) (quotation marks omitted). If a proposed intervenor would be "substantially affected in a practical sense" by the outcome of a case, "he should, as a general rule, be entitled to intervene." *U.S. Army Corps of Eng'rs*, 2010 WL 3324698, at *3 (quoting Fed. R. Civ. P. 24 advisory committee's note to 1966 amendment). The Seventh Circuit has "interpreted statements of the Supreme Court as encouraging liberality in the definition of an interest." *Lopez-Aguilar*, 924 F.3d at 392. Furthermore, "[t]he interest requirement may be judged by a more lenient standard if the case involves a public interest question or is brought by a public interest group." *Brumfield v.*

*Dodd*, 749 F.3d 339, 344 (5th Cir. 2014) (quoting 6 Moore's Federal Practice § 24.03[2][c] (3d ed. 2008)).[13]

Here, the Proposed Intervenors represent thousands of registered Wisconsin voters who oppose the disclosure of their sensitive personal information to the federal government. *See supra* Background Part IV. The risk of disclosure alone, and of accompanying adverse consequences, is enough to satisfy Rule 24(a). *See Doe v. Oberweis Dairy*, 456 F.3d 704, 718 (7th Cir. 2006) (recognizing privacy interest as sufficient interest for entitlement to intervention); *see also DOJ v. Reps. Comm. For Freedom of the Press*, 489 U.S. 749, 763 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.") And multiple federal courts have held as much in the DOJ's parallel cases seeking state voter data, granting intervention as of right to the Wisconsin Alliance's sister chapters, including the Michigan Alliance for Retired Americans and the New Mexico Alliance for Retired Americans. *See Benson*, 2025 WL 3520406 (granting intervention as of right to Michigan Alliance for Retired Americans); Ex. B (Minute Order, *United States v. Oliver*, No. 1:25-cv-01193 (D.N.M. Dec. 15, 2025), Dkt. No. 9) (granting intervention as of right to New Mexico Alliance for Retired Americans); *see also Oregon*, 2025 WL 3496571 (granting intervention as of right to Oregon social welfare organization).

Importantly, the voter registration data of the Proposed Intervenors' members is protected from disclosure under Wisconsin law, including specifically the data that DOJ seeks. *See* Wis.

---

[13] Although the Seventh Circuit has stated that a proposed intervenor must have a "unique" interest, Rule 24(a)(2) "demands only that an interest belong to the would-be intervenor in its own right, rather than derived from the rights of an existing party." *Bost v. Ill. State Bd. of Elections*, 75 F.4th 682, 687 (7th Cir. 2023). There is no requirement to demonstrate "a right that belongs *only* to the proposed intervenor, or even a right that belongs to the proposed intervenor *and not to* the existing party." *Id*. (emphasis in original).

Stat. § 6.36(1)(b)1.a. And the Proposed Intervenors are credibly concerned about the consequences of the disclosure of their sensitive information to DOJ, both because of the potential risk of data breaches that would expose them to identity theft scams, and because of the potential for retaliation by the federal government against voters who engage in political advocacy work disfavored by the current administration, or who are simply disfavored given their status as naturalized citizens. Winklbauer Decl. ¶¶ 8–9; Morin Decl. ¶¶ 11–15. Furthermore, these privacy interests implicate the right to vote, and Proposed Intervenors have a substantial interest in preserving their members' "right to vote privately," *Powell v. Benson*, No. 20-CV-11023, 2020 WL 5229104, at *5 (E.D. Mich. Sept. 2, 2020), and in ensuring that right is not unlawfully burdened, *see, e.g.*, *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 434–35 (5th Cir. 2011) (reversing denial of intervention and concluding voting-right interest was "sufficient interest").

DOJ's efforts also threaten the Proposed Intervenors' missions, both of which have missions to increase the civic participation of the memberships they serve. *See* Winklbauer Decl. ¶¶ 4–5, 7, 10; Morin Decl. ¶¶ 4–9. The Alliance's members are predominantly senior citizens, who are frequently targets of identity theft scams, and many members are also concerned about the prospect of political retaliation against disfavored political advocacy. *See* Winklbauer Decl. ¶¶ 3, 8. If members know their sensitive identifying information will be disclosed to a federal government that they do not trust to handle it with care, some members may opt out of voter registration and political engagement altogether, thus undermining the Alliance's core mission. *Id.* ¶ 9–10. Forward Latino, for its part, fears that its members, especially those who are naturalized citizens, may opt out of registering and voting if they know that the federal government may scrutinize their rights to civic participation. *See* Morin Decl. ¶¶ 11–12, 17–18. Courts have long recognized that organizations have a significant protectable interest in preserving and pursuing

their own mission-critical organizational activities, particularly when it comes to ensuring their members' ability to vote. *See, e.g.*, *Jud. Watch, Inc. v. Ill. State Bd. of Elections*, No. 24 C 1867, 2024 WL 3454706, at *3 (N.D. Ill. July 18, 2024); *Paher v. Cegavske*, No. 3:20-cv-00243-MMD-WGC, 2020 WL 2042365, at *2 (D. Nev. Apr. 28, 2020); *Issa v. Newsom*, No. 2:20-CV-01044-MCE-CKD, 2020 WL 3074351, at *3 (E.D. Cal. June 10, 2020).

Ultimately, however, as a federal court hearing one of these parallel cases found, the Alliance and its members "have an interest in keeping their information private from the DOJ, whether or not disclosure to the DOJ produces any additional harm." *Benson*, 2025 WL 3520406, at *3. Because once that information is disclosed, "the cat is out of the bag." *In re Sealed Case*, 237 F.3d 657, 664 (D.C. Cir. 2001) (citation omitted) (finding impairment when intervenor's confidential information was at risk of disclosure); *see also Oberweis Dairy*, 456 F.3d at 718 (finding privacy interest sufficient for intervention); *Kalbers v. DOJ*, 22 F.4th 816, 828 (9th Cir. 2021) (holding intervenor's "interest in keeping its documents confidential would obviously be impaired by an order to disclose" those documents). There is no doubt these interests satisfy Rule 24(a)(2)'s "liberal[] . . . definition of an interest." *Lopez-Aguilar*, 924 F.3d at 392; *see also Benson*, 2025 WL 3520406, at *2; *Oregon*, 2025 WL 3496571, at *1.

### C. As other courts have recognized in parallel litigation, the existing parties do not adequately represent the Proposed Intervenors.

Lastly, the Proposed Intervenors readily meet the burden of establishing inadequate representation—which, here, is a "minimal one" requiring only that Proposed Intervenors demonstrate that "representation of his interest *may* be inadequate." *Driftless Area Land Conservancy v. Huebsch*, 969 F.3d 742, 747 (7th Cir. 2020) (quoting *Trbovich*, 404 U.S. at 538 n.10) (emphasis added). Proposed Intervenors plainly meet that requirement here; as other courts granting intervention to voting groups have recognized, states sued by the federal government will

not necessarily share the same interests and goals in the litigation moving forward, putting voters' privacy and voting rights at risk absent their participation.

The Seventh Circuit has established a three-tiered methodology for evaluating inadequacy of representation, which focuses on a "discriminating comparison" of the interests of the existing party and the interests of the party attempting to intervene. *Bost*, 75 F.4th at 688. Those tiers are: (1) the default liberal rule, which applies where "there is no notable relationship between the existing party and the applicant for intervention," (2) the intermediate approach, which applies when "the prospective intervenor and [a] named party have the same goal," and (3) a stricter standard which applies when a party is specifically "charged by law with protecting the interests of the proposed intervenors." *Id.* (cleaned up).

DOJ naturally does not represent Proposed Intervenors' interests, as it seeks to forcibly compel production of Wisconsin's unredacted voter registration list, which Proposed Intervenors oppose. And although WEC, to date, has resisted that demand, WEC does not adequately represent the Proposed Intervenors' distinct private interests. Here, the interests of the Proposed Intervenors are to (1) protect the privacy interests of its members and (2) ensure its members are not deterred from participating in the political process as a result of DOJ's demand for sensitive voter information. *See supra* Background Part IV. By contrast, WEC has a distinct interest: to administer and enforce election law.[14]

As the Eastern District of Wisconsin recognized in a case evaluating a voter's attempt to intervene in a case alongside WEC, "neither the WEC nor its members are charged with protecting the interests of individual voters beyond the voter's interest in seeing Wisconsin's election laws

---

[14] See Wisconsin Election Commission, *About the WEC*, https://elections.wi.gov/about-the-wec (Dec. 19, 2025).

enforced." *Feehan v. Wis. Elections Comm'n*, 506 F. Supp. 3d 640, 647 (E.D. Wis. 2020). The court concluded, "to the extent that the movant's interests go beyond his interest in the proper administration and enforcement of state and federal election laws and procedures," WEC was not "charged by law with protecting [his interests]." *Id.* (citation omitted). The same is true here; the Proposed Intervenors' interests go far beyond simple compliance with election law and instead specifically concern protecting the privacy interests and voting rights of its members.

Nor do the Proposed Intervenors and WEC share the "same goal" in this case. As the Seventh Circuit has held:

> For the potential intervenor and the named party to have the same goal, it is not enough that they seek the same outcome in the case. After all, a prospective intervenor must intervene on one side of the 'v.' or the other and will have the same general goal as the party on that side. If that's all it takes to defeat intervention, then intervention as of right will almost always fail.

*Bost*, 75 F.4th at 688 (cleaned up). For that reason, "we require a more discriminating comparison" of interests, and "[w]hen we compare the interests of a would-be intervenor and an existing party, we find that they have 'the same goal' only where the interests are genuinely 'identical.' Otherwise, we apply our lenient default rule." *Id.* (citing *Driftless*, 969 F.3d at 748). Applying that standard, in *Bost* the Seventh Circuit held that the Illinois State Board of Elections and the Democratic Party of Illinois (DPI) did not share the "same goal," even though both parties sought to defend a challenge to Illinois law allowing the state to accept ballots received after Election Day. *See id.* at 689. As the Seventh Circuit emphasized, "DPI's associational interest in representing its members is not identical to or completely included within the Board's interests." *Id.* And because "the stakes for each of them are different," they did not share the same goal, even though both "want the law upheld." *Id.* Similarly here, *even if* WEC decides to defend the suit— which is not yet known—it does not have a specific interest in protecting the privacy rights or voting rights of the Proposed Intervenors' members, which means it does not share the "same goal"

18

in this litigation, as the Seventh Circuit has defined it. Indeed, it is the Proposed Intervenors' *members* who are at risk of having their identities improperly exposed, not WEC, which gives them a different stake in the matter. *See, e.g.*, *Driftless*, 969 F.3d at 749 (noting that even though "the Commission can be expected to mount a vigorous defense against the plaintiffs' attack on the integrity of the permitting process . . . the power-line project itself, and the permit necessary to construct it, belong to the transmission companies," giving it a "different stake" in the litigation).

"Under the lenient default standard, [Proposed Intervenors] need only show that the [Defendants'] representation 'may be' inadequate, and the burden of making that showing should be treated as minimal." *Id.* (quotation marks omitted). The default rule is satisfied if a proposed intervenor can show some conflict, "potential or otherwise," with the existing parties' litigation strategy. *Bost*, 75 F.4th at 690; *see also Trbovich*, 404 U.S. at 538–39 (noting risk of inadequate representation of a would-be intervenor where the interests of the existing party "may not always dictate precisely the same approach to the conduct of the litigation").

That risk is significant here. As the court granting the Michigan Alliance's request for intervention as of right in the similar case against Michigan noted, "Michigan has other countervailing incentives—for example, to maintain an election system, comply with federal law, and preserve comity with the federal government—that may ultimately induce it to stop defending the lawsuit or give up the information at issue." *Benson*, 2025 WL 3520406, at *6; *see also Oregon*, 2025 WL 3496571, at *2 (noting the Oregon "Defendants have obligations under the NVRA and HAVA that Proposed Intervenors do not share and have broader public policy obligations and considerations that may incentivize them to make compromises that Proposed Intervenors would not make").

Indeed, courts routinely find inadequate representation where it is possible an existing defendant will resolve a case on terms that proposed intervenors would not agree to, *see City of Chicago v. Fed. Emergency Mgmt. Agency*, 660 F.3d 980, 986 (7th Cir. 2011); *Judicial Watch, Inc.*, 2024 WL 3454706, at *5, and here that risk is surely present. There may be good reason for WEC to seek a settlement with the federal government, whose commitment is to the general public interest and in complying with state and federal laws, not to ensuring sensitive voter information does not land in a weaponized DOJ, no matter the cost. The Supreme Court recently emphasized this point, noting that public officials must "bear in mind broader public-policy implications," whereas private litigants—like the Proposed Intervenors and its members—seek to vindicate their own rights, "full stop." *Berger*, 597 U.S. at 195–96 (citing *Trbovich*, 404 U.S. at 538–39). Here, the Proposed Intervenors are not constrained by competing public duties, but are instead vehemently opposed to the exposure of its members' personal and private information, and should be allowed to intervene in order to ensure that their interests are adequately represented.[15]

## II.    Alternatively, Proposed Intervenors should be granted permissive intervention.

Alternatively, the Court should grant permissive intervention. *See Baldus v. Members of Wisconsin Gov't Accountability Bd.*, No. 11-CV-562 JPS-DPW-RMD, 2011 WL 5834275, at *2 (E.D. Wis. Nov. 21, 2011) (granting permissive intervention despite expressing doubts as to whether "intervenors have satisfied the interest requirement" for intervention as of right). Rule 24(b) is readily satisfied here: Proposed Intervenors assert a "claim or defense that shares with the main action a common question of law or fact," and granting intervention would not "unduly delay or prejudice the adjudication" of the matter. Fed. R. Civ. P. 24(b); *see* Ex. A (Proposed Answer).

---

[15] Because of this significant potential conflict, this intervention is easily distinguishable from *Bost*, where the court found that the proposed intervenor was "not entitled to intervention as of right" because it made *no* "showing of conflict—potential or otherwise." 75 F.4th at 690.

Proposed Intervenors agree to abide by any schedule entered by the Court or agreed to by the existing parties prior to their intervention.

Courts regularly grant permissive intervention to ensure actual voters (or organizations representing them) have a say in litigation concerning their rights.[16] That rationale applies with particular force here. Proposed Intervenors and their members indisputably have "confidentiality and/or privacy interest[s]" at stake in this case, which alone "warrant[] an opportunity to permissively intervene to protect that interest." *In re Exch. Union Co.*, No. 24-MC-91645-ADB, 2025 WL 894652, at *3 (D. Mass. Mar. 24, 2025). Furthermore, Proposed Intervenors represent a collection of Wisconsin voters. Thus, their presence will add a unique—and critically important— voter perspective that will "serve the interests of judicial administration." *Swenson v. Bostelmann*, No. 20-CV-459-WMC, 2020 WL 8872099, at *2 (W.D. Wis. June 23, 2020); *see also Romero v. Bd. of Cnty. Comm'rs for the Cnty. of Curry*, 313 F.R.D. 133, 140 (D.N.M. 2016) ("allowing an intervenor with a contingent interest to intervene will usually only strengthen the litigation, making the parties' presentation of the issues more sharply focused"). These considerations, in addition to the clear satisfaction of Rule 24(b), strongly weigh in favor of permissive intervention, as courts have found in permitting groups to intervene in parallel cases seeking state voter data. *See* Ex. C (Mins. of Mot. Hr'g, *United States v. Weber*, No. 25-cv-09149 (C.D. Cal. Nov. 24, 2025), Dkt. No. 70) (granting permissive intervention by oral order to state affiliates of the NAACP and League of Women Voters in DOJ's parallel lawsuit in California); Ex. D (Order, *United States v. Bellows*, No. 1:25-cv00468 (D. Me. Dec. 12, 2025), Dkt. No. 49) (granting intervention to voters).

---

[16] *See, e.g.*, *RNC v. Aguilar*, No. 2:24-CV-00518-CDS-MDC, 2024 WL 3409860, at *3 (D. Nev. July 12, 2024); *Ariz. All. for Retired Ams. v. Hobbs*, No. CV-22-01374-PHX-GMS, 2022 WL 4448320, at *2 (D. Ariz. Sep. 23, 2022); *PILF v. Winfrey*, 463 F. Supp. 3d 795, 802 (E.D. Mich. 2020).

## CONCLUSION

For all of the foregoing reasons, Proposed Intervenors respectfully request that the Court grant them intervention as of right or, in the alternative, permissive intervention.

Dated: December 20, 2025

*Respectfully submitted,*
*/s/ Omeed Alerasool*

Diane M. Welsh
(Wisconsin State Bar No. 1030940)
**PINES BACH LLP**
122 West Washington Ave., Suite 900
Madison, WI 53703
T: (608) 251-0101
F: (608) 251-2883
dwelsh@pinesbach.com

David R. Fox*
Christina Ford*
Omeed Alerasool
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4490
F: (202) 968-4498
dfox@elias.law
cford@elias.law
oalerasool@elias.law

*Application for admission forthcoming

*Counsel for Proposed Intervenors*