IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff,* | |
| v. | 25-cv-1036-amb |
| WISCONSIN ELECTIONS COMMISSION, et al., | |
| *Defendants.* | |

**MEMORANDUM IN SUPPORT OF MOTION OF COMMON CAUSE, MELISSA ADAMS, AMANDA MAKULEC, AND JAIME RIEFER TO INTERVENE AS DEFENDANTS**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

BACKGROUND ...................................................................................................... 2

    I.   DOJ's Efforts To Obtain Private Voter Information ......................................... 2

    II.  Proposed Intervenors.......................................................................................... 8

ARGUMENT ........................................................................................................ 10

    III. Movants Are Entitled To Intervene as a Matter of Right............................... 10

      A.   The Motion To Intervene Is Timely. ....................................................... 10

      B.   Proposed Intervenors Have Concrete Interests in the Litigation................. 11

      C.   Disposition of this Case May Impair Proposed Intervenors' Interests......... 13

      D.   WEC's and its Officers' Interests Differ from Those of Proposed Intervenors. ............................................................................................... 14

    IV. In The Alternative, The Court Should Grant Permissive Intervention. ......... 16

CONCLUSION ..................................................................................................... 17

CERTIFICATE OF SERVICE ............................................................................. 19

## INTRODUCTION

The United States seeks to force Wisconsin to turn over voters' sensitive personal information and data. It has been widely reported that the United States intends to use this data to build an unauthorized national voter database and to target voters for potential challenges and disenfranchisement, and the United States' own representations to states tend to confirm those suspicions.

Proposed Intervenors are Common Cause, a non-partisan organization dedicated to grassroots voter engagement in Wisconsin whose members and whose own work are at risk by the relief the federal government seeks in this case, and individual voters who are directly threatened. Proposed Intervenors have a strong interest in preventing the disclosure of Wisconsin's most sensitive non-public voter data. Common Cause has an interest in protecting the voting and privacy rights of its members and all Wisconsin voters. The relief the federal government seeks risks discouraging Wisconsin residents from registering to vote, undermining its work. And the privacy and voting-rights interests of Common Cause's members and of the individual voter Intervenors are also directly at stake. Proposed Intervenors include members of groups who are under particular threat from the United States' requested relief, including voters who have recently moved to or within the State of Wisconsin.

Proposed Intervenors are entitled to intervene as of right under Rule 24 as this motion is timely, their rights and interests are at stake, and those rights and interests are not adequately represented by Defendants, who unlike Proposed Intervenors, are state actors, subject to broader considerations external to the legal issues presented in this case. Their unique interests, perspective, and motivation to interrogate the purpose of the sweeping request for non-public voter data will ensure full development of the record and aid the Court in its resolution of this case. Indeed, in similar cases brought over California's and New Mexico's refusal to turn over sensitive voter information, such organizations and individuals have been granted

1

intervention. *See* Minute Order, *United States v. Amore*, No. 1:25-cv-00639-MSM-PAS (D.R.I. Jan. 6, 2026); Order, *United States v. Galvin*, 1:25-CV-13816 (D. Mass Jan. 6, 2026), Dkt. No. 30; Order, *United States v. Simon*, No. 25-cv-3761 (D. Minn. Jan. 6, 2026), Dkt. No. 90; Minute Order, *United States v. Oliver*, No. 25-cv-01193 (D.N.M. Dec. 19, 2025), Dkt. No. 25; Minute Order, *United States v. Weber*, No. 25-cv-09149, (C.D. Cal. Nov. 19, 2025), Dkt. No. 70. Intervention as of right pursuant to Rule 24(a), or in the alternative permissive intervention pursuant to Rule 24(b), should be granted.

## BACKGROUND

### I.    DOJ's Efforts To Obtain Private Voter Information

Beginning in May 2025, Plaintiff United States, through its Department of Justice ("USDOJ"), began sending letters to election officials in at least forty states, making escalating demands for the production of voter registration databases, with plans to gather data from all fifty states. *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, Tracker of Justice Department Requests for Voter Information, Brennan Ctr. for Just. (updated Dec. 19, 2025), https://perma.cc/A4A4-737Z.

On June 17, 2025, USDOJ sent a letter to the Wisconsin Elections Commission ("WEC") Administrator, Meagan Wolfe (the "Administrator"), requesting information about WEC's administration of elections and compliance with the federal Help America Vote Act ("HAVA"). Dkt. 1, Compl. ¶¶ 19–20; *see also* Dkt. 3-1 at 1, Ex. 1 to U.S. Mot. to Compel, Letter of Acting Chief Maureen Riordan to Administrator Meagan Wolfe dated June 17, 2025 ("June 17 USDOJ Letter"). Among other things, USDOJ requested that the Administrator provide a copy of Wisconsin's "current voter registration list" that includes "both active and inactive voters." Dkt. 1, Compl. ¶¶ 19–20; *see also* Dkt. 3-1 at 3, June 17 USDOJ Ltr. It also propounded several questions regarding Wisconsin's voter registration and list maintenance procedures,

including requests for information about WEC's identification and removal from the rolls of purported "registrants who are ineligible due to non-citizenship" and voters "who have moved outside the state." Dkt. 3-1 at 3, June 17 USDOJ Ltr. USDOJ asked the Administrator to respond within 20 days. *Id.*

On July 2, 2025, WEC responded to USDOJ's questions about Wisconsin election administration and HAVA compliance. Dkt. 1, Compl. ¶ 22; Dkt. 3-1 at 4, Ex. 2 to U.S. Mot. to Compel, Letter of Wis. Elections Comm'n to Acting Chief Maureen Riordan dated July 2, 2025 ("July 2 WEC Letter"). As to USDOJ's request for Wisconsin's voter registration list, WEC "offered the publicly available" list, Dkt. 1, Compl. ¶ 22, and noted that "Wisconsin law requires the Commission to charge a fee for access to voter registration data," without any "exceptions for elected officials, government agencies, journalists, non-profits, academics, or any other group," Dkt. 3-1 at 9, July 2 WEC Ltr.

Months later, on December 2, 2025, USDOJ sent an email to WEC. Dkt. 1, Compl. ¶ 23. This time, it directed WEC to "[p]lease consider this email a demand to provide . . . [a]n electronic copy of the full Wisconsin statewide voter registration list." Dkt. 3-1 at 11, Ex. 3 to U.S. Mot. to Compel, Email of Attorney Eric Neff to WEC dated December 2, 2025 ("December 2 USDOJ Demand"). The body of that email read, in full, as follows:

> Please consider this email a demand to provide within 7 days:
> - An electronic copy of the full Wisconsin statewide voter registration list
>   - This list is to include, pursuant to the Help America Vote Act, either the last four digits of the social security number, the driver's license number, or both.
> This request is for the purpose of ensuring compliance with minimum standards and routine voter registration list maintenance.

*Id.* USDOJ also attached a proposed memorandum of understanding to its email. Dkt. 1, Compl. ¶ 24; *see also* Ex. 1 to Common Cause Mot. to Intervene, U.S. Dep't of Just.,

Civ. Div., Confidential Mem. of Understanding ("MOU").[1] That memorandum indicated that the "purpose" of USDOJ's request for data was to "test, analyze and assess states' [voter registration lists] for proper list maintenance and compliance with federal law." Dkt. 1, Compl. ¶ 24; *see also* Ex. 1 to Common Cause Mot. to Intervene, MOU at 2 (containing identical language).

On December 11, 2025, WEC Chair Ann S. Jacobs and Commissioners Marge Bostelman, Don M. Millis, Carrie Riepl, and Mark L. Thomsen responded to the December 2 USDOJ Demand. Dkt. 3-1 at 12, Ex. 4 to U.S. Mot. to Compel, Letter of WEC Chair Ann S. Jacobs et al. to Attorney Neff dated December 11, 2025 ("December 11 WEC Letter"). The commissioners explained that WEC is "willing to provide any non-confidential voter registration data or records" to USDOJ, but that "Wisconsin law explicitly prohibits the Commission from providing the full unredacted voter registration list." Dkt. 3-1 at 13, Dec. 11 WEC Ltr. The commissioners set out controlling Wisconsin law's limitations on disclosure of certain personally identifiable information—including an elector's driver's license number and social security number—and explained why nothing in federal law contradicts or overrides the governing state law. Dkt. 3-1 at 13-15, Dec. 11 WEC Ltr. And they described the "broader framework of list maintenance practices in Wisconsin,"

---

[1] While the United States has not filed the MOU as an exhibit in this case, the MOU has become publicly available. *See* Jonathan Shorman, *Trump's DOJ offers states confidential deal to remove voters flagged by feds*, STATELINE, Dec. 18, 2025, https://stateline.org/2025/12/18/trumps-doj-offers-states-confidential-deal-to-wipe-voters-flagged-by-feds-as-ineligible/. In addition to incorporating the memorandum of understanding that USDOJ sent to WEC by reference in its Complaint, Dkt. 1, Compl. ¶ 24, the United States has represented in court that it intended for a number of States to sign MOUs as to its requests for state voter files. Ex. 2 to Common Cause Mot. to Intervene, Hr'g Tr. at 72–73, 90, *United States v. Weber*, No. 25-cv-09149 (C.D. Cal. Dec. 4, 2025) (DOJ attorney discussing MOU). This Court can take judicial notice of the MOU as a government document produced by USDOJ. *See, e.g.*, *Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003); *see also Bova v. U.S. Bank, N.A.*, 446 F. Supp. 2d 926, 930 n.2 (S.D. Ill. 2006) (collecting cases where courts took judicial notice of public records and government records).

including a description of each of Wisconsin's eleven major voter list maintenance processes. *Id.* at 15–17.

The United States responded by filing this lawsuit, which is one of at least twenty-four similar suits seeking disclosure of sensitive voter data.[2] The United States concurrently filed a motion to compel the production of records—namely, "an electronic copy of the Wisconsin statewide Voter Registration List with all fields, including each registrant's name, date of birth, address, and as required by HAVA, the last four digits of the registrant's social security number, driver's license/state identification number or the unique HAVA identifier." Dkt. 2 at 3–4, Mot. to Compel.

DOJ's request for private, sensitive voter data appears to be in connection with never-before-seen efforts by the United States to construct a national voter database, and to otherwise use untested forms of database matching to scrutinize voter rolls. According to reporting, USDOJ employees "have been clear that they are interested in a central, federal database of voter information." Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times, Sept. 9, 2025, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html. USDOJ is coordinating these efforts with the federal Department of Homeland Security ("DHS"), according to reported statements from USDOJ and

---

[2] *See* Press Release, *U.S. Dep't of Just., Justice Department Sues Arizona and Connecticut for Failure to Produce Voter Rolls* (Jan. 6, 2026), https://perma.cc/6QP2-8ZXC; Press Release, U.S. Dep't of Just., *Justice Department Sues Four States for Failure to Produce Voter Rolls* (Dec. 18, 2025), https://perma.cc/HHJ7-JWQQ; Press Release, U.S. Dep't of Just., *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025), https://perma.cc/TQ5T-FB2A; Press Release, U.S. Dep't of Just., *Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls* (Dec. 2, 2025), https://perma.cc/F5MD-NWHD; Press Release, U.S. Dep't of Just., *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (Sept. 25, 2025), https://perma.cc/7J99-WGBA; Press Release, U.S. Dep't of Just., *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls* (Sept. 16, 2025), https://perma.cc/M69P-YCVC.

DHS. *Id.*[3] A recent article extensively quoted a lawyer who recently left USDOJ's Civil Rights Division, describing the government's aims in these lawsuits:

> We were tasked with obtaining states' voter rolls, by suing them if necessary. Leadership said they had a DOGE person who could go through all the data and compare it to the Department of Homeland Security data and Social Security data. . . . I had never before told an opposing party, Hey, I want this information and I'm saying I want it for this reason, but I actually know it's going to be used for these other reasons. That was dishonest. It felt like a perversion of the role of the Civil Rights Division.

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES MAG. (Nov. 16, 2025), https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html.

According to additional reporting, these efforts are being conducted with the involvement of self-proclaimed "election integrity" advocates within and outside government who have previously sought to disenfranchise voters and overturn elections.[4] Such actors have previously sought to compel states to engage in aggressive purges of registered voters and have abused voter data to mass challenge voters in other states. *See, e.g.*, *PA Fair Elections v. Pa. Dep't of State*, 337 A.3d 598, 600 n.1 (Pa. Commw. Ct. 2025) (determining that complaint brought by group

---

[3] *See also, e.g.*, Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025, https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security; Sarah Lynch, *US Justice Dept Considers Handing over Voter Roll Data for Criminal Probes, Documents Show*, REUTERS, Sept. 9, 2025, https://www.reuters.com/legal/government/us-justice-dept-considers-handing-over-voter-roll-data-criminal-probes-documents-2025-09-09.

[4] *See* Alexandra Berzon & Nick Corasaniti, *Trump Empowers Election Deniers, Still Fixated on 2020 Grievances*, N.Y. TIMES, Oct. 22, 2025, https://www.nytimes.com/2025/10/22/us/politics/trump-election-deniers-voting-security.html (documenting "ascent" of election denier Honey); Matt Cohen, *DHS Said to Brief Cleta Mitchell's Group on Citizenship Checks for Voting*, DEMOCRACY DOCKET (June 12, 2025), https://www.democracydocket.com/news-alerts/dhs-said-to-brief-cleta-mitchells-anti-voting-group-on-checking-citizenship-for-voters/; Jude Joffe-Block & Miles Parks, *The Trump Administration Is Building a National Citizenship Data System*, NPR, June 29, 2025, https://www.npr.org/2025/06/29/nx-s1-5409608/citizenship-trump-privacy-voting-database (reporting that Mitchell had received a "full briefing" from federal officials).

affiliated with current DHS official Heather Honey, challenging Pennsylvania's list maintenance practices, was meritless).[5] Notably, the United States' own representations to states tend to confirm suspicions of federal overreach that could disenfranchise voters. Far from indicating a purpose of ensuring compliance with HAVA, the United States' proposed MOU *runs afoul* of HAVA, seeking to place authority to identify supposed ineligible voters in the hands of the federal government, contrary to statutory text. *Compare* Ex. 1 to Common Cause Mot. to Intervene, MOU at 2, 5, *with* 52 U.S.C. § 21085 (methods of complying with HAVA "left to the discretion of the State"); *see* Common Cause Proposed Mot. to Dismiss at 11. This MOU further indicates that the United States' supposed purpose is not in compliance with federal law but aggrandizes authority to a federal agency in ways contrary to federal law.

Here, USDOJ's actions also indicate that it may target specific groups of voters in its use of the requested data. *See also, e.g.*, Jonathan Shorman, *Trump's DOJ offers states 'confidential' deal to wipe voters flagged by feds as ineligible*, STATELINE, Dec. 18, 2025, https://stateline.org/2025/12/18/trumps-doj-offers-states-confidential-deal-to-wipe-voters-flagged-by-feds-as-ineligible/. In its initial June 17 Letter to the Administrator, or in letters to other states requesting the same private voter data, USDOJ has requested information about how election officials, among other things, process applications to vote by mail; identify and remove duplicate registrations; and verify that registered voters are not ineligible to vote, such as due to a felony conviction or lack of citizenship. *See, e.g.*, Dkt. 3-1 at 2–3, June 17 USDOJ Ltr.; Ex. 3 to Common Cause Mot. to Intervene, Letter from Maureen Riordan to Sec'y of State

---

[5] *See* Carter Walker, *Efforts to Challenge Pennsylvania Voters' Mail Ballot Applications Fizzle*, SPOTLIGHT PA, Nov. 8, 2024, https://www.spotlightpa.org/news/2024/11/mail-ballot-application-challenges-pennsylvania-fair-elections/ (describing mass-challenges and noting connection to Honey and her organization "PA Fair Elections").

Al Schmidt (June 23, 2025), *United States v. Pennsylvania*, No. 25-cv-01481 (W.D. Pa. Oct. 9, 2025), Dkt. No. 37-1. The Trump administration has also confirmed that USDOJ has been sharing the requested information with DHS.[6]

## II.    Proposed Intervenors

Proposed Intervenor Common Cause is a nonpartisan organization committed to, *inter alia*, ensuring that all eligible Wisconsin voters register to vote and exercise their right of vote at each election. *See* Decl. of Wisconsin State Director of Common Cause Bianca N. Shaw ("Shaw Decl.") ¶¶ 5–7. Common Cause expends significant resources conducting voter engagement and assistance efforts, including registering qualified people to vote, helping voters navigate the vote-by-mail process, encouraging participation, and assisting voters who face problems trying to vote. *See id.* ¶¶ 7–13. The success of these efforts, especially with respect to voter registration, depend on voters' trust that, when they provide personal information to the State as part of the registration process, that information will not be abused, their privacy will be respected, and their right to participate will be honored. *See id.* ¶¶ 12–13.

Common Cause has more than 9,900 members in Wisconsin. *See* Shaw Decl. ¶ 4. Those members include Wisconsin voters, whose personal data will be provided to USDOJ if the United States prevails in this lawsuit. *See id.* ¶ 6. Common Cause's members in Wisconsin include voters who are at particular risk of being caught up in USDOJ's efforts to remove voters from voter rolls, whether because they have a supposed "duplicate" record in the system, registered to vote by mail, have a felony conviction, and/or are naturalized citizens. *See id.* ¶¶ 6, 11–12. They also may include voters whose identifying information is particularly important to keep private, for example, due to their status as victims of domestic violence. *See* Shaw Decl. ¶ 8; *see*

---

[6] Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*, Stateline (Sept. 12, 2025), https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security.

*also* Wis. Stat. § 165.68 (establishing address confidentiality program administered by Wisconsin's Department of Justice to protect victims of child abuse, domestic abuse, sexual abuse, stalking, and trafficking).

Individual Proposed Intervenors Melissa Adams, Amanda Makulec, and Jaime Riefer are at particular risk of being caught up in USDOJ's efforts to remove voters from voter rolls because each has recently moved to or within the State of Wisconsin and has updated their voter registration accordingly—which could lead to an incorrect flag that have a supposed "duplicate" record in the state voter lists that USDOJ seeks to collect. *See* Decl. of Melissa Adams ("Adams Decl.") ¶¶ 2–4 (recently moved to Wisconsin from Illinois and registered to vote in Wisconsin); Decl. of Amanda Makulec ("Makulec Decl.") ¶¶ 2–3 (recently moved to Wisconsin from the District of Columbia and registered to vote in Wisconsin); Decl. of Jaime Riefer ("Riefer Decl.") ¶¶ 2–4 (recently moved within Wisconsin and updated voter registration to reflect new address). As a human resources professional, Ms. Adams understands that data migration is imperfect, and she fears that the United States' efforts to collect sensitive voter information en masse will detrimentally impact her and other eligible Wisconsinites' ability to exercise their right to vote. Adams Decl. ¶¶ 6–7. Likewise, Ms. Makulec's professional specialization in public health data gives her grave concern that forcing Wisconsin to share individuals' unique identifiers and other sensitive personal information with the federal government—an entity that has access to other types of data about Americans, and can therefore use Wisconsin's voter data to create a bigger, broader picture about voters than it otherwise had access to—will create serious privacy risks for her and other Wisconsin voters. Makulec Decl. ¶¶ 7–11; *see also* Adams Decl. ¶ 8. And Ms. Riefer is concerned about the collection of her personal, sensitive data, including because of the risks of reprisal for engaging in political activity, and because errors in the data sought or the collection process could inaccurately flag voters as ineligible and prevent them from

9

exercising their right to vote. Riefer Decl. ¶¶ 7–9.

**ARGUMENT**

## III. Movants Are Entitled To Intervene as a Matter of Right.

In the Seventh Circuit, a party is entitled to intervene as of right under Federal Rule of Civil Procedure 24(a) upon establishing: "(1) timely application; (2) an interest relating to the subject matter of the action; (3) potential impairment, as a practical matter, of that interest by the disposition of the action; and (4) lack of adequate representation of the interest by the existing parties to the action." *Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 321 (7th Cir. 1995) (quotation marks and citation omitted). "A motion to intervene as a matter of right . . . should not be dismissed unless it appears to a certainty that the intervenor is not entitled to relief under any set of facts which could be proved under the complaint." *Id.* Because Prospective Intervenors satisfy each of these requirements, intervention should be granted.

### A. The Motion To Intervene Is Timely.

Timeliness is determined "from all the circumstances." *Lopez-Aguilar v. Marion Cnty. Sheriff's Dept.*, 924 F.3d 375, 388 (7th Cir. 2019). Relevant factors include the "(1) the length of time the intervenor knew or should have known of his interest in the case; (2) the prejudice caused to the original parties by the delay; (3) the prejudice to the intervenor if the motion is denied; [and] (4) any other unusual circumstances." *Id.* (quotation marks and citation omitted). Ultimately, the test "is essentially one of reasonableness: 'potential intervenors need to be reasonably diligent in learning of a suit that might affect their rights, and upon so learning they need to act reasonably promptly.'" *Id.* (quoting *Reich*, 64 F.3d at 321). Courts should be reluctant to dismiss a request for intervention as untimely where the proposed intervenor would be "seriously harmed" if intervention is denied. *See id.* at 388–89.

This motion is timely. The suit was filed on December 18, 2025, and, upon learning of it, Proposed Intervenors promptly prepared this motion. *Cf. Reich*, 64 F.3d

10

at 321 (intervention motions deemed timely "because they were filed soon after the potential intervenors learned of the impairment of their respective interests"). Defendants have not yet filed their response, meaning that the case is at its earliest stages and the existing partes would not be prejudiced. In contrast, Proposed Intervenors will be substantially prejudiced absent intervention, given the serious threats that the relief sought poses to Proposed Intervenors' fundamental rights. *See* Shaw Decl. ¶¶ 7–13.

### B.    Proposed Intervenors Have Concrete Interests in the Litigation.

Proposed Intervenors have a "sufficient"—*i.e.*, a "significantly protectable"—interest in the litigation. *Donaldson v. United States*, 400 U.S. 517, 531 (1971). In the Seventh Circuit, the "interest must be direct, significant, and legally protectable." *Lopez-Aguilar*, 924 F.3d at 391 (quotation marks and citation omitted). While the required interest is "more than the minimum Article III interest," *Flying J, Inc. v. Van Hollen*, 578 F.3d 569, 571 (7th Cir. 2009), the Seventh Circuit has "interpreted 'statements of the Supreme Court as encouraging liberality in the definition of an interest.'" *Lopez-Aguilar*, 924 F.3d at 392 (quoting *Meridian Homes Corp. v. Nicholas W. Prassas & Co.*, 683 F.2d 201, 204 (7th Cir. 1982)).

Here, Proposed Intervenors offer multiple, independently sufficient interests.

*First*, Proposed Intervenors have a right to privacy in the sensitive data sought, *i.e.*, the entire unredacted voter file, "with all fields, including . . . state driver's license number, the last four digits of their Social Security number, or HAVA unique identifier." Dkt. 1, Compl. ¶ 28(B). The Supreme Court has made clear that "disclosure of private information" is an injury "traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). Consequently, Proposed Intervenors have "a direct, significant, and legally protectable" in avoiding its disclosure. *Lopez-Aguilar*, 924 F.3d at 391.

Sensitive information like dates of birth, driver's license numbers, and Social Security numbers are protected from disclosure by Wisconsin law. *See* Wis. Stat. §§ 6.36(1)(b)1.a, 165.68. The data sought is also protected by federal law, which prohibits the creation of a national voter database of the type that the United States is reportedly assembling. *See* 5 U.S.C. § 552a(e)(7) (prohibiting the creation of any database "describing how any individual exercises rights guaranteed by the First Amendment," which includes exercising the right to vote). These privacy interests are significant and inure to each of the individual voter Proposed Intervenors and to Common Cause's members who are Wisconsin voters. *See* Shaw Decl. ¶¶ 11–12; Adams Decl. ¶¶ 7–8; Makulec Decl. ¶¶ 7–13; Riefer Decl. ¶¶ 6–9.

*Second*, based on the United States' requests to Wisconsin and other States, the data sought is likely to be used to challenge the registration of certain Wisconsin voters, including voters who are naturalized citizens (who may have indicated they were not a citizen on a government form prior to naturalization), voters with prior felony convictions (who may have been previously recorded as ineligible to vote before having their rights restored), and voters who have moved within Wisconsin or left the state and then returned to Wisconsin (but might be deemed "duplicate" voters or "out-of-state" voters due to a shoddy matching system). *See supra* at 7–8 & n.5. Both individual voter Proposed Intervenors as well as numerous Common Cause members fall within those categories. *See* Shaw Decl. ¶¶ 11–12; Adams Decl. ¶¶ 2–4; Makulec Decl. ¶¶ 2–3; Riefer Decl. ¶¶ 2–4. And these individual voters and Common Cause members, especially those most likely to be targeted using the data sought, have a concrete interest in not being disenfranchised.

*Third*, Common Cause as an organization has a protectable interest at stake as its core mission will be harmed if the relief that the federal government seeks is granted. Common Cause's voter registration activities will be harmed as voters will be chilled from registering if they believe their sensitive personal data will be

provided to the federal government and potentially misused as part of a national database. Shaw Decl. ¶¶ 11–14. Mass challenges by activists now wielding the power of the federal government will force Common Cause to redirect resources to mitigating the attempted disenfranchisement of existing voters, away from core activities of registering voters and engaging new voters in the democratic process. *Id.* ¶ 12. Courts routinely find that non-partisan organizations, like Common Cause, should be granted intervention in election-related cases, due to their significantly protectable interests related to voting. *See, e.g.*, *Texas v. United States*, 798 F. 3d 1108, 1111–12 (D.C. Cir. 2015); *Kobach v U.S. Election Assistance Comm'n*, No. 13-cv-04095, 2013 WL 6511874, at *1–2 (D. Kan. Dec. 12, 2013). This case is no exception. Indeed, in similar cases brought by USDOJ to compel disclosure of sensitive voter information, such organizations have been granted intervention. *See* Minute Order, *United States v. Amore*, No. 1:25-cv-00639-MSM-PAS (D.R.I. Jan. 6, 2026); Order, *United States v. Galvin*, 1:25-CV-13816 (D. Mass Jan. 6, 2026), Dkt. No. 30; Order, *United States v. Simon*, No. 25-cv-3761 (D. Minn. Jan. 6, 2026), Dkt. No. 90; Minute Order, *United States v. Oliver*, No. 25-cv-01193 (D.N.M. Dec. 19, 2025), Dkt. No. 25; Minute Order, *United States v. Weber*, No. 25-cv-09149, (C.D. Cal. Nov. 19, 2025), Dkt. No. 70.

### C.    Disposition of this Case May Impair Proposed Intervenors' Interests.

Proposed Intervenors' interests would be impaired if Plaintiff succeeds in obtaining its requested relief. This third element requires a showing that "the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect th[e] interest." *Flying J. Inc.,* 578 F.3d at 572 (quoting Fed. R. Civ. P 24(a)(2)). "[T]he possibility that the would-be intervenor if refused intervention might have an opportunity in the future to litigate his claim" is no bar to intervention. *City of Chicago v. Fed. Emergency Mgmt. Agency*,

660 F.3d 980, 985 (7th Cir. 2011).

Here, the threat of impairment is significant. Plaintiff proposes to summarily dispose of voters' interests by obtaining an immediate order compelling the disclosure of private voter data, bypassing the normal civil litigation process and any discovery into "the basis and the purpose" of their request, 52 U.S.C. § 20703. *See* Dkt. 1, Compl. ¶¶ 2–4; Dkt. 2, U.S. Mot. to Compel. This attempt to secure the irrevocable disclosure of private voter data at the very beginning of the case militates strongly in favor of allowing Proposed Intervenors into the case to represent voters' interests. Indeed, if USDOJ is successful in obtaining Proposed Intervenors' private voter data, that "would as a practical matter foreclose rights of the proposed intervenors in a subsequent proceeding." *Judicial Watch, Inc. v. Ill. State Bd. of Elections*, No. 24-cv-1867, 2024 WL 3454706, at *3 (N.D. Ill. July 18, 2024).

### D.   WEC's and its Officers' Interests Differ from Those of Proposed Intervenors.

The Seventh Circuit "appl[ies] three different standards for showing inadequacy" of representation, depending on the strength of "the relationship between the interests of the existing party and the interests of the party attempting to intervene." *Bost v. Illinois State Board of Elections*, 75 F.4th 682, 688 (7th Cir. 2023). Where, as here, "there is no notable relationship between the existing party and the applicant for intervention," the test "is a lenient one." *Id.* "[T]he applicant for intervention need only show that representation of his interest by the existing party *may be* inadequate." *Id.* (quotation marks and citation omitted). That rule applies so long as the would-be intervenor's interests are not "genuinely identical" to the existing party. *Id.* Merely "seek[ing] the same outcome" is not enough. *Id.*; *see also Driftless Land Area Conservancy v. Huebsch*, 969 F.3d 742, 748 (7th Cir. 2020) (requiring a "discriminating comparison of the absentee's interests and the interests of existing parties" that accounts for the possibility that "interests and objectives

14

overlap in certain respects but are importantly different").

Proposed Intervenors meet this minimal burden here. As a governmental entity, WEC has a generalized interest in carrying out its legal obligations and in minimizing burdens on governmental employees and resources. It also must consider broader public policy concerns, in particular the need to maintain working relationships with federal officials. In contrast, Proposed Intervenors bring a distinct, particular interest to this litigation, making the existing representation inadequate: the perspective of civil rights groups whose sole commitment is to ensuring access to the ballot and individual voters whose own rights are at risk. *Compare Judicial Watch,* 2024 WL 3454706, at *5 ("The State Board has an interest in fulfilling its election obligations as required by the NVRA and Illinois law. Proposed Intervenors seek protection for their discrete set of members' voting rights and have an interest in preventing resource reallocation in doing so." (citations omitted)), *with, e.g.*, Shaw Decl. ¶¶ 5, 11 (describing Common Cause's commitment to "empower[ing] people to make their voices heard in the political process" and its interest in preventing resource reallocation from its capacity to "run voter registration drives, educate voters, and mobilize communities" toward responding to USDOJ's activities if it obtains the requested data).

Moreover, there may be arguments and issues that Defendants may not raise that are critical to organizations like Common Cause and the individual voter Proposed Intervenors. For example, individual voters have a more direct injury than states under the Privacy Act for misuse of their personal data, especially given that the Privacy Act grants individuals an express right to bring suit. *See* 5 U.S.C. § 552a(g)(1)(D) ("Whenever an agency fails to comply with any other provision of this section . . . in such a way as to have an adverse effect on an individual, the individual may bring a civil action against the agency."). *Cf. Feehan v. Wisconsin Elections Comm'n*, 506 F. Supp. 3d 640, 648 (E.D. Wis. 2020) (holding that even when proposed

intervenors share "same goal" as defendant," courts still have to inquire as to whether proposed intervenors had "a right, independent of the defendants, to defend" the action before presuming adequate representation).

As another example, courts have found a risk that considerations external to the issues presented by a case like this can motivate officials to pursue a settlement that could jeopardize the private information of Proposed Intervenors or of their members. *See Judicial Watch*, 2024 WL 3454706, at *5 (allowing intervention in NVRA case and observing that "potential intervenors can cite potential conflicts of interests in future settlement negotiations to establish that their interests are not identical with those of a named party"); *cf. Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 198 (2022) (reversing denial of motion to intervene where North Carolina Board of Elections was "represented by an attorney general who, though no doubt a vigorous advocate for his clients' interests, is also an elected official who may feel allegiance to the voting public or share the Board's administrative concerns").

These diverging perspectives—between the government's general need to balance various considerations and the Proposed Intervenors' personal and particular interest in the privacy of their own data—present a classic scenario supporting intervention. *See, e.g.*, *Am. Farm Bureau Fed'n v. EPA*, 278 F.R.D. 98, 110–11 (M.D. Pa. 2011) (allowing public interest groups to intervene, "[b]ecause the EPA represents the broad public interest . . . not only the interests of the public interest groups").

## IV.    In The Alternative, The Court Should Grant Permissive Intervention.

Should the Court decline to grant intervention as of right, the Court should use its broad discretion to grant permissive intervention. "On timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). In exercising its discretion, the district court "must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R.

Civ. P. 24(b)(3); *see, e.g.*, *Sec. Ins. Co. of Hartford v. Schipporeit, Inc.*, 69 F.3d 1377, 1381 (7th Cir. 1995) (intervenor qualified for permissive intervention because the benefits of "efficiency and consistency that result from resolving related issues in a single proceeding" were "considerable" and outweighed prejudice to existing parties). These are the "only required considerations." *Bost*, 75 F.4th at 691.

As discussed above, this motion is timely, there will be no delay or prejudice to the adjudication of the existing parties' rights, and their interests are not adequately represented by any of the existing parties. And Proposed Intervenors' defense goes directly to the matters at issue, such as (1) whether federal law permits Plaintiff to force Wisconsin to give it the personal information sought; (2) whether federal and state legal privacy protections prohibit disclosure of that information; and (3) whether the United States' motivations for the data sought are permissible. Proposed Intervenors' distinct perspective on the issues will complement or amplify Defendants' arguments and sharpen the issues and the quality of the record, aiding the Court in resolving the issues before it.

Because of this unique perspective, district courts routinely grant permissive intervention to advocacy organizations, even when a government party defends a challenged action. *See, e.g.*, *Republican Nat'l Comm. v. Aguilar*, 2024 WL 3409860, at *1–3 (D. Nev. July 12, 2024) (permitting intervention by voter advocacy group as defendant in litigation seeking purge of voter rolls). The Court should do the same here.

## CONCLUSION

For all these reasons, the Motion should be granted.

Dated: January 8, 2026

Respectfully submitted,

Megan C. Keenan*
American Civil Liberties Union
Foundation
915 15th St. NW
Washington, DC 20001
(740) 632-0671
mkeenan@aclu.org

Sophia Lin Lakin*
American Civil Liberties Union
Foundation
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2500
slakin@aclu.org

*/s/ Douglas M. Poland*
Douglas M. Poland, SBN 1055189
Scott B. Thompson, SBN 1098161
Law Forward, Inc.
222 W. Washington Ave., Ste. 680
Madison, WI 53703
dpoland@lawforward.org
sthompson@lawforward.org
608.283.9822

Ryan V. Cox, SBN 1140899
ACLU of Wisconsin Foundation, Inc.
207 East Buffalo Street, Suite 325
Milwaukee, WI 53202
Tel.: (414) 272-4032
Fax: 414-272-0182
rcox@aclu-wi.org

*Application for admission forthcoming*

*Attorneys for Proposed Intervenors
Common Cause, Melissa Adams, Amanda
Makulec, and Jaime Riefer*

18

**CERTIFICATE OF SERVICE**

I hereby certify that on January 8, 2026, a true and correct copy of the foregoing document was served via the Court's ECF system on all counsel of record who have consented to electronic service. All other counsel will be served in accordance with Federal Rule of Civil Procedure 5(a).

*/s/ Douglas M. Poland*

19