IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                          Case No. 3:25-CV-1036

WISCONSIN ELECTIONS COMMISSION, et al.,

        Defendants.

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL

JOSHUA L. KAUL
Attorney General of Wisconsin

SAMUEL T. WARD-PACKARD
Assistant Attorney General
State Bar #1128890

CHARLOTTE GIBSON
Assistant Attorney General
State Bar #1038845

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-8938 (SWP)
(608) 957-5218 (CG)
(608) 294-2907 (Fax)
samuel.ward-packard@wisdoj.gov
charlotte.gibson@wisdoj.gov

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................5

BACKGROUND ....................................................................................6

    I.    After the 2020 election, private litigants bring numerous suits challenging states' administration of elections, many involving voter registration lists. .....................................................6

    II.   In 2025, US DOJ begins asserting authority to audit States' voter registration lists. ...................................................................7

    III.  US DOJ sues States that refuse to provide unredacted voter lists, suing 24 States and the District of Columbia to date. ..........8

    IV.  US DOJ requests information about Wisconsin's list maintenance practices, and the Commission provides detailed responses. ........................................................................ 10

    V.   Five months later, US DOJ demands Wisconsin's entire voter registration list, including partial social security numbers and driver's license numbers. ....................................... 11

    VI.  The Commission offers to provide a voter list with sensitive information redacted and explains why state law forbids it from providing an unredacted list. ............................................. 12

    VII. US DOJ sues the Commission and moves for dispositive relief. ........................................................................................... 13

LEGAL STANDARD ........................................................................ 13

ARGUMENT ..................................................................................... 14

    I.    The Complaint fails to state a claim. .......................................... 15

        A.   US DOJ's claimed authority conflicts with HAVA's remedial scheme. ................................................................. 15

           1.   HAVA and the NVRA impose only limited, open-ended list maintenance obligations on covered States. ...................................................................... 15

2.  Wisconsin is exempt from the entire NVRA and from HAVA's specific list maintenance provisions. ................................................................ 18

3.  Incorporating Title III into HAVA's remedial scheme would undermine Congress's choices about how to delegate and allocate enforcement powers. ..................................................................... 19

4.  Wisconsin has no relevant HAVA obligations that US DOJ could audit. .......................................... 21

B.  US DOJ's demand to the Commission was not a valid demand under Title III. ....................................... 22

1.  Title III authorizes US DOJ to investigate violations of Americans' right to vote. ..................... 23

2.  US DOJ's demand lacks a lawful purpose. .............. 28

3.  US DOJ's demand lacked any basis. ....................... 28

4.  US DOJ's demand exceeded Title III's permitted scope. .................................................................... 29

5.  US DOJ may not evade meaningful judicial review of the demand's legality. ............................... 32

C.  Federal law does not preempt Wisconsin law's restrictions on disclosing voters' personally identifiable information. ...................................... 33

1.  Wisconsin election law limits disclosure of voters' sensitive private information, including social security and driver's license numbers. ........... 34

2.  Title III does not preempt Wisconsin law's voter privacy safeguards. .................................................... 36

II. The Court should deny the motion to compel. ............................ 41

A.  By taking custody of the voter information it demands, US DOJ would violate the Privacy Act. .............................. 41

3

B.    The motion to compel is improper........................................ 42

    1.    The Federal Rules of Civil Procedure govern this case. ............................................................................. 43

    2.    The Federal Rules dictate the process by which a party may obtain "summary" relief. ...................... 44

    3.    The motion to compel is procedurally improper....... 45

    4.    The motion to compel is substantively insufficient.................................................................. 45

CONCLUSION.................................................................................. 47

## INTRODUCTION

The U.S. Department of Justice demands that Wisconsin turn over its complete, unredacted voter registration list. That list includes sensitive information about the State's more than 3.6 million registered voters—including partial social security numbers, driver's license numbers, and address information for confidential voters. US DOJ says it needs this information to audit Wisconsin's compliance with list maintenance obligations under the Help America Vote Act ("HAVA").

But HAVA imposes few concrete obligations on states in general, even fewer on Wisconsin, and none that US DOJ is entitled to audit. And just months ago, in response to a demand from US DOJ invoking HAVA, the Wisconsin Elections Commission provided US DOJ with detailed information about Wisconsin's list maintenance efforts—efforts that go far beyond anything federal law requires—and offered to provide the United States with a redacted copy of Wisconsin's voter registration list.

US DOJ now invokes Title III of the Civil Rights Act of 1960, but that change in citation does not solve US DOJ's problems. Title III does not entitle US DOJ to Wisconsin's voter registration list: it is a civil rights law aimed at ending discrimination against voters based on race, and US DOJ's demand here goes beyond the statute's text and remedial scope. And granting US DOJ

access to an *unredacted* list would run afoul of state privacy laws that no federal law preempts.

The Court should grant the motion to dismiss.

The Court should also deny US DOJ's motion to compel for the above reasons, and two more. US DOJ cannot take custody of the data it seeks without violating the Privacy Act. And the motion to compel amounts to a premature demand for summary judgment that satisfies neither the procedural nor the substantive requirements for such relief.

## BACKGROUND

## I. After the 2020 election, private litigants bring numerous suits challenging states' administration of elections, many involving voter registration lists.

After the 2020 presidential election, conspiracy theories about the results of that election proliferated.[1] Many theories focused on how States maintained their voter lists. Private litigants brought suit under HAVA and the National Voter Registration Act ("NVRA") in many States, including in

---

[1] *See, e.g.*, Carrie Levine, *States' withdrawals weaken ERIC and show conspiracy theories taking deep root*, VoteBeat (Mar. 13, 2023), https://www.votebeat.org/2023/3/13/23634072/eric-election-integrity-activists-clean-voter-rolls/; Andrew Bahl, *Voter ID system is secure despite conspiracy theories, officials say*, Cap Times (May 16, 2024), https://captimes.com/news/elections/voter-id-system-is-secure-despite-conspiracy-theories-officials-say/article_741eb830-13b2-11ef-9606-77d603cb41e7.html; Ruby Edlin *et al.*, *7 Facts About Voting — and Myths Being Spread About Them*, Brennan Center for Justice (updated Oct. 31, 2024), https://www.brennancenter.org/our-work/research-reports/7-facts-about-voting-and-myths-being-spread-about-them.

Wisconsin, alleging that States were not complying with federal law requirements about how voter lists are maintained.[2] To date, none of those cases has resulted in a court's holding that the defendant State's procedures violated HAVA or the NVRA.[3]

## II.    In 2025, US DOJ begins asserting authority to audit States' voter registration lists.

Until 2025, US DOJ often sided with the defendant States—at least in part—against private litigants' complaints about the state administration of

---

[2] *See* Petition ¶ 17, *Wisconsin ex rel. Cerny v. Wis. Elections Comm'n*, No. 24-CV-1353 (Cir. Ct. Waukesha Cnty. Aug. 16, 2024) (Doc. 10) (Ward-Packard Decl. Ex. 1); *see also Pub. Int. Legal Found. v. Benson*, No. 1:21-cv-0929 (W.D. Mich. Nov. 3, 2021); *Judicial Watch, Inc. v. Valentine*, No. 22-cv-3952 (E.D.N.Y. Jul. 6, 2022); *RNC v. Benson*, 1:24-cv-0262 (W.D. Mich. Mar. 13, 2024); *RNC v. Aguilar*, No. 2:24-cv-0518 (D. Nev. Mar. 18, 2024); *Judicial Watch, Inc. v. Weber*, No. 2:24-cv-3750 (C.D. Cal. May 6, 2024); *Utd. Sovereign Ams., Inc. v. Ohio*, No. 5:24-cv-1359 (N.D. Ohio Aug. 8, 2024); *Utd. Sovereign Ams., Inc. v. N.C. State Bd. of Elections*, No. 4:24-cv-0128 (E.D.N.C. Aug 28, 2024); *Utd. Sovereign Ams., Inc. v. Benson*, No. 5:24-cv-12256 (N.D. Mich. Aug. 28, 2024); *Utd. Sovereign Ams., Inc. v. Griswold*, No. 1:24-cv-2499 (D. Colo. Sep. 10, 2024); *Quinn v. Raffensperger*, No. 1:24-cv-4364 (N.D. Ga. Sep. 26, 2024); *Wortman v. Schmidt*, No. 1:24-cv-1655 (M.D. Pa. Sep. 27, 2024); *Judicial Watch, Inc. v. Griffin-Valade*, No. 6:24-cv-1783 (N.D. Ore. Oct. 23, 2024); *1789 Found., Inc. v. Schmidt*, No. 3:24-cv-1865 (M.D. Pa. Oct. 29, 2024); *1789 Found., Inc. v. Fontes*, No. 2:24-cv-2987 (D. Ariz. Oct. 30, 2024).

[3] *See, e.g.*, Order Vacating the Court's Oct. 3, 2025 Order, *Cerny*, No. 24-CV-1353 (Nov. 5, 2025) (Doc. 198) (Ward-Packard Decl. Ex. 2); *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613 (6th Cir. 2025) (affirming grant of summary judgment to Michigan secretary of state in case challenging sufficiency of Michigan's list-management practices); *Aguilar*, No. 2:24-cv-0518, 2024 WL 4529358 (D. Nev. Oct. 18, 2024) (granting motion to dismiss complaint challenging sufficiency of Nevada's list-management practices); *Quinn*, No. 1:24-cv-4364, 2025 WL 1561710 (N.D. Ga. Apr. 30, 2025) (granting motion to dismiss case challenging sufficiency of Georgia's list-management practices); *Schmidt*, 781 F. Supp. 3d 282 (M.D. Pa. May 2, 2025) (granting motion to dismiss complaint challenging sufficiency of Pennsylvania's list-management practices).

voter registration lists. In 2023, for instance, US DOJ argued that Maine was entitled to redact sensitive voter information when disclosing voter registration records under the NVRA.[4] And just last year, US DOJ argued in the Seventh Circuit in support of affirming this Court's decision that Wisconsin's NVRA exemption is valid.[5]

Over the summer of 2025, US DOJ began to shift course. It began demanding voter registration data from state elections officials, citing concerns about adequate list management. In particular, US DOJ indicated that it wanted "the last four digits of every voter's Social Security number."[6] As of this filing, US DOJ had made demands to at least 44 states.[7]

## III.  US DOJ sues States that refuse to provide unredacted voter lists, suing 24 States and the District of Columbia to date.

Most States refused US DOJ's demands for unredacted voter data. In response, US DOJ has sued 24 states and the District of Columbia.[8] The first

---

[4] Brief for United States as Amicus Curiae at 27, *Pub. Int. Legal Found., Inc. v. Bellows*, No. 23-1361 (1st Cir. July 25, 2023) (Ward-Packard Decl. Ex. 3).

[5] Brief for United States as Appellee at 62, *Pub. Int. Legal Found., Inc. v. Wolfe*, No. 24-3258 (7th Cir. Apr. 23, 2025) (Ward-Packard Decl. Ex. 4).

[6] Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sep. 9, 2025), https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html.

[7] Kaylie Martinez-Ochoa, *et al.*, *Tracker of Justice Department Requests for Voter Information*, Brennan Center for Justice (last updated Jan. 30, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information.

[8] *Id.* Only 11 states have indicated that they may comply with US DOJ's demands.

wave of lawsuits, filed in late September, raised an array of claims under the NVRA, HAVA, and—usually in passing—Title III.[9] Later-filed cases forewent NVRA and HAVA claims and emphasized Title III.[10] In one case, eighteen former US DOJ employees filed an amicus brief warning that US DOJ's proffered purpose for its demands "appears to be a stalking horse for its true purpose: to create a national voter roll and enable the federal government to conduct its own list maintenance."[11]

Two courts have already granted States' motions to dismiss.[12] In US DOJ's case against California, the district court held that its demand failed to satisfy Title III's requirements.[13] It ruled that Title III is a civil rights enforcement statute that may not be used to police States' voter list maintenance; that US DOJ had not provided a statutorily adequate basis or

---

[9] *See, e.g.*, Compl., *United States v. Bellows*, No. 25-cv-468 (D. Me. Sep. 16, 2025); Compl., *United States v. Oregon*, No. 25-cv-1666 (D. Or. Sep. 16, 2025); Compl., *United States v. Weber*, No. 25-cv-09149 (C.D. Cal. Sep. 25, 2025).

[10] *See, e.g.,* Compl., *United States v. Raffensperger*, No. 25-cv-0548 (M.D. Ga. Dec. 18, 2025); Compl., *United States v. Matthews*, No. 3:25-cv-3398 (C.D. Ill. Dec. 19, 2025); Compl., *United States v. Thomas*, No. 26-cv-00021 (D. Conn. Jan. 6, 2026); Compl., *United States v. Fontes*, No. 2:26-cv-00066 (D. Ariz. Jan. 6, 2026).

[11] Brief of Amici Curiae Former Employees of the U.S. Department of Justice at 2, *Weber*, No. 2:25-CV-09149 (Dec. 22, 2025) (Dkt. 121) (Ward-Packard Decl. Ex. 5).

[12] *Weber*, 2026 WL 118807, at *1 (Jan. 15, 2026); Minutes of Proceedings, *Oregon*, No. 6:25-cv-01666 (D. Or. Jan. 26, 2026) (Dkt. 68) (noting grant of motions to dismiss at hearing and indicating that a written opinion will follow).

[13] *Weber*, 2026 WL 118807, at *8–12.

purpose for its demand; and that US DOJ's proffered purpose was pretextual.[14]
The court also rejected claims under the NVRA and HAVA.[15] In US DOJ's case
against Oregon, the district court has granted a motion to dismiss but has not
yet issued its opinion.[16]

## IV. US DOJ requests information about Wisconsin's list maintenance practices, and the Commission provides detailed responses.

On June 17, 2025, US DOJ sent Commission Administrator Meagan
Wolfe a letter asserting that it had received complaints that the Commission
was "failing to comply with the list maintenance procedure requirements of
Section 303 of HAVA." (Dkt. 3-1:2.) The June 17 letter asked a series of
questions about Wisconsin's voter registration list. These questions related to
coordination with other States, removal of voters deemed "ineligible," removal
of "inactive" voters, removal of "duplicate voter registrations," removal of
"voters who have moved out of state," and removal of "registrants who are
ineligible due to non-citizenship." (Dkt. 3-1:1–2.) The June 17 letter also
requested Wisconsin's "current voter registration list," including "both active
and inactive voters." (Dkt. 3-1:2.) The June 17 letter did not request an
unredacted list or cite Title III.

---

[14] *Id.*

[15] *Id.* at *12–20.

[16] Minutes of Proceedings, *Oregon*, No. 6:25-cv-01666 (Jan. 26, 2026) (Dkt. 68).

On July 2, 2025, the Commission responded in a five-page letter answering each of US DOJ's questions in detail. (Dkt. 3-1:5–10.)[17] The Commission explained that it coordinates list management efforts with the State's Departments of Transportation, Corrections, and Health Services on a regular schedule. (Dkt. 3-1:6.) With respect to the request for Wisconsin's voter registration list, the letter explained that Wisconsin voter data is available through the online Badger Voters portal for a fee. (Dkt. 3-1:9.)

## V.    Five months later, US DOJ demands Wisconsin's entire voter registration list, including partial social security numbers and driver's license numbers.

Five months later, the Commission heard from US DOJ again. On December 2, 2025, US DOJ attorney Eric Neff emailed the Commission a demand for records with the subject line "Demand for Full Voter Roll from DOJ CRT":

To the Wisconsin Elections Commission:

Please consider this email a demand to provide within 7 days:

- An electronic copy of the full Wisconsin statewide voter registration list
    - o This list is to include, pursuant to the Help America Vote Act, either the last four digits of the social security number, the driver's license number, or both.

This request is for the purpose of ensuring compliance with minimum standards and routine voter list maintenance.

---

[17] The Complaint (Dkt. 1 ¶ 22) incorrectly states that Administrator Wolfe sent the July 2 letter.

If you have any questions, do not hesitate to contact me.

(Dkt. 3-1:11). Neff's email did not cite Title III, offer any basis for the demand, or cite any specific provision of HAVA.

The email attached a proposed memorandum of understanding intended to cover any agreement to share data; it cited the NVRA, HAVA, Title III, and the Privacy Act of 1974 (5 U.S.C. § 552a) as authorities. (*See* Dkt. 1 ¶ 24.)

## VI. The Commission offers to provide a voter list with sensitive information redacted and explains why state law forbids it from providing an unredacted list.

On December 11, 2025, the Commission responded to Neff's email with a six-page letter. (Dkt. 3-1:13–18.)[18] The Commission reiterated that it was "willing to provide any non-confidential voter registration data or records sought by US DOJ." (Dkt. 3-1:13.) The Commission explained that Wis. Stat. § 6.36(1)(b)1.a. prohibits it from disclosing certain personally identifiable information (PII), including driver's license numbers, social security numbers, addresses of confidential electors, and voting accommodations. (Dkt. 3-1:13.)

The Commission also indicated that it had reviewed the federal authorities cited in US DOJ's proposed agreement and concluded that none preempted Wisconsin's voter privacy protections. The Commission explained that Wisconsin is exempt from the NVRA, so the NVRA cannot impose any

---

[18] The Complaint (Dkt. 1 ¶ 25) incorrectly states that Administrator Wolfe sent the December 11 letter.

obligation to disclose PII; that no provision of HAVA obligates Wisconsin to disclose PII; that Neff's email did not "constitute the type of demand, including a statement of the basis and purpose" authorized by Title III; and that the Privacy Act applies to federal agencies, not state agencies. (Dkt. 3-1:14–15.)

The Commission described in detail Wisconsin's "11 major voter list maintenance processes." (Dkt. 3-1:15–17.) The letter concluded by reiterating the Commission's willingness to help US DOJ "obtain Wisconsin voter records through the process permitted by law," and offered to answer any further questions about those processes or list maintenance. (Dkt. 3-1:17–18.)

## VII.  US DOJ sues the Commission and moves for dispositive relief.

On December 18, US DOJ sued the Commission, its individual Commissioners, and Administrator Wolfe. (Dkt. 1.) The same day—and nearly two weeks before effectuating service—US DOJ filed a Motion for Order to Compel Production of Records Pursuant to 52 U.S.C. § 20701, *et seq*. (Dkt. 2.)

## LEGAL STANDARD

A court must dismiss a complaint if, accepting all well-pleaded factual allegations as true, the complaint does not "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A court need not "accept legal conclusions or threadbare allegations that merely recite the elements of a claim." *One Wis. Institute, Inc. v. Nichol*, 155 F. Supp. 3d 898, 901 (W.D. Wis. 2015); *see Ashcroft v. Iqbal*, 556 U.S 662, 678 (2009).

If the Court considers the merits of the motion to compel, it should construe it as a motion for summary judgment. A court may grant summary judgment only where the movant establishes "that there is no genuine dispute as to any material fact" and that it is "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Johnson v. Edward Orton, Jr. Ceramic Found.*, 71 F.4th 601, 609 (7th Cir. 2023) (citation omitted).

## ARGUMENT

US DOJ's demand ignores the choices Congress made in enacting HAVA and the NVRA, which leave voter maintenance to the States and confer no audit power on the federal executive. US DOJ's invocation of Title III of the Civil Rights Act of 1960, passed under the Fifteenth Amendment to enforce civil rights laws, fails to supply the authority US DOJ lacks; its demand does not even satisfy the procedural requirements of Title III. And providing an unredacted voter list to US DOJ would violate Wisconsin law that no federal statute preempts. The case should be dismissed.

US DOJ's motion to compel should thus be dismissed as moot, but it otherwise should be denied for the same reasons, as well as its conflict with the Privacy Act and the basic rules of civil procedure.

## I.     The Complaint fails to state a claim.

### A.     US DOJ's claimed authority conflicts with HAVA's remedial scheme.

US DOJ's assertion of authority to police HAVA compliance conflicts with HAVA itself and is therefore *ultra vires*. HAVA (and the NVRA) allocate responsibilities under the Elections Clause. Congress chose to give the States discretion about how to manage voter registration lists; gave Wisconsin even more discretion than most other states; and authorized US DOJ to enforce Congress's choices only by means of civil actions for declaratory and injunctive relief. Pasting Title III's delegation of Fifteenth Amendment authority onto this scheme would violate Congress's careful allocation of those responsibilities.

### 1.     HAVA and the NVRA impose only limited, open-ended list maintenance obligations on covered States.

The Elections Clause gives the States default authority over federal election administration, subject to Congress's superintending authority. It provides: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art I, § 4, cl. 1.

Congress has exercised its Elections Clause authority by enacting two laws regulating the States' voter registration practices. Neither imposes a comprehensive registration list maintenance regime on the States; rather, each affords covered States considerable discretion about how to implement Congress's broad mandates. And by virtue of two statutory exemptions, federal law imposes even fewer obligations on Wisconsin than it does on most other states.

Congress enacted the National Voter Registration Act in 1993 to standardize registration requirements for federal elections. *See* Pub. L. No. 103–31, 107 Stat. 77 (now codified at 52 U.S.C. §§ 20501 *et seq.*). The NVRA's requirements for covered States include accepting a standard federal registration form, providing an opportunity to register when a person applies for or renews a driver's license, and permitting mail registrations for several categories of voters. *See* 52 U.S.C. §§ 20503–05.

Section 8 of the NVRA addresses voter registration lists. *See id.* § 20507. It gives States discretion to manage their lists, requiring only that States make "a reasonable effort to remove the names of ineligible voters," *id.* § 20507(a)(4), and imposing a few specific, pro-voter mandates, including that States follow a set of steps before deregistering a voter, *id.* § 20507(a)(3).

Congress enacted the Help America Vote Act in 2002 to improve election infrastructure and further standardize administration. *See* Pub. L. 107–252,

16

116 Stat. 1666 (now codified at 52 U.S.C. §§ 20901 *et seq.*). HAVA mandates that States requiring registration establish "a single, uniform, official, centralized, interactive computerized statewide voter registration list." 52 U.S.C. § 21083(a)(1)(A). HAVA also supplements the list maintenance regulations established by the NVRA by requiring that the names of all registered voters appear on the computerized list, that only voters who are not registered or eligible are removed, and that duplicates are removed. *Id.* § 21083(a)(2)(B). HAVA does not specify how States are to comply with these mandates; rather, "[t]he specific choices on the methods of complying with" HAVA are "left to the discretion of the State[s]." *Id.* § 21085.

A separate subsection of HAVA requires state officials who process new registrations not to accept a federal registration unless it includes, where available, either a driver's license number or a partial social security number. *Id.* § 21083(5)(A)(i). Applicants who have not been issued driver's license or social security numbers may instead be assigned "unique identifying numbers." *Id.* § 21083(5)(A)(ii). States are entitled to "determine whether the information provided by an individual is sufficient . . . in accordance with State law." *Id.* § 21083(5)(A)(iii).

Neither the NVRA nor HAVA authorizes US DOJ to conduct an audit of a State's practices; under each, US DOJ's only enforcement tool is "a civil

action" for "declaratory and injunctive relief." *Id.* § 20510 (NVRA); *id.* § 21111 (HAVA).

### 2.    Wisconsin is exempt from the entire NVRA and from HAVA's specific list maintenance provisions.

States are exempt from the NVRA if they have maintained pro-voter registration rules continuously since August 1, 1994, including allowing same-day registration at polling places. *See id.* § 20503(b). States exempt from the NVRA are also exempt from HAVA's list-maintenance provisions; they are instead entitled to "remove the names of ineligible voters from the computerized list in accordance with State law." *Id.* § 21083(a)(2)(A)(iii).

Wisconsin, which has allowed same-day registration since August 1994, is exempt from the entire NVRA. *Pub. Int. Legal Found., Inc. v. Wolfe*, No. 24-CV-285-JDP, 2024 WL 4891940, at *2 (W.D. Wis. Nov. 26, 2024). Wisconsin is thus also exempt from HAVA's list-maintenance provisions; it has discretion to conduct its list maintenance in "accordance with State law." 52 U.S.C. § 21083(a)(2)(A)(iii). So long as Wisconsin (i) establishes a statewide, computerized list and (ii) maintains that list in accordance with Wisconsin law, it complies with HAVA.

3.    **Incorporating Title III into HAVA's remedial scheme would undermine Congress's choices about how to delegate and allocate enforcement powers.**

Here, US DOJ claims that it may use Title III to police Wisconsin's compliance with purported HAVA obligations. That novel theory cannot be squared with Congress's design of the HAVA statutory scheme.

Title III exercises Congress's enforcement powers under section 2 of the Fifteenth Amendment. *See United States v. Mississippi*, 380 U.S. 128, 138 (1965) (upholding the Civil Rights Act of 1960 under section 2); *cf. South Carolina v. Katzenbach*, 383 U.S. 301 (1966) (upholding the Voting Rights Act of 1965 on the same basis). Specifically, Title III delegates some of those powers to the executive branch, in the form of US DOJ.

HAVA, by contrast, exercises Congress's powers under the Elections Clause. *Colon-Marrero v. Velez*, 813 F.3d 1, 19 (1st Cir. 2016); *see* H.R. Rep. 107–329, pt. 1, 2001 WL 1579545, at *57. That exercise of power has two throughlines.

First, Congress made HAVA a limited and precise infringement on States' otherwise-plenary authority to administer elections. Congress left the "specific choices on the methods of complying with [HAVA's] requirements" to the States' discretion. 52 U.S.C. § 21085. Even in HAVA's mandatory provisions, Congress employed broad language that gives States room to maneuver. *See, e.g., id* § 21083(a)(2)(A) (requiring that list maintenance occur

"on a regular basis"); *id*. § 21083(a)(3) (requiring "adequate" security measures for computerized registration lists). And Congress maintained the exemptions it had previously granted to certain States, including Wisconsin. *See id*. § 21083(a)(2)(A)(iii), (b)(5).

Second, Congress's delegation of its Elections Clause powers to the executive branch was just as limited and precise. HAVA created a new bipartisan, independent commission—the Electoral Assistance Commission— and delegated duties to that body rather than assigning them to the President or an existing executive agency under direct presidential control. *See id*. §§ 20921–23. HAVA grants only routine litigation authority to US DOJ, not any broader investigatory or oversight authority. *See id*. § 21111. And HAVA invites States to police their own compliance by requiring state-run administrative complaint procedures for states that accept federal funds. *See id*. § 21112.

Assessed against this backdrop, US DOJ's account of its Title III authority makes no sense. US DOJ is claiming authority under Title III to enforce an *Elections Clause* scheme against Wisconsin. But Title III delegates Fifteenth Amendment authority, not Elections Clause authority. And when Congress made choices about how to allocate Elections Clause authority by enacting HAVA, it (i) left Wisconsin's default election-administration authority

almost wholly undisturbed and (ii) delegated only a precise quantum of authority to the executive branch.

In a recent case involving a similarly sweeping executive-branch assertion of Elections Clause authority, the court concluded that the "proper remedy" for a statutory conclusion that would nullify "Congress's careful structural choices" would be to "invalidate Congress's entire delegation of authority . . . rather than to eliminate only the procedural protections that Congress has built into its limited delegation of its Elections Clause authority." *League of United Latin Am. Citizens v. Exec. Off. of President*, No. CV 25-0946, 2025 WL 3042704, at *31 (D.D.C. Oct. 31, 2025).

Similar logic applies here, though the remedy is more straightforward. The Court should construe Title III's scope not to extend to HAVA enforcement. To hold otherwise would be to grant US DOJ "unfettered authority to cast about for potential wrongdoing" that Congress never authorized. *CFPB v. Accrediting Council for Indep. Colleges & Sch.*, 854 F.3d 683, 690 (D.C. Cir. 2017).

### 4.   Wisconsin has no relevant HAVA obligations that US DOJ could audit.

Even if Title III were available to police HAVA compliance in some circumstances, this would not be such a case. US DOJ cites two HAVA provisions as the focus of its proposed audit. (Dkt. 3:12–13.). The first,

52 U.S.C. § 21083(a)(5)(A), requires state officers who process voter registration applications to reject any that lack a driver's license number or partial social security number. The second, 52 U.S.C. § 21083(a)(2)(B)(iii), supplements the list-maintenance regulations created by the NVRA.

Neither provision imposes list maintenance obligations on Wisconsin. Subsection 21083(a)(5)(A) imposes no list maintenance obligations on any State; it regulates how officials should process applications to register but says nothing about list management. And subsection 21083(a)(2)(B)(iii) imposes no list maintenance obligations on Wisconsin; it specifies how states should perform list maintenance "under subparagraph A," but Wisconsin is exempt from the subparagraph A in question. *See* 52 U.S.C. § 21083(a)(2)(A)(iii). US DOJ cannot audit Wisconsin's compliance with obligations it does not have.

## B. US DOJ's demand to the Commission was not a valid demand under Title III.

US DOJ also fails to comply with the basic requirements of a Title III demand. Title III authorizes this Court to issue an order for production only if Wisconsin failed to comply with a valid Title III demand. *See* 52 U.S.C. § 20705. Here, the Complaint alleges that the demand was Neff's December 2, 2025, email to Administrator Wolfe, which asserted that US DOJ was demanding Wisconsin's registration list "for the purpose of ensuring compliance with minimum standards and routine voter registration list

22

maintenance." (Dkt. 1 ¶ 23 (quoting Dec. 2 Email).)  That demand was not valid under Title III. It lacked a lawful purpose, lacked a basis of any sort, and exceeded Title III's scope.

> ### 1.     Title III authorizes US DOJ to investigate violations of Americans' right to vote.

Title III's text and the context of its enactment tell the same story: Congress intended Title III to be a tool for protecting individual Americans' civil rights, chief among them the right to vote.

Congress passed the Civil Rights Act of 1960, including Title III, to shore up the preexisting civil rights enforcement scheme. In 1957, Congress, exercising its Fifteenth Amendment enforcement power, passed the first civil rights law since Reconstruction. *See* Civil Rights Act of 1957, Pub. L. No. 85–315, 71 Stat. 637.  Scholars have described that law as a product of compromise, and a symbolic but limited first step toward equality under law. *See* Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the United States* 260 (2000); *see generally* Robert Caro, *The Years of Lyndon Johnson: Master of the Senate* chs. 37–40 (2002).

The 1957 Act did not establish new substantive rights; instead, it expanded the federal government's capacity to enforce substantive rights previously conferred by Reconstruction-era statutes and the Fourteenth and Fifteenth Amendments. *See, e.g.*, 71 Stat. at 637 (creating subsections

(b) through (d) of the statute now codified at 52 U.S.C. § 10101). The 1957 Act created the bipartisan Commission on Civil Rights and empowered it to "investigate allegations . . . that certain citizens of the United States are being deprived of their right to vote and have that vote counted by reason of their color, race, religion, or national origin." *Id.* at 635. And the Act created US DOJ's civil rights division and authorized the attorney general to seek injunctive relief in voting rights cases. *Id.* at 637.

The 1957 Act's enforcement scheme soon proved inadequate. The Civil Rights Commission's 1959 report to the President and Congress complained that southern States were hindering that Commission's investigations, as well as US DOJ's enforcement efforts, by destroying or blocking access to voting records—particularly Black would-be voters' registration applications. *See* Comm'n on Civil Rights, 1959 Report of the United States Commission on Civil Rights 137 (Ward-Packard Decl. Ex. 6).

The Report was replete with examples of state courts and local officials destroying or limiting access to voting records in order to deny voting rights. An Alabama state court judge foiled Commission investigators by impounding the voter registration records of several counties, warning that "if any agent of the Civil Rights Commission comes down here to get them, they will be locked up." *Id.* at 70. An Alabama county destroyed rejected applications within 30 days. *Id.* at 93. And Louisiana parish registrars denied federal investigators

24

access to registration records, citing a state law that allowed inspection "only by a registered voter of the parish." *Id.* at 98; *see generally id.* at 40–106 (collecting more examples).

The Commission concluded that "[s]uch practices" were "beyond the effective reach of the present remedial provisions of the Civil Rights Act of 1957." *Id.* at 137. It recommended that Congress enact a new law requiring the States to preserve registration and voting records for inspection. *Id.* at 138. President Eisenhower concurred, urging passage of such a law on the grounds that "[a]ccess to registration records is essential to determine whether the denial of the franchise was in furtherance of a pattern of racial discrimination." Dwight D. Eisenhower, Special Message to the Congress on Civil Rights (Feb. 5, 1959) (Ward-Packard Decl. Ex. 7).

Congress answered the call by enacting the Civil Rights Act of 1960. Title III of that Act requires preservation of certain records, imposes criminal liability on persons who violate the preservation requirement, and creates a process for DOJ to inspect certain records. *See* 74 Stat. at 88–89 (now codified at 52 U.S.C. §§ 20701–06). Congress was explicit that the "purpose of Title III" was "to provide a more effective protection of the right of all qualified citizens to vote without discrimination on account of race." H.R. Rep. No. 86-956 at 7 (1959), 1959 WL 3581 at *1945. President Eisenhower shared Congress's understanding; his signing statement predicted that Title III would be

"of invaluable aid in the successful enforcement of existing voting rights statutes." Dwight D. Eisenhower, Statement by the President Upon Signing the Civil Rights Act of 1960 (May 6, 1960) (Ward-Packard Decl. Ex. 8).

The other Titles of the 1960 Act tell the same story. All but one aimed to redress other defects in the 1957 Act's civil rights enforcement scheme. *See Katzenbach*, 383 U.S at 313 (describing the 1960 Act as making "[p]erfecting amendments" to the 1957 Act). Title I criminalized obstructing federal court orders "by threats or force." 74 Stat. at 86. Title II expanded federal criminal liability for bombing, bomb threats, and related conduct. *Id.* at 86–87. Title IV expanded the authority of the Civil Rights Commission to administer oaths and take witness statements. *Id.* at 89. And Title VI redefined "vote," as that term had been used in the 1957 Act, to encompass all acts requisite to voting, including registration. *Id.* at 91–92.[19]

Title III's statutory text confirms what its enactment context suggests: It is a delegation of Congress's Fifteenth Amendment powers intended to be used to protect the right to vote. Every part of the statutory scheme aims at combatting a specific segregationist tactic—destroying, altering, or misplacing voting records to prevent Black citizens from registering and casting effective ballots.

---

[19] Title V provided for free public education for children of members of the armed forces residing on federal property. 74 Stat. at 89–90.

The statutory scheme has three key features. First, Title III requires that for twenty-two months following any federal election, elections officials must "retain and preserve" "all records and papers which come into [an official's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting." 52 U.S.C. § 20701. Second, criminal liability attaches to officials who willfully violate the preservation requirement, as well as to any other person who "willfully steals, destroys, conceals, mutilates, or alters" covered records. *Id.* §§ 20701–02. And third, US DOJ may inspect covered records by making a "demand in writing" that states "the basis and the purpose therefore," with judicial process available to procure compliance where appropriate. *Id.* §§ 20703, 20705.

When these provisions are read as "a single coherent whole," *Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 355 (1999), the overall scheme is plain: Title III requires that States maintain voter registration records so that the federal government can review those records when it reasonably believes that a State has violated voters' civil rights in a federal election. The nature of the covered records, connection to the timing of an election, and focus on preservation without alteration, all confirm that Article III is a tool for ensuring that Americans' voting rights are not violated through discriminatory state practices.

### 2.    US DOJ's demand lacks a lawful purpose.

Any demand for records under Title III must "contain a statement of the basis and the purpose therefore." 52 U.S.C. § 20703. Here, the demand's alleged purpose was to "ensure[]" Wisconsin's "compliance with minimum standards and routine voter registration list maintenance," (Dkt. 1 ¶ 23 (quoting Dec. 2 Email)—in other words, a list management audit.

Conducting such an audit is not a permissible "purpose" under Title III because the proposed audit would do nothing to further civil rights enforcement. US DOJ does not allege that its proposed audit would enforce the Civil Rights Act of 1960, other civil rights laws, or any constitutional amendment. Nor could it. US DOJ's concern appears to be that Wisconsin is not removing ineligible voters from its rolls fast enough. (*See, e.g.*, Dkt. 3:12; Dkt. 3-1:2.) That concern is baseless, (*see* Dkt. 3-1:13–18), but it also has nothing to do with civil rights. In the elections context, civil rights laws protect individual citizens' right to vote. *See, e.g.*, 52 U.S.C. § 10101. If Wisconsin were *removing* voters from the rolls without sufficient reason, the right to vote might be implicated. But *failing* to remove voters in a timely fashion would not violate substantive civil rights law.

### 3.    US DOJ's demand lacked any basis.

The requirement to provide a "basis" for a Title III demand is separate from the "purpose" requirement. *See* 52 U.S.C. § 20703. The term "and" is

"conjunctive," and when used in a list means that all items "are required." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 116 (2012). Title III thus requires US DOJ "to offer a written statement of *both* the purpose and basis for its demands." *United States v. Weber*, No. 25-cv-09149, 2026 WL 118807, at *8 (C.D. Cal. Jan. 15, 2026).

Here, US DOJ did not attempt to articulate a valid basis in its demand. The demand was thus invalid under Title III's plain text.

The lack of any articulated basis is not surprising. As US DOJ's across-the-board demands reflect, it is not engaged in a targeted investigation into Wisconsin's list management practices (or any other State's). It cited no basis for the demand because it has none.

### 4. US DOJ's demand exceeded Title III's permitted scope.

Title III applies only to "records and papers which come into [an official's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting." 52 U.S.C. § 20701. Wisconsin's unredacted voter list is not such a record because it did not "come into [the Commission's] possession." Instead, the voter list is generated and maintained by the Commission, with extensive assistance from local and county elections officials. (*See* Dkt. 3-1:15–18.) By its plain terms, Title III does not authorize a demand for such a record.

Start with ordinary meaning. Although dictionaries do not define "come into possession," a phrase, they often use that phrase in definitions. For instance, Merriam-Webster uses the phrase "come into possession" in its definitions of "receive," "acquire," "attain," and "inherit."[20] Black's Law Dictionary similarly employs the phrase in its definition of "receive." *Receive*, Black's Law Dictionary (12th ed. 2024). As a matter of ordinary usage, the Commission does not "receive," "acquire," or "attain" a registration list that it generates internally.

Immediate statutory context dictates the same reading. Each of the listed instances of a covered record—an "application, registration, [or] payment of poll tax"—refers to an individual record that a voter submits *to* an elections official. Where a statute lists specific examples of a general type, courts "should read the examples as limiting" the general category. *Begay v. United States*, 553 U.S. 137, 143 (2008). Here, that rule dictates reading "come into possession" not to cover Wisconsin's complete, unredacted voter list, which is not an individual record submitted by a voter to an official.

---

[20]    *Receive*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/receive (last accessed Feb. 2, 2026); *Acquire*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/acquire (last accessed Feb. 2, 2026); *Attain*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/attain (last accessed Feb 2, 2026); *Inherit*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/inherit (last accessed Feb. 2, 2026).

Other federal statutes employing the phrase "come into possession" exclude internally generated things from that phrase. For instance, 50 U.S.C. § 217 requires a servicemember to give notice of and relinquish any "captured or abandoned property" that "comes into his possession." That prohibition makes perfect sense as applied to property received or obtained from an external source; it makes no sense at all for property a servicemember personally creates or generates. *See also, e.g.*, 18 U.S.C. § 1709 (applying a similar rule to postal workers). And Congress knows how to use the broader alternative "in the possession of" when that is what it means. *See*, *e.g.*, 7 U.S.C. § 12 (authorizing the Commodity Futures Trading Commission to publicly disclose certain "information in the possession of the Commission").

The "cardinal principle" of statutory interpretation is "that courts must give effect, if possible, to every clause and word of a statute." *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (citation omitted). That principle is yet stronger where Congress "did not adopt obvious alternative language." *Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017) (citation omitted). Here, the Court should give effect to Congress's choice of the phrase "come into possession"—rather than the obvious alternative "in the possession of"—by limiting Title III's scope to externally created records.

31

### 5.    US DOJ may not evade meaningful judicial review of the demand's legality.

Relying on *Kennedy v. Lynd*, US DOJ says the Court may not "ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." (Dkt. 1 ¶ 4 (quoting 306 F.2d 222, 226 (5th Cir. 1962)).) The Court need not make those inquiries to grant the motion to dismiss; the demand contained no statement of basis at all.

In any case, *Lynd* is wrong. The usual rule—applied by many courts across many statutory contexts—is that when the government demands documents, it must establish that the demand has a legitimate purpose, a colorable basis, and a reasonable scope. *See, e.g.*, *United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 4 (1st Cir. 1996) (announcing a general rule that to enforce an administrative subpoena, "the agency must prove that (1) the subpoena is issued for a congressionally authorized purpose, the information sought is (2) relevant to the authorized purpose and (3) adequately described, and (4) proper procedures have been employed in issuing the subpoena"); *In re Sealed Case (Admin. Subpoena)*, 42 F.3d 1412, 1417 (D.C. Cir. 1994) (applying an "articulable suspicion" standard to Office of Thrift Supervision subpoenas); *United States v. Theodore*, 479 F.2d 749, 754 (4th Cir. 1973) (holding a tax summons unenforceable because it was "overbroad and disproportionate to the

end sought"); *see also In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 238 (D. Mass. 2025) (quashing a pretextual subpoena under the *Sturm, Ruger* standard).[21]

Given that federal courts have required sufficient showings for many other categories of document demands, the requirement of a "basis and purpose" in Title III should be read as imposing a similar requirement. *Lynd* offers no analysis of Title III to suggest that that law is unique.[22] The Court should treat the demand as it would any other government document demand.

## C. Federal law does not preempt Wisconsin law's restrictions on disclosing voters' personally identifiable information.

By insisting that it needs an *unredacted* voter list, US DOJ has failed to state a plausible claim for relief in a third sense. Wisconsin law requires redaction of driver's license and social security numbers absent a handful of inapplicable exceptions. And Title III does not preempt that requirement.

---

[21] In cases where the target of a demand makes a sufficient showing of improper purpose and irreparable injury, courts have even granted *pre-enforcement* relief from document demands. *See Media Matters for Am. v. Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025) (affirming prophylactic injunction against state attorney general's civil investigative demand because demand was issued to retaliate against journalists' First Amendment expression and was causing irreparable chill).

[22] *Lynd*'s only justification of any sort appears to be an overreading of *Hannah v. Larche*, 363 U.S. 420 (1960). *See Kennedy v. Lynd*, 306 F.2d 222, 225 (5th Cir. 1962) (citing four authorities that all trace back to *Hannah*). In *Hannah*, the Supreme Court upheld certain procedural rules of the Civil Rights Commission. 363 U.S. at 421. It is far from clear why that holding, which did not construe the phrase "appropriate process" or evaluate any procedures use in adversarial Article III courts, would dictate the meaning of Title III. *Lynd* does not explain the leap.

So, even if Title III otherwise entitled US DOJ to Wisconsin's registration list, the Commission would still be required to redact that list under state law.

### 1. Wisconsin election law limits disclosure of voters' sensitive private information, including social security and driver's license numbers.

Wisconsin election statutes provide for broad availability of most voter data, while at the same time protecting sensitive voter information.

Through a proper request, "any person" may obtain the state's official registration list. Wis. Stat. § 6.36(1)(b)1. The Commission routinely provides the entire list or portions thereof to candidates, parties, civic organizations, academic researchers, journalists, and interested members of the public. That list, however, has certain important information redacted to protect voters' privacy.

Five categories of personally identifying information ("PII") must be redacted when the list is publicly disclosed. Specifically, state law bars the Commission from disclosing an elector's "date of birth, operator's [*i.e.*, driver's] license number, or social security account number . . . the address of [a confidential elector], or any indication of [a voting] accommodation." Wis. Stat. § 6.36(1)(b)1.a.; *see also id.* § 6.47 (regulating confidential electors); *id.* § 7.15(14) (authorizing voting accommodations). In general, such PII may be disclosed only to certain designated Wisconsin elections officials who use it to carry out their duties. *Id.* § 6.36(1)(b)1.a.

That general rule has three exceptions. First, the Commission must share unredacted PII as necessary to comply with Electronic Registration Information Center (ERIC) membership agreements. *Id.* § 6.36(1)(ae). Second, the Commission "may" —but is not required to—provide unredacted PII "to a law enforcement agency . . . to be used for law enforcement purposes." *Id.* § 6.36(1)(bm). And third, the Commission may provide PII "to a subunit of the state government of another state to be used for official purposes." *Id.* § 6.36(1)(bn).

US DOJ has not argued that any of these exceptions applies to its demand. None does. The ERIC and other-state-subunit exceptions clearly do not apply. And although US DOJ is a law enforcement agency, the law enforcement exception does not apply either, for several reasons.

First, US DOJ did not issue the demand in furtherance of a "law enforcement purpose[]." As explained, *supra* § I.A., the law US DOJ purports to be enforcing—HAVA—does not give it any authority to audit Wisconsin's list management. Second, the Commission understands section 6.36(1)(bm) to authorize release of unredacted PII only where law enforcement makes a particularized showing of need. US DOJ's fishing expedition does not qualify. And third, the exception uses a discretionary "may," Wis. Stat. § 6.36(1)(bm), and so the Commission's decision was a valid exercise of its discretion.

Because Wisconsin law prohibits release of the unredacted voter list to US DOJ, it may obtain that list only if federal law preempts Wisconsin law. *See Tafflin v. Levitt*, 495 U.S. 455, 458 (1990).

### 2. Title III does not preempt Wisconsin law's voter privacy safeguards.

Title III's demand provision does not preempt the state-law requirement that the Commission redact PII from the voter list.

As a threshold matter, Congress's choices since enacting Title III make any preemption argument uphill sledding. The NVRA contains a public inspection provision, 52 U.S.C. § 20507(i)(1), but courts have held that Congress intended to allow redaction of PII under that provision, *see, e.g. Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 55–56 (1st Cir. 2024); *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 267 (4th Cir. 2021); *see also Bellows*, 92 F.4th at 56 (collecting further cases). And HAVA does not contain a public inspection provision at all. So, any preemption argument would need to posit that Congress (i) did not require disclosure of any sort in the federal law regulating computerized registration lists; (ii) required disclosure but allowed PII redaction in the federal law regulating registration more broadly; yet (iii) preempted redaction of PII derived from computerized registration lists in a law enacted half a century before such lists existed.

Basic preemption principles foreclose a finding of preemption here, in three respects. First, under *Murphy v. NCAA*, 584 U.S. 453, 477 (2018), the Title III demand provision may not effectuate preemption of any sort, because it does not "regulate private actors." Second, the state-law PII redaction rule may not be preempted, because it also does not regulate private actors. And third, Title III does not preempt PII redaction under any recognized variety of the doctrine.

Under the Supremacy Clause, the laws of the United States "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. The scope of a statute's preemptive effect is determined by congressional intent: "the purpose of Congress is the ultimate touchstone" in every preemption case. *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) (quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996)).

"The Supreme Court has recognized 'three different types of preemption—conflict, express, and field.'" *McHenry County v. Raoul*, 44 F.4th 581, 587 (7th Cir. 2022) (quoting *Murphy*, 584 U.S. at 477)). All three "work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Murphy*, 584 U.S. at 477. To be "valid," a preemption

provision "'must be best read as one that regulates private actors.'" *McHenry County*, 44 F.4th at 587 (quoting *Murphy*, 584 U.S. at 477); *see also id.* at 588 ("The Court said at least three times in *Murphy* that a valid preemption provision is one that regulates private actors."). Here, Title III's demand provision, 52 U.S.C. § 20703, regulates state actors, not private actors.

That section entitles US DOJ to demand that "the person having custody, possession, or control of [a covered] record or paper" make that record or paper "available for inspection, reproduction, and copying at the principal office of such custodian." Read in terms of Title III's preservation provision, "person" in this provision refers either to the state "officer of election" or to the "custodian" charged by state law with preserving the record in question, *id.* § 20701—that is, to state, not private actors. The "principal office" clause in § 20703 confirms this reading. That clause makes sense only with respect to state officers who, unlike private persons, necessarily have "principal offices." Accordingly, under *Murphy*, the demand provision does not preempt Wisconsin law.

And Wisconsin's PII redaction requirement, Wis. Stat. § 6.36(1)(b)1.a., likewise does not regulate private actors. It regulates the Commission, which is required to provide PII to certain other state officials and otherwise to redact PII when it prepares voter registration data for public inspection. Accordingly, under *Murphy*, the redaction requirement is not preempted, either.

Even aside from *Murphy*, no recognized form of preemption applies. Title III does not expressly prohibit redaction, so express preemption does not apply. *See Murphy*, 584 U.S. at 478. Nor has Congress determined that the administration of registration lists is "a field" that "must be regulated by its exclusive governance." *McHenry County*, 44 F.4th at 588 (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)). To the contrary, the NVRA and HAVA both affirmatively encourage "supplementary state legislation." *Id.* at 589 (quoting *Murphy*, 584 U.S. at 479); *see supra* § I.A.1. Thus, field preemption does not apply, either.

That leaves conflict preemption. This "doctrine includes 'cases where compliance with both federal and state regulations is a physical impossibility'"—*i.e.*, impossibility preemption—"'and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" *i.e.* obstacle preemption. *McHenry County*, 44 F.4th at 591 (quoting *Arizona*, 567 U.S. at 399).

Neither variety fits. Providing information to US DOJ about Wisconsin's voter list while complying with Wis. Stat. § 6.36(1)(b)1.a. is not impossible: the Commission could comply with both laws by providing a redacted record. And Wisconsin's requirement that the Commission redact voter PII—chiefly, driver's license numbers and partial social security numbers—is not an

obstacle to Congress's objectives in Title III. US DOJ has not identified any instance where Wisconsin redacted driver's license or partial social security numbers to further a scheme aimed at denying any category of voters the franchise.

US DOJ's cursory argument in favor of preemption, (Dkt. 3:13–15), relies on a South Carolina trial court order that declined to block the state election commission from releasing South Carolina's registration list to US DOJ. *Crook v. S.C. Election Comm'n*, No. 2025-CP-40-06539 (Richland Cnty., S.C., Ct. Comm. Pleas Oct. 1, 2025) (Neff Decl. Ex. 5). But that order said nothing about preemption. And for good reason—it concluded that "South Carolina law vests the Election Commission with the authority" to share data with US DOJ. *Crooks*, No. 2025-CP-40-06539, at 5 (Neff. Decl. Ex. 5:6).[23] The court had no reason to analyze preemption because it saw no potential conflict between state and federal law.

---

[23] South Carolina law indeed appears to be more permissive than Wisconsin law. *Contrast* S.C. Code Ann. § 7-5-186(C) ("The commission may provide such otherwise confidential information or data to persons or organizations that are engaging in legitimate governmental purposes related to the maintenance of the statewide voter registration list."), *with* Wis. Stat. 6.36.

## II.    The Court should deny the motion to compel.

### A.    By taking custody of the voter information it demands, US DOJ would violate the Privacy Act.

The Privacy Act of 1974, as codified at 5 U.S.C. § 552a, bars US DOJ's claim for Wisconsin voters' information.[24] Under the Privacy Act, federal agencies generally are prohibited from collecting or maintaining records related to an individual's First Amendment activities. 5 U.S.C. § 552a(e)(7). And agencies must follow specific procedures before they "maintain, collect, use, or disseminate," *id.* § 552a(a)(3), any group of records searchable by individual, *see id.* § 552a(e).

Both restrictions apply here. Wisconsin voting records track election participation, so they describe how individuals exercise "rights guaranteed by the First Amendment." *Id.* § 552a(e)(7). US DOJ thus may collect and maintain such records only (i) if "expressly authorized by statute," (ii) with permission from all affected individuals, or (iii) because the records are "pertinent to and within the scope of an authorized law enforcement activity." *Id.*

US DOJ's demand satisfies none of those exceptions. The only one that might fit is the third. But US DOJ has not articulated any "authorized law

---

[24] Although the Privacy Act is generally an affirmative defense, and so may not be cognizable on a motion to dismiss, *see Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012), it at a minimum preclude granting the motion to compel at this juncture.

enforcement activity" that the complete, unredacted voter list pertains to. It has not described the purpose, mechanisms, or scope of its proposed audit at all, leaving the Court without any means to assess their legality. And as explained, HAVA does not grant US DOJ authority to conduct such an audit.

And more generally, US DOJ seeks to assemble a system of records searchable by individual, an activity that under the Privacy Act requires advance publication of a system of records notice in the Federal Register. *Id.* § 552a(e)(4). US DOJ has neither alleged that it has published such a notice nor, to the Commission's knowledge, published any such notice.[25]

### B.      The motion to compel is improper.

The motion to compel is procedurally and substantively improper. This case is governed by the Federal Rules of Civil Procedure. The Federal Rules provide a procedure for "summary" relief, a procedure which US DOJ has not followed. And at this juncture, disputes of material fact would preclude a grant of summary judgment to US DOJ.

---

[25] For similar reasons, US DOJ appears to have violated the E-Government Act's requirement to prepare a privacy impact statement before collecting certain information about identifiable individuals. *See* Pub. L. No. 107–347, § 208, 116 Stat. 2899 (2002). The Commission will assert any other applicable affirmative defenses if and when it answers.

### 1. The Federal Rules of Civil Procedure govern this case.

Title III provides that a court may compel compliance with a valid demand "by appropriate process." 52 U.S.C. § 20705. The Federal Rules "govern the procedure in all civil actions and proceedings in the United States district courts, except as stated in Rule 81." Fed. R. Civ. P. 1. And Rule 81 provides no exception here; to the contrary, it indicates that the Federal Rules "apply to proceedings to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute, except as otherwise provided by statute, by local rule, or by court order in the proceedings." Fed. R. Civ. P. 81(a)(5); *see also Weber*, 2026 WL 118807, at *8 (citing Rule 81 and holding that the Federal Rules control US DOJ's Title III action against California). Thus, absent a specific statutory instruction to the contrary, the Federal Rules of Civil Procedure dictate the "appropriate process" in federal court.

Supreme Court precedent confirms that Title III does not contain a contrary statutory instruction. In *United States v. Powell*, the Supreme Court held that the Federal Rules govern the procedures to be followed when a federal statute provides that a court may grant certain relief "by appropriate process." 379 U.S. 48, 52, 58 n.18 (quoting 26 U.S.C. § 7504(a) & (b)). To be sure, that conclusion comes from a footnote and is not the main holding of

*Powell*. But the central question in *Powell* was one about appropriate investigative process, *id.* at 52–53, and the *Powell* footnote is the only binding appellate authority construing the phrase "by appropriate process."

> **2.    The Federal Rules dictate the process by which a party may obtain "summary" relief.**

US DOJ claims entitlement to "summary" relief. (Dkt. 3:7 (citation omitted).) But the Federal Rules provide the mandatory procedure for obtaining summary relief in federal civil actions. To obtain such relief, a party must show "that there is no genuine dispute as to any material fact" and that it is "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Here, US DOJ would need to meet that standard with respect to its claim that it made a valid demand to the Commission.

*Lynd*'s conclusion that Title III instead dictates a "special statutory proceeding" in "the form of a traditional order to show cause," 306 F.2d at 225, should be rejected. *Lynd* predates *Powell* and, unlike *Powell*, is not binding on this Court. *Lynd* does not ground its deviation from federal procedural norms in Title III's text which, again, just requires an "appropriate process." And *Lynd*'s invocation of order to show cause procedures is problematic under the Federal Rules and Seventh Circuit precedent. *See SEC v. Hyatt*, 621 F.3d 687, 696 (7th Cir. 2010). Show-cause orders are "burdensome," *id.* and create an "unnecessary appearance of irregularity," *id.* (quoting *Application of Tracy*,

106 F.2d 96, 98 (2d Cir. 1939) (Clark, J., concurring)), by inverting usual burdens. For those reasons, the Federal Rules "declined to incorporate" show-cause motions "into the modern procedural code." *Id.*; *see also* 5 Fed. Prac. & Proc. Civ. § 1195 (4th ed.) ("The drafters of the rules apparently felt that the historical and technical procedures surrounding [show-cause orders'] use did not comport with the philosophy of simplifying procedure underlying the federal rules."). The burden to read a show-cause procedure into a statute should accordingly be high. US DOJ's filings do not clear the bar.

### 3.    The motion to compel is procedurally improper.

US DOJ's motion to compel is procedurally improper. Rule 56 requires a party to move for summary judgment by proper motion. US DOJ has not; its motion to compel does not comply with any of Rule 56's procedural requirements. *See* Fed. R. Civ. P. 56(c)(1). And this Court's standing order establishes additional procedures that a movant must observe. *See* Standard Attachment for Civil Cases Assigned to Judge Peterson 2–7. US DOJ has not complied with any of those procedures. The proper remedy for these procedural deficiencies is to summarily dismiss the motion to compel.

### 4.    The motion to compel is substantively insufficient.

Alternatively, the Court should construe US DOJ's motion to compel as a motion for summary judgment and deny it on the merits. For the reasons set

forth above, US DOJ is not entitled to judgment as a matter of law. And several disputes of material fact preclude summary judgment.

First, the Commission disputes the factual sufficiency of the basis for US DOJ's demand. Although US DOJ has not actually articulated that basis, any proffered basis tied to the demand's purpose—auditing list management under HAVA—will be factually groundless. As explained, federal law imposes very few obligations on Wisconsin, which has qualified for full NVRA and partial HAVA exemptions. *Supra* § I.A.2. The Commission nonetheless provided US DOJ with detailed information about its comprehensive list-management practices twice, in its June 2 and December 11 letters. (Dkt. 3-1:5–9, 13–18.) US DOJ asked no follow-up questions on either occasion. And it has not identified any specific list-maintenance deficiencies at any point.

Second, insofar as US DOJ intends to argue that it is complying with the Privacy Act's requirements, the Commission anticipates disputing its factual assertions.

Third, the Commission affirmatively alleges that US DOJ's proffered purpose is pretext (as is its basis, assuming one is forthcoming). The indicia of pretext are overwhelming. Prior to filing, US DOJ changed its story about its statutory authority several times. *See supra* Background §§ IV–VI. The theory that it eventually landed on, that it needs to conduct a HAVA audit, is not credible because HAVA exempts Wisconsin from the requirements US DOJ

proposes to audit. *See* 52 U.S.C. § 21083(a)(2)(A)(iii). And US DOJ has sued many other States for the same data, though those States employ a diversity of list management practices and are subject to varied federal requirements. *See supra* Background § III.

All this suggests that US DOJ's real purpose is to collect data for a federal voter database—as its own former employees have indicated. *See supra* n.11. Courts "are 'not required to exhibit a naiveté from which ordinary citizens are free.'" *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019) (quoting *United States v. Stanchich*, 550 F. 2d 1294, 1300 (2d Cir. 1977)). Here, the Court may and should consider whether US DOJ's stated purpose is pretext before holding the demand to be valid.

These three disputes of material fact would preclude summary judgment even if US DOJ had made a proper motion. The Court should deny the motion to compel and grant the Commission an opportunity to take discovery before resolving any fact-bound merits issues.

## CONCLUSION

The Court should grant the Commission's motion to dismiss with prejudice and deny US DOJ's motion to compel as moot.

Alternatively, if the Court does not grant the motion to dismiss, it should either dismiss the motion to compel as procedurally improper or deny it on its merits.

Dated this 2nd day of February 2026.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

s/ Samuel T. Ward-Packard
SAMUEL T. WARD-PACKARD
Assistant Attorney General
State Bar #1128890

CHARLOTTE GIBSON
Assistant Attorney General
State Bar #1038845

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-8938 (SWP)
(608) 957-5218 (CG)
(608) 294-2907 (Fax)
samuel.ward-packard@wisdoj.gov
charlotte.gibson@wisdoj.gov