## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

      *Plaintiff,*

      v.

WISCONSIN ELECTIONS
COMMISSION AND MEAGAN
WOLFE, *et al.*,

      *Defendants.*

CIVIL ACTION

CASE NO. 3:25-CV-01036-JDP

## BRIEF OF *AMICUS CURIAE* THE REPUBLICAN PARTY OF WISCONSIN IN SUPPORT OF THE UNITED STATES OF AMERICA

NJB LAW & CONSULTING LLC
Nicholas J. Boerke, WI SBN 1083217
1045 W. Glen Oaks Lane, Suite 103
Mequon, WI 53092
Tel: (262) 235-5300; Fax: (262) 235-7870
nick@njblaw.net

*Attorney for the Republican Party of Wisconsin*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................ 1

DISCUSSION ..................................................................................................... 2

    I.    This Court is obligated to compel defendants to provide the
    Election Records demanded by the Attorney General. ...................... 3

        A.    Congress enacted Title III to prevent what WEC
            is trying to do today. ........................................................... 4

        B.    The Attorney General easily cleared the low bar
            required to compel the Election Records sought. ................... 5

    II.    The Attorney General is appropriately discharging her duty
    to protect the voting rights of all Americans. ....................................... 7

        A.    Ensuring that voter rolls are properly maintained
            lies at the core of the Attorney General's duties. ................... 8

        B.    WEC is required by federal law to properly
            maintain Wisconsin's voter rolls, whether they
            like it or not. ...................................................................... 11

        C.    Use of Title III to investigate various voting
            rights violations is not new or unique to this case. ............... 12

    III.    The Attorney General's investigation of Wisconsin's voter
    roll is particularly necessary. ................................................................ 15

        A.    WEC abruptly ended its practice of deactivating
            registrants who moved. ....................................................... 15

         B.    WEC refuses to properly investigate and
            deactivate non-citizens on Wisconsin's voter roll. ............... 17

         C.    WEC has mismanaged Wisconsin's voter roll, and
            it's getting worse. ............................................................... 20

    IV.    Wisconsin privacy law does not, and cannot, supersede the
    Attorney General's broad investigatory power. ................................... 21

    V.    The privacy concerns asserted in this case are unfounded. ........... 24

CONCLUSION .................................................................................................. 25

## INTRODUCTION

"WITH INTEGRITY, YOU HAVE NOTHING TO FEAR BECAUSE YOU
HAVE NOTHING TO HIDE." – ZIG ZIGLAR[1]

Why are so many Democrats and Democrat-aligned interest groups devoting substantial resources and fighting so hard to stop the Attorney General from **simply investigating** whether (and how many) ineligible voters are on active voter rolls? **Because they fear what the investigation will discover** and the threat that discovery poses to their electoral success and political power.

Increasingly fueled by hyperbolic propaganda in today's political discourse, many have lost touch with common sense and become cognitively blind to obvious truths. Mr. Ziglar, like many other late, great Americans, would not recognize today's America, where many, including some state and local officials, actively undermine or obstruct federal law enforcement rather than cooperate to achieve the mutual benefits of public safety, fraud prevention, and law and order.

Defendants, as well as politically aligned groups and media outlets, look to divert attention from the obvious truths to obstruct the enforcement of federal voting rights laws and prevent the Attorney General from even conducting a preliminary investigation. This Court should not assist with these politically motivated efforts by stripping the Attorney General of her well-settled investigatory powers.

RPW, its members, and its affiliates prioritize the privacy concerns of all Americans. There is, however, no rational basis to believe that the Attorney

---

[1] Hilary Hinton "Zig" Ziglar (1926-2012) was a prolific American speaker and author of over 30 books who inspired millions, including world leaders, with his simple but critical life-guiding principles.

General's investigation is likely to result in any unauthorized disclosure or other dissemination of PII. The unfounded claim that her goal is to create a "national voter roll" is ***nothing more than a smokescreen obscuring the real concern: what the investigation will reveal***. If the Wisconsin Elections Commission ("WEC") and election officials in other states have nothing to hide, they should instead be forthcoming and put all concerns to rest.

The Attorney General's investigation is necessary to protect the voting rights of ***all Americans***, particularly in Wisconsin. It is not the role of the Judiciary, and certainly not that of defendants, to decide what investigations the Attorney General should pursue or not. The clear legal authorization provided by Congress to the Attorney General requires that this Court deny all motions to dismiss and grant the Attorney General's motion to compel.

## **DISCUSSION**

The power vested in the Attorney General, the Nation's chief law enforcement officer, to investigate potential violations of the voting rights of ***all Americans*** is unequivocal, and the reasons offered to strip her of this power are without merit.

Federal law requires that states preserve Election Records[2] and provide those records to the Attorney General if requested to prevent states from impeding voting rights investigations. The Court's role here is limited to confirming that the statutory prerequisites are met and then ensuring that the investigation can proceed. The Attorney General need not prove violations before investigating potential violations.

---

[2] "Election Records" herein mean the records subject to the Attorney General's investigative powers under Title III of the Civil Rights Act of 1960, including "all records and papers . . .relating to any application, registration . . . or other act requisite to voting in" a federal election. *See* 52 U.S.C. § 20701.

Congress intentionally set a low bar for the Attorney General to compel Election Records so that states could not do what Wisconsin, and others, are trying to do here—stop the investigation before it can begin.  Here, the Attorney General has easily cleared this low bar, and Wisconsin law does not (nor could it) prohibit the production of its voter rolls to the Attorney General for a voting rights investigation.

Like the obstruction of federal voting rights investigations by Democrat-run states in the 1950s and 1960s, Democrat-run states today are again working in concert with political allies to obstruct federal investigations.  WEC and the intervenors prefer that the Attorney General turn a blind eye to the alleged failures of certain states, including Wisconsin, to properly maintain voter rolls and ensure only eligible voters are registered.  That decision, however, is within the province of the current President and his Attorney General, and, because of WEC's willful neglect, an investigation into Wisconsin's voter roll maintenance is necessary.

## I.    This Court is obligated to compel defendants to provide the Election Records demanded by the Attorney General.

Congress designated the Attorney General with the duty to ensure that elections are properly administered in all states so that the voting rights of all eligible voters are protected. *See, e.g.*, 52 U.S.C. §§ 20105, 20307, 20510, 20703, 21111-21112. This began with the voting rights provisions of the Civil Rights Acts of 1957, 1960, and 1964, and was expanded in other federal election laws such as the National Voter Registration Act of 1993 ("NVRA") and the Help America Vote Act of 2002 ("HAVA"). These election laws, all codified in Title 52, set forth requirements for proper election administration practices by the states, and specifically applicable here, Title III of

the Civil Rights Act of 1960 ("Title III") provided the Attorney General with investigatory authority so that states could no longer thwart voting rights investigations. 52 U.S.C. §§ 20701-20706.

### A. Congress enacted Title III to prevent what WEC is trying to do today.

As WEC acknowledges, Congress granted the Attorney General broad investigatory powers to compel Election Records as a necessary "tool for protecting individual Americans' civil rights, chief among them the right to vote." Dkt. 58 at 23. Title III was necessary because of the same issues faced today, where certain states will do anything to impede federal voting rights investigations they disagree with.

Before Title III's grant of broad investigatory authority, states simply destroyed or blocked access to Voting Records. *See* Dkt. 58 at 23-26. States continued to obstruct the Attorney General even after Title III was in place. Like certain states are trying to do again today, the obstruction initially succeeded when federal district courts inappropriately treated the Attorney General's demand as a conventional civil action, attempting to adjudicate the merits before his investigation could even proceed. In several seminal cases, the Fifth Circuit intervened and mandated that courts must handle actions to compel Election Records as a "summary proceeding" where the district court confirms that the Attorney General met the low bar set forth by Title III and then grants the Attorney General's request "as a matter of course." *Kennedy v. Bruce*, 298 F.2d 860, 864 (5th Cir. 1962); *United States v. Lynd*, 301 F.2d 818, 822 (5th Cir. 1962); *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962) (holding that upon the filing of the "simple statement by the Attorney General, the Court is

4

required to treat it as a summary proceeding."); *see also In re Gordon*, 218 F. Supp. 826, 826-27 (S.D. Miss. 1963).

In *Bruce*, a federal district court initially dismissed an action to compel Election Records from Wilcox County because the local officials claimed there was no basis for the demand since the Attorney General did not identify any violations. *Bruce*, 298 F.2d at 862. The Fifth Circuit reversed, holding that such reasoning was "a complete *non sequitur*", seeing right through the smoke screen and calling out the local officials for their attempt to obstruct the investigation. *Id.* at 863. Chief Judge Tuttle emphasized that courts cannot allow actions to compel Election Records under Title III to become "a suit of any kind" where the Attorney General must prove the merits of an investigation before that investigation can even begin. *Id.*

*Bruce* and its progeny set forth the long-standing and well-reasoned precedent applied to Title III demands: If the Attorney General has substantially complied with the minimal procedures set forth in Title III, courts must **not** allow delay to frustrate the Attorney General's investigation and should compel production of Election Records "as a matter of course." *Id.* at 864; *see also Lynd*, 301 F.2d at 822 (the "simple assertion" that the Attorney General believes voting rights violations are occurring is enough to compel election records and allow the investigation to proceed).

## B. The Attorney General easily cleared the low bar required to compel the Election Records sought.

The minimal statutory prerequisites only require that the Attorney General submit a written demand that includes the basis and purpose for which the Election Records are sought. 52 U.S.C. § 20703. The Attorney General easily cleared this low

bar. She set forth numerous federal laws that require accurate and up-to-date voter rolls and explained why she needs the unredacted voter roll to properly conduct her investigation and assess Wisconsin's compliance with federal law. Dkt. 1 at ¶¶12-13, 20, 23-24; Dkt. 3-1 at 11. At this investigatory stage, neither the factual foundation nor the merits of the investigation are open to judicial review or critique. The Attorney General is only required to "identify in a general way the reasons for [her] demand". *See Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (*per curiam*) (citing 106 Cong. Rec. 7767 (1960)) (holding that claims that the Attorney General must show a *prima facie* case prior to obtaining records were "totally without merit").

Title III is essential for the Attorney General to conduct "preliminary investigations of registration practices" and effectively protect voting rights. *State ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960). Actions by the Attorney General to compel Election Records cannot "be plagued by the injection of collateral issues" because it "would make the investigation interminable." *Bruce*, 298 F.2d at 863 (quoting *Hannah v. Larche*, 363 U.S. 420, 443 (1960)). History tends to repeat itself, and unfortunately, it is happening again today in a different but also important context. Defendants don't want to be investigated, and activist groups like the intervenors don't want citizenship requirements enforced.[3] But these enforcement and policy decisions are not within the province of the Judiciary,[4] and this Court should not depart from the long-standing and well-reasoned precedent.

---

[3] *See, e.g., Wisconsin Groups: Urge voters to vote no on November constitutional amendment*, WISPOLITICS.COM, Oct. 29, 2024, https://www.wispolitics.com/2024/wisconsin-groups-urge-voters-to-vote-no-on-november-constitutional-amendment/.
[4] *See, e.g., Morrison v. Olson*, 487 U.S. 654, 656 (1988) (emphasizing "the broad prohibition upon the courts' exercise of executive or administrative duties of a nonjudicial nature').

## II.    The Attorney General is appropriately discharging her duty to protect the voting rights of all Americans.

The Court's inquiry should end given the broad investigatory tools the Attorney General is granted under Title III, but it is still important to address the speculative and unfounded collateral issues inappropriately inserted into this matter.

Defendants concede that Title III authorizes the Attorney General to investigate potential violations of voting rights. Dkt. 58 at 23 (admitting that Title III is "a tool for protecting individual Americans' civil rights, chief among them the right to vote"). Yet it becomes clear they believe only the voting rights of certain classes are worthy of protection. Defendants assert that the Attorney General can only use these investigatory powers to probe voting rights violations related to racial discrimination. Such a narrow limitation of the Attorney General's ability to conduct a voting rights investigation is not supported by the statutory language. Reading in such a limitation would inappropriately alter decades of precedent and accepted practice. Instead, Congress chose broad language allowing the Attorney General to use Title III to protect the voting rights of **all Americans**, not just certain classes.

The language used by Congress requires **all** states to retain **all** records that are in any way "requisite to voting" in federal elections. 52 U.S.C. § 20701. The Attorney General is then empowered to inspect **any and all** of these records upon a minimal statement of need. 52 U.S.C. § 20703. Congress did not limit access to these records to only certain types of voting rights investigations or require any assertion of discrimination, whether racial or otherwise. The unambiguous language of Title III gives the Attorney General broad power to investigate potential violations of any

7

federal election law.  While the statutory language is not ambiguous, legislators understood that "[c]learly a sufficient statement [to compel Election Records] would be the assertion that the demand was made for the purpose of investigating possible violations of **_a_** federal statute."[5]

At certain times, the focus was necessarily on protecting the voting rights of certain racial minorities, but it has unfortunately now become necessary that the Attorney General act to protect the voting rights of **_all Americans_** from infringement by non-citizens and other ineligible voters potentially casting illegal votes.  During the last Administration, the federal government abdicated its responsibility to protect American Citizens by refusing to enforce immigration laws and maintain a secure border.  Allowing nearly 10 million (by conservative estimates) foreign nationals into the United States, most of whom entered and remained illegally, directly imperiled numerous rights of Americans, not the least of which includes voting rights.[6]  It has thus become necessary that the Attorney General undertake a Nationwide effort to protect the voting rights of all eligible voters from infringement by ineligible voters.

## A.    Ensuring that voter rolls are properly maintained lies at the core of the Attorney General's duties.

The Attorney General's duty to protect the voting rights of **_all Americans_** not only stems from the Civil Rights Acts, but Congress expanded the Attorney General's

---

[5] *See*, 106 Cong. Rec. 7767 (1960) (Senators clarifying on the day of passage that Title III was a broad tool for investigation of the violation of any federal election law).

[6] *See, e.g.,* Steven A. Camarota & Karen Zeigler, *Foreign-Born Number and Share of U.S. Population at All-Time Highs in January 2025*, CENTER FOR IMMIGRATION STUDIES, Mar. 12, 2025, https://cis.org/Report/ForeignBorn-Number-and-Share-US-Population-AllTime-Highs-January-2025 (explaining that during the Biden Administration America entered "uncharted territory on immigration" and including conservative estimates of an 8.3 million person increase in the immigrant population, with at least 5.4 million illegal).

responsibilities and enforcement authority since.  Under both the NVRA and HAVA, Congress recognized that accurate and up-to-date voter rolls were necessary to "protect the integrity of the electoral process" and "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(3).  Just as the NVRA requires accurate and current voter rolls, HAVA further requires that all states establish and properly maintain a statewide voter registration list[7] containing registration information of every legally registered voter in the state, and that the list include a "unique identifier" for each voter, such as a driver's license number or the last four digits of a social security number. 52 U.S.C. §§ 21083(a)(1)(A), 21083(a)(5)(A).  HAVA also mandates that states "ensure that voter registration records . . . are accurate and are updated regularly" and that states make "reasonable effort[s] to remove registrants who are ineligible to vote." 52 U.S.C. § 21083(a)(4).

Defendants again assert an improperly narrow and shortsighted view of how to properly protect voting rights—shockingly claiming that leaving ineligible voters on voter rolls cannot violate any voting rights. Dkt. 58 at 28.  In their view, only removing individuals from the voter roll could possibly implicate any voting rights. It is this misguided and legally incorrect view that furthers the importance of the Attorney General's investigation. *Id.*

Any state that fails to properly maintain its voter rolls for federal elections not only violates the NVRA and/or HAVA but also infringes on the voting rights of all legally registered voters nationwide.  This infringement includes when states allow

---

[7] The term "statewide voter registration list" under HAVA is referred to herein as a state's "voter roll".

9

for the active and continued registration of individuals who are deceased, not U.S. Citizens, or otherwise ineligible to vote. *See Brnovich v. Democratic Nat'l Comm.*, 594 U.S. ___,141 S. Ct. 2321, 2340, 210 L.Ed.2d 753 (2021) (emphasizing that illegal votes not only "can affect the outcome of a close election" but further "dilute the right of citizens to cast ballots that carry appropriate weight"). Discussing the importance of election integrity, the Supreme Court has held that "[t]here is no question about the legitimacy or importance of . . . counting only the votes of eligible voters" and "carefully identifying all voters participating in the election process." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 196 (2008). The voting rights of legally registered voters nationwide are also directly violated when any state fails to properly administer elections in accordance with the law. *Id.* (emphasizing the importance of "orderly administration and accurate record keeping" in federal elections).

Election integrity impacts the voting rights of ***all Americans*** and is fundamental to maintaining our constitutional Republic. *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (noting that "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy"). It is impossible to ensure this integrity exists without accurate and up-to-date voter rolls. As the Nation's chief law enforcement officer, Congress gave the Attorney General a duty to enforce both the NVRA and HAVA, including the requirements that states properly maintain their voter rolls free from ineligible registrants. 52 U.S.C. § 21111 (granting the Attorney General power to enforce HAVA, including specifically § 21083); 52 U.S.C. § 20510(a) (providing broad enforcement authority of the NVRA to the Attorney General as well). To properly discharge this important duty, the Attorney

General must conduct investigations and access Election Records to first evaluate compliance and then, if necessary, take enforcement action.

**B.    WEC is required by federal law to properly maintain Wisconsin's voter rolls, whether they like it or not.**

WEC's misinterpretation of HAVA is even more absurd than its provincial view of voting rights. WEC claims that it does not need to properly maintain Wisconsin's voter roll as mandated by HAVA. Dkt. 58 at 18-22. Because it is not subject to the NVRA, WEC surmises that it can maintain its voter roll as it sees fit and even oversee its own compliance. *Id.* at 19-21. This is absurd and another example of WEC's willful neglect and cavalier attitude towards voter roll maintenance, summarized below.

*All* states must properly maintain and remove ineligible voters from their voter rolls, whether the state is subject to the NVRA or not. Like requirements in the NVRA, HAVA also requires that all states "shall perform list maintenance . . . on a regular basis" and "shall remove the names of ineligible voters". 52 U.S.C. § 21083(a)(2). The difference between states subject to the NVRA and other states is a distinction in the procedure for removal; the removal of all ineligible voters is required regardless.

States subject to the NVRA *must* follow the NVRA procedures for removal, which include notifying individual registrants that they are subject to removal so that they can confirm or correct their status and complete removals at least ninety days before an election for federal office. 52 U.S.C. §§ 20507(c) and (d). These safeguards are only necessary when states don't allow registration up to and on election day, because if individuals are erroneously removed, they won't be able to re-register and

11

still vote on, or before, election day. Certain states, including Wisconsin, are exempt from these NVRA requirements because they offer continuous voter registration even at the polls on election day, and therefore erroneous removal does not prevent those individuals from re-registering and voting. 52 U.S.C. 20503(b). States not subject to the NVRA are still required by HAVA to properly maintain their voter rolls, but because they offer continuous voter registration, the stringent limits and procedural requirements for removal of registrants under the NVRA are not necessary. 52 U.S.C. § 21083(a)(2)(A)(iii) (establishing that even states not subject to the more stringent requirements of NVRA still "shall remove the names of ineligible voters").

WEC argues that because Wisconsin is not subject to the NVRA's procedures for removal, it has free rein to maintain or not maintain Wisconsin's voter roll to its liking. Dkt. 58 at 18-22. Similarly, intervenor-defendants claim that Wisconsin only needs to *establish* voter roll maintenance provisions to comply, inferring that it does not matter whether the provisions are sufficient or effectively implemented. Dkt. 65 at 9-10. These arguments are absurd. Wisconsin has more discretion than other states in that it does not need to abide by the specific NVRA safeguards for removal, but Wisconsin is still required to comply with federal voter roll maintenance requirements, and the Attorney General has the duty to ensure such compliance.

## C. Use of Title III to investigate various voting rights violations is not new or unique to this case.

The Attorney General has often used Title III's broad investigatory powers to obtain Election Records for the purpose of investigating potential violations of various federal election laws. In fact, nearly two decades ago, the Attorney General used his

Title III authority to demand and obtain the same voter roll information demanded by the Attorney General in this matter.  In July 2006, the Attorney General sent a demand letter to the Georgia Secretary of State (at the time a Democrat, Cathy Cox) requesting the production of Georgia's statewide voter rolls "including the voters' social security numbers."[8]  When Ms. Cox did not comply, the Attorney General followed the procedure required in Title III and filed suit in the U.S. District Court for the Northern District of Georgia, requesting that the court summarily compel production of the demanded Election Records.[9]  The Attorney General simply stated that the demand for the Election Records was pursuant to Title III and that the purpose was "to assess compliance by the State with the procedures for voter registration . . . as well as the list maintenance provisions" under federal election laws.[10]  The Attorney General quickly obtained a Consent Judgment and Decree compelling production of all Election Records sought (including full social security numbers).[11]  In fact, the Decree expressly stated that the Attorney General shall use the Election Records to "assess the state's compliance with federal voting laws" and that these laws included, but were not limited to, **both** the NVRA **and** HAVA.[12]

Not only has the Attorney General historically used Title III to properly obtain Election Records for investigations into potential violations of both the NVRA and HAVA, but this included PII such as social security numbers, driver's license

---

[8] *See* Compl. ¶¶ 9-10, *United States v. Georgia¸* No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006) (Boerke Decl. Ex. A).
[9] *Id.* ¶¶ 1, 11.
[10] *Id.* ¶ 9.
[11] *See* Consent Judgment and Decree, *Georgia, supra¸* Dkt. No. 4, ¶¶ 1-2 (Boerke Decl. Ex. B).
[12] *Id.* ¶ 3.

numbers, and dates of birth. In these circumstances, states have acknowledged that even though state laws prohibit the disclosure of PII from voter registration lists, providing such PII to the Attorney General as part of their law enforcement investigation is not a public disclosure and the Attorney General's power to obtain information under Title III supersedes state law.

In 2008, the Attorney General sought Election Records from the State of Texas, including its statewide voter registration list with driver license numbers, social security numbers, and other PII. The Department of Justice and Texas entered a Memorandum of Understanding that acknowledged the Attorney General's right to compel this information under Title III to investigate various federal voting laws and that the Supremacy Clause applied to any conflicting state laws.[13]

A brief was filed by so-called "Former Employees of the U.S. Department of Justice," but these individuals are in fact ideological activists, and many are affiliated with groups advocating for policy preferences directly related to election law and voter registration.[14] Masquerading as only former DOJ employees, these activists[15] incorrectly claim the Attorney General's investigation is "inconsistent with prior DOJ practice." Dkt. 61-1 at 1. In support, they cite several Biden-era actions unrelated to

---

[13] *Memorandum of Understanding*, U.S. Dept. of Just. (May 13, 2008) (Boerke Decl. Ex. C).

[14] *Amici Curiae* filing as just "former employees" of the USDOJ are in fact ideological activists. *See* Dkt. 61-1 at 1a-2a. For example, Ms. Baldwin, Mr. Heard, and Mr. Sells were all part of the politicized hiring of Fmr. Att'y Gen. Aric Holder's Voting Section. *See* Hans A. von Spakovsky, *Every Single One: The Politicized Hiring of Eric Holder's Voting Section*, HERITAGE FOUND., Aug. 14, 2011, https://www.heritage.org/civil-society/commentary/every-single-one-the-politicized-hiring-eric-holders-voting-section.

[15] Mr. Becker is a liberal election administration advocate who led the development of ERIC (the below-mentioned third-party group collecting voter roll data from 25 states) and is the founder of the Center for Election and Innovation Research. *See, e.g., David Becker*, INFLUENCE WATCH, last visited Feb. 16, 2026, https://www.influencewatch.org/person/david-becker/. Others work for left-wing groups such as the "Southern Poverty Law Center" and "Advancement Project."

HAVA's list maintenance requirements while burying in a footnote the on-point DOJ practice discussed above. *Id*. at 16-18, note 6.

Congress granted the Attorney General broad investigatory powers under Title III because it was a necessary tool to ensure compliance with federal election laws. Title III grants the Attorney General the power to demand the Election Records sought in this case, and these very same records were often sought and obtained under the same procedures in the past. This Court should not participate in defendants' attempts to strip the Attorney General of this long-established authority.

## III. The Attorney General's investigation of Wisconsin's voter roll is particularly necessary.

It is the Attorney General's duty to protect the voting rights of ***all Americans*** in all the States, but the need for an investigation into Wisconsin's voter roll is particularly necessary. WEC and other election officials throughout Wisconsin have willfully neglected their responsibilities to properly administer elections according to the law. Examples of WEC's willful neglect are too numerous to fully address here, but it is important to highlight a few that directly concern Wisconsin's voter roll.

### A. WEC abruptly ended its practice of deactivating registrants who moved.

Wisconsin and twenty-four other states already share the information sought by the Attorney General with a private third-party organization known as the Electronic Registration Information Center ("ERIC").[16] ERIC takes the voter roll data (including PII) from member states and uses "powerful data matching software"

---

[16] *See generally,* ERIC, *Ericstates.org*, https://ericstates.org/ (last visited Feb. 16, 2026).

to create "maintenance reports" detailing, among other items, registrants that have moved out of state or to a different voting district.[17]  Prior to 2019, when ERIC sent WEC a maintenance report identifying individuals on its voter roll who may not be eligible to vote because they moved, WEC would vet the report and then notify and remove ineligible voters. *See State ex rel. Zignego v. Wisconsin Elections Commission*, 2021 WI 32, 396 Wis. 2d 391, 957 N.W.2d 208.  If WEC received information that registrants moved, it notified the individuals that their registrations would be deactivated at their old address, and they would need to register at their new address. *Id.* at ¶32, ¶¶45–50 (R. Bradley, J., dissenting) (setting forth the record of WEC's change in voter roll maintenance practices).  Unless a notified individual responded that they still lived at the existing registered address, WEC deactivated the individual. *Id.*  In 2019, WEC abruptly reversed this prior practice. *Id.*

As Wisconsin's chief election official, WEC has the responsibility to ensure the accuracy of Wisconsin's voter roll both under HAVA and Wisconsin law. 52 U.S.C. §§ 21083(a)(1)(A) (assigning responsibility for the accuracy of statewide voter rolls to the chief election official in each state); Wis. Stat. § 5.05(15) (assigning WEC the responsibility to ensure proper maintenance of Wisconsin's statewide voter roll). Without any changes in federal or state election laws, but with newly elected Democrats as governor and state attorney general, WEC abdicated its responsibility to properly maintain its voter roll.

When sued for a *writ of mandamus* to undertake proper voter roll

---

[17] *Id.* at https://ericstates.org/how-does-it-work/ (last visited Feb. 16, 2026).

maintenance, WEC refused. *See generally Zignego*, 2021 WI 32.  Supported by the new Democrat state attorney general, WEC spent years obstructing and delaying concerned citizens' simple requests to properly maintain the voter rolls and litigated the matter for years. *Id.*  Ultimately, WEC avoided any accountability and shifted the blame for the lack of voter roll maintenance to the thousands of individual municipal clerks despite being Wisconsin's chief election official. *Id.*

### B. WEC refuses to properly investigate and deactivate non-citizens on Wisconsin's voter roll.

WEC also refuses to properly identify and remove registrants currently on its voter roll who are not U.S. Citizens.  Non-citizens cannot vote in federal elections, but Wisconsinites also recently amended the State's Constitution to make it expressly clear that "*only*" U.S. Citizens may vote in Wisconsin's elections. Wis. Const. art. III, § 1.  This measure passed with over 70% of the statewide vote on November 5, 2024.[18]

Defendants do not dispute that *only* U.S. Citizens may legally vote in *all* of Wisconsin's elections under current law.  Yet WEC has admitted that there are likely non-citizens actively registered and non-citizens who have voted in Wisconsin; WEC just doesn't believe there are enough for concern.[19]  WEC believes that we should look the other way because "there is no[ ] evidence to support the idea that non-citizens are voting in Wisconsin in significant numbers", but at the same time, WEC opposes

---

[18] Wis. Elections Comm'n, *2024 General Election Referendum Results*, WEC, Nov. 27, 2024, https://elections.wi.gov/sites/default/files/documents/County%20by%20County%20Report_Referendum.pdf.

[19] *See, e.g.,* Steven Potter & Frederica Freyberg, *How often do non-US citizens vote in Wisconsin elections?*, PBS WIS., Apr. 12, 2024, https://pbswisconsin.org/news-item/how-often-do-non-us-citizens-vote-in-wisconsin-elections/.

all efforts to investigate whether this is true.[20]  Of course, if there is never any real investigation, it is guaranteed that there will be no real evidence.  That is exactly what defendants and intervenors want.

Considering just several known circumstances in Wisconsin, no objective observer would deny that fertile ground exists for the rapid growth of undetected non-citizen voting.  First, the non-citizen population skyrocketed since 2021, and Wisconsin was no exception.[21]  Additionally, many of these non-citizens were issued state driver's licenses and/or identification cards.  From 2019 until 2024, the Wisconsin Department of Motor Vehicles issued more than 258,000 driver's licenses and 41,000 photo ID cards to non-citizens.[22]  These 300,000 IDs issued in just several years meet the technical voter ID requirements in Wisconsin.  If that wasn't enough cause for concern, the "process" relied upon by WEC for identifying non-citizen registrants is objectively inadequate.

The inadequate "process" cited by WEC again highlights its willful neglect— leaving it up to individual voters and municipal clerks to address the problem.  An individual registering to vote in Wisconsin simply needs to check a box that they are a U.S. Citizen and sign a form.[23]  In response to the Attorney General's inquiry, WEC

---

[20] *Id.*

[21] *Supra* note 6; *see also,* Evan Casey, *Whitewater adjusted to changing population amid increase of immigrants*, WPR, Jan. 24, 2024, https://www.wpr.org/social-issues/immigration/whitewater-adjusts-to-changing-population-amid-influx-of-immigrants (explaining that even a small town of previously 15,000 total residents has seen an influx of at least 1,000 immigrants in a couple of years).

[22] *Supra* note 19.

[23] The EL-131 application form is processed by municipal clerks and is available at https://elections.wi.gov/sites/default/files/legacy/2020-06/El-131%2520Voter%2520Registration%2520App_Fillable-%2520%2528REV%25202020-06%2529_0.pdf and the online application form includes the same information and certification as the EL-131 at https://myvote.wi.gov/en-us/ (last visited Feb. 16, 2026).

admitted that it does nothing to identify and remove non-citizens illegally registered to vote in Wisconsin. Dkt. 3-1 at 9. WEC claims that "[r]egistrants ineligible due to non-citizenship are identified through the statutory challenge process or through law enforcement reporting," but at the same time, WEC is obstructing this investigation and other election integrity efforts and relying on a "challenge process" that WEC knows is ineffective.[24] *Id.*

The "challenge process" that WEC relies upon is Wis. Stat. §§ 6.92-6.95 and § 7.52(5). This procedure allows a Wisconsin "elector" or "election inspector"[25] to challenge an individual's eligibility but typically requires that the challenge be made in person while that individual is at the polls. The elector or election worker must have personal knowledge that the challenged individual is not eligible to vote and must swear under penalty of perjury to the accuracy of this personal knowledge. This typically requires confronting the challenged individual in person when they are trying to vote or challenging a specific absentee ballot in person when that ballot is being processed. Especially in cities with hundreds of thousands of voters and when mail-in or early voting is now commonplace, it is wildly unrealistic to expect this process to work, no matter how many non-citizens might be registered.

When pressed on these legitimate concerns, WEC has only excuses and no action. Despite the responsibility to properly maintain its voter roll and remove ineligible voters, WEC claims it is powerless because there is no *specific* state or

---

[24] *Supra* note 19.
[25] Under Wisconsin law, an "election inspector" is what is commonly known as an election worker or poll worker.

federal law requiring citizenship verification for an individual to register.[26]  Again, for WEC and those obstructing the Attorney General's investigation, ignorance is bliss.  If WEC or other states are not required to investigate **and** don't allow any outside investigations, they don't have to be concerned with the truth.

Concerned citizens recently sued to require WEC to fulfill its responsibilities and investigate the citizenship status of registered voters using readily available information.[27]  In *Cerney*, the state district court initially ordered WEC to verify the accuracy of information provided by an individual when they register to vote, including citizenship, which can be done by cross-checking registration records with other records, including records of the Wisconsin Department of Transportation.[28]  But, WEC again refuses, litigates, and delays.  "Shockingly," WEC has taken the position that it has no responsibility to prevent non-citizens from appearing on Wisconsin's voter roll, nor any obligation to investigate and remove non-citizens.[29]

## C.  WEC has mismanaged Wisconsin's voter roll, and it's getting worse.

The damage done to election integrity in Wisconsin is not speculative. Research by a Wisconsin-based law and policy firm indicates mismanagement. Before the November 2020 election, there were 95,150 mismatches between Wisconsin's voter roll and Wisconsin DOT records.[30]  This was concerning, but the

---

[26] *Supra* note 19.
[27] *See* Petition, *Wisconsin ex rel. Cerney v. Wis. Elections Comm'n*¸ No. 24-CV-1353 (Cir. Ct. Waukesha Cnty. Aug 16, 2024) (Doc. 10) (Ct. Dkt. 57-1).
[28] *Id*. Decision and Order (Oct. 3, 2025) (Doc. 150) (Boerke Decl. Ex. D).
[29] *Id*. at 7.
[30] Will Flanders, *et al.*, *A Review of the 2020 Election, Wisconsin Institute for Law & Liberty*, WIS. INST. FOR L. & LIBERTY, Dec. 2021, https://will-law.org/wp-content/uploads/2022/05/2021ReviewStudy.pdf.

more recent data is even more alarming, showing that voting record errors accelerated as WEC continues to fight any effort to properly investigate the accuracy of its voter roll.[31]  Since 2021, the number of mismatches nearly tripled where there was no driver license number match and where there was no match for both name and date of birth.[32]

WEC claims that it has provided detailed information on its voter roll maintenance efforts and that its "efforts" go even further "beyond anything federal law requires." Dkt. 58 at 5.  The facts tell a very different story.  The cursory and dismissive responses WEC gave the Attorney General are insufficient. Dkt. 3-1 at 5-9, 13-18.  For example, in response to a question from the Attorney General about **how** an ineligible registrant is identified, WEC explained the process that may occur **when** an ineligible individual is identified. Dkt. 3-1 at 9.  WEC identifies no action it takes to identify registrants that have moved or that are non-citizens, admitting it has abdicated these responsibilities. *Id.*

Especially because of this demonstrable willful neglect, the Attorney General's investigation of Wisconsin's voter roll is necessary.

## IV.    Wisconsin privacy law does not, and cannot, supersede the Attorney General's broad investigatory power.

One of the reasons that Congress enacted Title III was to preempt state and local laws being used to obstruct federal voting rights investigations.

---

[31] Letters of Lucas T. Vebber, Deputy Counsel, Wis. Inst. of L. & Liberty, Inc., to Maureen Riordan, Acting Chief, Voting Section, U.S. Dep't of Justice, Aug. 14, 2025, https://will-law.org/wp-content/uploads/2025/08/08-14-2025-WILL-letter-to-USDOJ-regarding-Wisconsin.pdf, and Oct. 27, 2025, https://will-law.org/wp-content/uploads/2025/10/FINAL-FINAL-Letter-to-USDOJ-1.pdf.
[32] *Id.*

Like Alabama in the 1950s, Wisconsin attempts to use state law to obstruct the Attorney General's investigation today. But the state law WEC relies on does not actually prohibit defendants from producing the complete voter roll to the Attorney General, and even if it did, Title III would preempt state law under the Supremacy Clause. U.S. Const. art. VI, cl. 2.

Wisconsin law establishes the official statewide voter registration list required by HAVA and that WEC maintains it. Wis. Stat. § 6.36(1)(a). This voter roll must contain data provided by each individual when registered to vote, which includes their name, address, voting district or ward, as well as certain PII such as date of birth, and either a driver's license number or the last four digits of the individual's social security number. *Id.* The Wisconsin Legislature further mandated that, except for the PII, the voter roll must be "open to public inspection" under public records law and "shall be electronically accessible by any person." Wis. Stat. § 6.36(1)(b)1.

The fact that certain PII is not "open for public inspection" and not "accessible to any person" does not prevent the Attorney General from obtaining the Election Records as part of her express investigatory powers. Moreover, the Wisconsin restriction on public disclosure of PII does not prevent WEC from providing all data, including PII, to a "law enforcement agency," which includes the Attorney General. Wis. Stat. § 6.36(1)(bm) (allowing WEC to transfer data, including PII restricted from public disclosure, to a "law enforcement agency," as defined in Wis. Stat. § 165.77(1)(b), which definition includes federal government units tasked with law enforcement and full-time employees authorized to make arrests).

In the alternative, even if there were a Wisconsin statute that tried to shield

disclosure of Election Records from the Attorney General, the express Congressional directives of Title III would supersede any state law under the Supremacy Clause. U.S. Const. art. VI, cl. 2.

Defendant Wolfe and Wisconsin's Attorney General recently agreed that when there is a conflict between state and federal election law, the federal law preempts.[33] In *RPW v. Evers*, there was a conflict between federal and state law on the meeting of presidential electors. Wisconsin law required electors to meet to cast their electoral votes on December 16, 2024, but recently enacted federal law required the same electors to meet and cast their electoral votes on December 17, 2024. 3 U.S.C. § 7. RPW sought a declaration from this Court as to which date applied. Defendant Wolfe, as well as the Wisconsin Attorney General, agreed that the conflict between federal and state election law presented "a plain case of preemption".[34] The Wisconsin Attorney General explained that when it is impossible to comply with both state and federal requirements, or even if a state law "stands as an obstacle" to the execution of federal law, then the state law "must necessarily give way."[35]

In this case, the Attorney General seeks an order to compel defendants to produce Election Records under Title III that are necessary for the Attorney General to properly assess WEC's compliance with federal election law. Given that HAVA requires a "unique individual identifier," the Attorney General cannot properly assess compliance with HAVA, and thereby cannot properly enforce HAVA, without the

---

[33] *See Republican Party of Wis. v. Evers*, 3:24-cv-00867 (E.D. Wis. 2024) (hereinafter "*RPW v. Evers*").
[34] *Id.* Brief in Support of Motion to Dismiss (Dec. 11, 2024) (Doc. 17) at 7.
[35] *Id.* at 7-9 (citations omitted).

23

information demanded.  Even if there were a Wisconsin law that prohibited the disclosure of the Election Records sought, it would present a direct conflict with Title III and an obstacle to the investigation and enforcement of federal law.  Therefore, as defendants agreed, any conflicting Wisconsin law "must necessarily give way."

## V.    The privacy concerns asserted in this case are unfounded.

The privacy concerns raised and demagogic accusations lodged are a pretext to shield ongoing violations of federal law.

The data protection requirements, infrastructure, and federal rules and regulations applicable to the custody of PII by the Attorney General and the USDOJ are unquestionably more robust than anything applicable to WEC, or the thousands of county clerks, municipal clerks, and other election officials throughout Wisconsin that already have access to this information.  Wisconsin and twenty-four other states also already share the information sought by the Attorney General with a private third-party organization known as ERIC.[36]  If the real concern was the dissemination of voters' PII, why would opponents only raise objections to the Attorney General's investigation, but not the consistent transmittal of the same data to a private nationwide database?  This court should not fall victim to this absurd pretext.

Title III expressly prohibits the dissemination of any Election Records obtained thereunder, which would include the voter roll, 52 U.S.C. § 20704, but the USDOJ is also required to maintain PII contained in the voter roll obtained in accordance with the stringent rules and regulations mandated by the Privacy Act of 1974. 5 U.S.C. §

---

[36] *Supra* notes 16-17.

522a *et seq.* The Memorandum of Understanding attached to the Attorney General's December 2 email not only summarizes the authority under which WEC must produce the Election Records and the Attorney General's law enforcement purposes, but it also expounds upon the numerous safeguards and other requirements that will protect the data. Dkt. 1 at ¶24; Dkt. 63-1.

The Attorney General's investigation does not legitimately risk the violation of any privacy rights, but obstructing the investigation does directly place the voting rights of all eligible voters in jeopardy. Those looking to block the investigation are not legitimately concerned about public dissemination of PII. They are concerned that the Attorney General will enforce the law.

## **CONCLUSION**

Authority for the Attorney General's investigation is plentiful, and the purpose of the investigation is honorable and necessary to ensure election integrity and protect the voting rights of ***all Americans***. This court must ***not*** allow the obstruction to continue, should deny all motions to dismiss, and grant the Attorney General's motion to compel.

Respectfully submitted this 17th day of February 2026.

NJB LAW & CONSULTING LLC

By: _/s/ Nick Boerke____
Nicholas J. Boerke, WI SBN 1083217
1045 W. Glen Oaks Lane, Suite 103
Mequon, WI 53092
Tel: (262) 235-5300; Fax: (262) 235-7870
nick@njblaw.net

*Attorney for the Republican Party of Wisconsin*

25