# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>v.<br><br>WISCONSIN ELECTIONS COMMISSION AND MEGAN WOLFE, *et al.*,<br><br>*Defendants*,<br><br>v.<br><br>COMMON CAUSE, *et al.*,<br><br>*Intervenors*. | CIVIL ACTION<br><br>CASE NO. 3:25-CV-01036-AMB |

## BRIEF *AMICUS CURIAE* OF THE CENTER FOR ELECTION CONFIDENCE IN SUPPORT OF THE UNITED STATES

DANIEL R. SUHR
Center for American Rights
1341 W. Fullerton Ave., Suite 170
Chicago, IL 60614
dsuhr@americanrights.org
414.588.1658

JACOB J. CURTIS
HJC Law & Consulting, LLC
jcurtis@hjclawandconsulting.com
414.335.6338

*Attorneys for the Center for Election Confidence*

## INTEREST OF AMICUS CURIAE

Center for Election Confidence, Inc., (CEC) is a non-profit organization that promotes ethics, integrity, and professionalism in the electoral process. CEC works to ensure that all citizens can vote freely within an election system of reasonable procedures that promote election integrity, prevent vote dilution and disenfranchisement, and instill public confidence in election systems and outcomes. To accomplish this, CEC conducts, funds, and publishes research and analysis regarding the effectiveness of current and proposed election methods. CEC also periodically engages in public-interest litigation to uphold the rule of law and election integrity and files *amicus* briefs in cases where its background, expertise, and national perspective may illuminate the issues under consideration. CEC has an interest in the Attorney General's efforts to monitor and protect voting rights and in election transparency specifically. These issues are directly implicated in the instant litigation. [1]

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than the amicus and its counsel made any monetary contribution intended to fund the preparation or submission of this brief. The State Defendants and both sets of Intervenor Defendants do not oppose the motion to file this brief.

## INTRODUCTION

Section 303 of the Civil Rights Act of 1960 was enacted pursuant to Congress' authority under the Fifteenth Amendment to empower the federal government to protect the voting rights of American citizens. Section 303 grants the Attorney General authority to inspect all records relating to any voter application, registration or other act requisite to voting in the states. 52 U.S.C. § 20703. Congress granted this authority to obtain state records as a tool to monitor and protect voting rights. The voting rights protected by the Act include the right of each voter to cast an effective ballot. The right to cast an effective ballot includes the right to cast a ballot not diluted or cancelled by unlawful ballots.

The statute does not impose any restriction upon the purposes for which the Attorney General inspects voter registration records. It simply requires the Attorney General to provide a general "statement of the basis and the purpose therefor." *Id.* So long as the purpose relates to monitoring or enforcing voting rights, a federal court should credit the legitimacy of the Attorney General's reason for inspecting records and reject a recalcitrant state's resistance to basic election transparency and oversight based on nothing more than conjecture and conspiracy theories.

## ARGUMENT

**I.    Protecting lawful voters is a legitimate basis for DOJ review of records under Title III of the Civil Rights Act.**

The Attorney General has requested records covered by Section 301 from Wisconsin. The State resists the Attorney General's request on the purported basis that the Attorney General's request "lacked a lawful purpose," thus rendering it an invalid demand. ECF 58 at 22-23. The State also maintains that "an audit [of Wisconsin's compliance with HAVA] is not a permissible 'purpose' under Title III because the proposed audit would do nothing to further civil rights enforcement." ECF 58 at 28. This argument fails because vote dilution is a recognized threat to voting rights that the Attorney General has a legitimate role in protecting pursuant to the Voting Rights Amendments.

   A. Federal Authority Pursuant to the Voting Rights Amendments is Distinct and Broader than Federal Authority Pursuant to the Elections Clause.

While the Elections Clause would generally serve to limit federal action with respect to good faith state voter registration and list maintenance activities, the post-war Voting Rights Amendments expressly delegated to Congress broader authority to enforce their provisions to protect voting rights. So while it may be understandable

that the State's first inclination is to invoke the Election Clause's familiar shared-sovereignty arrangement, Congress passed the Civil Rights Act of 1960 pursuant to the broader authority of the Voting Rights Amendments and not pursuant to the Elections Clause.

The Voting Rights Amendments *specifically* delegated authority over these matters to Congress, *subjecting* them to federal oversight. Indeed, the Voting Rights Amendments were drafted *specifically* to limit State authority over certain matters relating to voter qualifications and to subject that authority to oversight by the Federal Government. Upon ratification—acquiescence by a sufficient number of States—these Amendments changed the original bargain concerning voter qualifications between the States and the government they established pursuant to the Constitution. *See Trump v. Anderson*, 601 U.S. 100, 109 (2024) ("Proposed by Congress in 1866 and ratified by the States in 1868, the Fourteenth Amendment 'expand[ed] federal power at the expense of state autonomy' and thus 'fundamentally altered the balance of state and federal power struck by the Constitution.'") (citations omitted). *See Brnovich v. Democratic National Committee*, 594 U.S. 647, 656-57 (2021) (similar, as to Fifteenth Amendment). Therefore, by their nature and

5

design, the Voting Rights Amendments *are* intrusions upon the States—but they are lawful, constitutional intrusions that establish the Federal Government as the protector of voting rights for enumerated classes. The Civil Rights Act of 1960 is an appropriate exercise of that authority.

B. The Civil Rights Act of 1960 Requires Only a Purpose Relating to Enforcement of the Voting Rights Amendments and Does Not Permit a State to Refuse a Demand for Records Because It Disagrees With DOJ's Proffered, Lawful Purpose.

Congress passed the Civil Rights Act of 1960 pursuant to the Voting Rights Amendments' broad delegation of authority to enforce their provisions. So long as the Federal Government's request pursuant to 52 U.S.C. § 20703 relates broadly to the enforcement of the provisions of the Voting Rights Amendments, that demand is lawful. And a State may not refuse a lawful demand by the Federal Government for these records simply because it does not like the proffered purpose.

Here, the State attempts to read into the statute words that are not present so as to limit the Federal Government's demand authority to purposes the State finds acceptable. There is no qualifying adjective—reasonable, good-cause, legitimate, sufficient, permissible—in 52 U.S.C. § 20703 that conditions the Attorney General's "purpose" in inspecting records that could invite a court to conduct a substantive review of the

government's rationale beyond a general connection to enforcing the Voting Rights Amendments.[2]

The State and its supporters posit that the DOJ might share the information with other government agencies (e.g., Department of Homeland Security, ECF 59-1 at 3), but Section 304 of the statute expressly provides that the DOJ may share information with other "government agencies." 52 U.S.C. § 20704.[3]

---

[2] The DNC Amicus also tried to limit the lawful "purpose" of DOJ inspection of data (and subsequent use of that data) to enforcing existing law (*see* DNC Amicus, 59-1, at 7: "database matching would not advance HAVA enforcement."). But the Voting Rights Amendments were meant to be broad, not narrow, in their grant of federal authority to ensure that states could not circumvent federal authority through creative or iterative schemes. *Shelby County v. Holder*, 570 U.S. 529, 537 (2013). And the inspection provision is important to ensure federal law enforcement and policymakers understand the context of voting rights in each state. DOJ could inspect the records and engage in database matching to study whether states are protecting lawful ballots from vote dilution by unlawful ballots. Or DOJ could inspect records to inform whether to recommend state or federal law-and-policy changes that could better protect voting rights. Regardless, nothing in the statutory text limits the purpose of the inspection to enforcing existing laws.

[3] Disclosure of these records beyond "Congress and any committee thereof, government agencies, and in the presentation of any case or proceeding before any court or grand jury" is prohibited expressly by the text of the statute. 52 U.S.C. § 20704.

7

Moreover, there could be good reason for the DOJ to compare registration information with other agencies. If DOJ is inspecting records to determine if Wisconsin and other states are complying with HAVA or the National Voter Registration Act, it may reasonably turn to other agencies with data that could be helpful in that "audit." For instance, the Internal Revenue Service (IRS) or Social Security Administration (SSA) may know better than DOJ whether voters are deceased—information sharing with the IRS or SSA could help DOJ determine if states are promptly removing deceased voters from the rolls. The U.S. Postal Service may be able to help DOJ determine if states are promptly recording when voters move addresses. *See* DNC Amicus, 59-1, at 7 n.3. The Department of Education may have student loan data that could help determine if college students are dual-registered in both their home state and their college state. These are legitimate purposes directly related to DOJ's advancement of voting rights.

It is true that the Department of Homeland Security may have information about who is a citizen and who is a legal resident noncitizen; apparently a Mexican national recently voted and ran for *re*-election for mayor of Coldwater, Kansas. *Kansas Mayor Faces Voter Fraud Charges*

8

*Following USCIS Assistance*, DHS Press Release (Nov. 7, 2025).[4] Such information sharing across agencies is not nefarious.

Data sharing for these purposes protects Americans' votes from vote dilution by unlawful votes. If the DOJ is doing what the State and its allies allege—engaging in a coordinated national strategy to review whether state voter rolls have unlawful voters—then it is pursuing a legitimate policy objective directly tied to protecting voting rights and thus permissible under the Voting Rights Amendments and the Civil Rights Act of 1960. The State, Intervenors, and their Amici may disagree as a policy matter whether vote dilution by unlawful votes is a widespread problem sufficient to justify investigation, but that is a policy disagreement that ratification of the Voting Rights Amendments left without lawful purchase or remedy.

### C. Protecting Against Vote Dilution Is an Appropriate Exercise of Federal Authority Granted by the Voting Rights Amendments.

As the State acknowledges, the Civil Rights Act was enacted "to protect the right to vote" (ECF 58 at 26). A key component of the right to

---

[4] https://www.uscis.gov/newsroom/news-releases/kansas-mayor-faces-voter-fraud-charges-following-uscis-assistance

vote includes "casting [an] effective ballot[]" (*id.*), which includes the right not to have a lawful ballot diluted by unlawful ballots.

Indeed, federal courts have consistently recognized that illegitimate or fraudulent votes dilute the effect of legitimate ballots, and protecting against such affronts to the franchise is an appropriate exercise of federal authority pursuant to the Voting Rights Amendments. *Brnovich*, 594 U.S. at 672 ("Fraud can affect the outcome of a close election, and fraudulent votes dilute the right of citizens to cast ballots that carry appropriate weight. Fraud can also undermine public confidence in the fairness of elections and the perceived legitimacy of the announced outcome."); *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) ("Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised. The right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."); *Reynolds v. Sims*, 377 U.S. 533, 555 (1964) ("The right to vote can neither be denied outright, nor destroyed by alteration of ballots, nor diluted by ballot-box stuffing."); *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("Not only can this right to vote not be denied outright, it cannot, consistently

10

with Article I, be destroyed by alteration of ballots or diluted by stuffing of the ballot box."); *Baker v. Carr*, 369 U.S. 186, 208 (1962) ("A citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution, when such impairment resulted from dilution by a false tally; or by a refusal to count votes from arbitrarily selected precincts, or by a stuffing of the ballot box."); *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 952 (7th Cir. 2007), *aff'd* 553 U.S. 181 (2008) ("[V]oting fraud impairs the right of legitimate voters to vote by diluting their votes--dilution being recognized to be an impairment of the right to vote."); *Ohio Republican Party v. Brunner*, 544 F.3d 711, 713 (6th Cir. 2008) (en banc) ("Enabling the casting of one vote does little good if another voter fraudulently cancels it out."); *League of Women Voters v. Walker*, 2014 WI 97, ¶54, 357 Wis. 2d 360, 851 N.W.2d 302 (the "right to vote" includes the right to ensure that one's "vote counts with full force and is not offset by illegal ballots.").

The right to vote encompasses "the personal right of the elector to cast his own vote and to have it honestly counted." *United States v. Saylor,* 322 U.S. 385, 389 (1944). "[T]o stuff the ballot box at an election for federal officers [is] thereby to dilute the value of votes of qualified

11

voters." *Anderson v. United States*, 417 U.S. 211, 226 (1974). Stuffing the ballot box not only undermines our elections—it is a crime.

Unlawful votes dilute lawful votes, and so stuffing the ballot box with unlawful votes injures the free exercise of lawful voters' constitutional and legal rights and privileges, *i.e.*, their civil rights. The Sixth Circuit explains: "The deposit of forged ballots in the ballot boxes, no matter how small or great their number, dilutes the influence of honest votes in an election, and whether in greater or less degree is immaterial. The right to an honest count is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." *Prichard v. United States*, 181 F.2d 326, 331 (6th Cir. 1950). Thus, the Section 241 cases all confirm that vote dilution through unlawful ballots impacts a voter's civil rights.

As this Court has explained, "The Supreme Court has recognized vote dilution as an injury arising from the malapportionment of legislative districts. Those cases require that each elector have the same voting power, as measured by the number of votes required to elect each

elected state official. For example, a citizen's vote is diluted if legislative districts have significant population differences." *Democratic Party of Wis. v. Vos*, 408 F. Supp. 3d 951, 956 (W.D.Wis. 2019) (internal citations omitted). The key principle behind the vote-dilution theory of gerrymandering is that voters have a civil right to equal voting power. Vote dilution is unconstitutional in the gerrymandering context because it denies a voter the equal impact or power of his or her vote. In the same way, vote dilution by fraud is unlawful because it denies a voter the equal impact or power of his or her vote.

In *Hall v. D.C. Bd. of Elections*, the D.C. Circuit considered whether voters in the District of Columbia had standing to challenge a new municipal ordinance permitting noncitizens to vote in local elections. Seven District voters challenged that ordinance under the Fourteenth Amendment. The D.C. Circuit held they had standing to do so because when unlawful ballots are cast, "each voter experiences a direct reduction in the strength of his or her 'individual and personal' vote." 141 F.4th 200, 206 (D.C. Cir. 2025). *Accord Judicial Watch, Inc. v. King*, 993 F. Supp. 2d 919, 924 (S.D. Ind. 2012).

13

The dilution of lawful ballots by the inclusion of unlawful ballots in the count injures the civil rights of the lawful voters and protection against such harms is an appropriate exercise of federal authority.

## II. DOJ is acting within the law in good faith.

Underlying all of the briefs from the State, Intervenors, and their Amici is a deep skepticism of the DOJ's "actual" motives. This comes in two forms. First, they say that DOJ's "real" purpose in seeking these records is to create a national voter database, and second, that DOJ will then use this national voter database to force states to purge lawful voters from the rolls or engage in a host of other horribles. *See, e.g.*, ECF 58 at 9 (the State's brief cites an amicus brief filed in a similar case "warning that US DOJ's proffered purposes for its demands 'appears to be a stalking horse for its true purpose: to create a national voter roll and enable the federal government to conduct its own list maintenance.'"); ECF 11 at 1-2 (Memo. in support of intervention by WARA and Forward Latino) (predicting that sharing the data "will result in its members' wrongful purge from Wisconsin's voter list or the targeting of its members for denaturalization."). The DNC Amicus charges that DOJ is acting with "deception," is not "forthright," (ECF 59-1 at 1), is "offering

14

mere pretext rather than an honest statement" (*id.* at 5), and has "obscured the true basis and purpose for its Title III demand" (*id.*).

This attack fails because it is contrary to the longstanding and widespread presumption of good faith accorded to government officials while going about their duties. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009) ("[G]overnment actors in their sovereign capacity and in the exercise of their official duties are accorded a presumption of good faith because they are public servants, not self-interested private parties."); *Freedom Watch v. BLM*, 220 F. Supp. 3d 65, 68 (D.D.C. 2016) (In FOIA cases, agency representations are "accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." Cleaned up); *Road & Highway Builders, LLC v. United States*, 102 Fed. Cl. 88, 92 (2011) ("As a general proposition, government officials are presumed to act in good faith; this presumption stands unless there is irrefragable proof to the contrary." Cleaned up).

"[W]ithout evidence of bad faith, [the] veracity of [the] government's submissions should not be questioned." *Stott v. IRS*, 2014 U.S. Dist. LEXIS 176137, *12 (W.D. Wis. Dec. 22, 2014) (Crabb, J.) (summarizing

15

holding of *In re Wade*, 969 F.2d 241, 246 (7th Cir. 1992)). And evidence means actual evidence: "Innuendo, suspicion, conjecture, or counsel's argument are not sufficient," yet that is all Defendants, their supporting Amici, and Intervenors have offered. *Proxtronics Dosimetry, LLC v. United States*, 128 Fed. Cl. 656, 682 (2016).

## CONCLUSION

The Attorney General has the statutory authority to demand state election records for inspection, pursuant to express authority that the Voting Rights Amendments' constitutional protections for voting rights be enforced, and it may legitimately do so to protect voters' from seeing their votes cancelled out by unlawful ballots. This Court should find in favor of Plaintiff United States of America.

Respectfully submitted,

/S/ DANIEL R. SUHR
Center for American Rights
1341 W. Fullerton Ave., Suite 170
Chicago, IL 60614
dsuhr@americanrights.org
414.588.1658

JACOB J. CURTIS
HJC Law & Consulting, LLC
jcurtis@hjclawandconsulting.com
414.335.6338

*Attorneys for the Center for Election Confidence*