IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

  v.                                  Case No. 3:25-CV-1036

WISCONSIN ELECTIONS
COMMISSION, et al.,

    Defendants.

**REPLY BRIEF IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS**

## INTRODUCTION

US DOJ says it needs Wisconsin's unredacted voting rolls to evaluate Wisconsin's list maintenance activities under HAVA. Its complaint fails to state a claim, for four independent reasons.

HAVA has not granted US DOJ the voter list oversight power it seeks, and subbing in the Civil Rights Act of 1960 is not a valid way to avoid the congressional choices reflected in HAVA. Even if the Civil Rights Act could be used to investigate violations of other statutes, the voter database US DOJ seeks is not a covered record under that law. Further, US DOJ's demand fails to offer a basis within the meaning of Title III. And providing US DOJ with an

unredacted database would violate a Wisconsin law that no federal law preempts, a problem that US DOJ fails to address.

US DOJ resorts to arguing that the Civil Rights Act provides no due process and that motions to dismiss are unavailable, but that view is unsupported in the law.

This case should be dismissed, with prejudice.

I. **US DOJ has no statutory authority for its request.**

   A. **HAVA confers no authority on the executive branch to audit States' voting maintenance practices, and Wisconsin is exempt from HAVA's list maintenance provisions.**

US DOJ asserts that its request is "for one purpose only: to evaluate Wisconsin's compliance with the list maintenance provisions of HAVA, and if appropriate, to bring an enforcement action." (Dkt. 71:11.) But that purported purpose ignores the choices Congress made in enacting that statute. HAVA, passed under the Elections Clause, gives the States discretion about how to manage voter registration lists; and gives Wisconsin even more discretion than most other States. US DOJ has no power to investigate and enforce HAVA in the way it envisions.

The relevant acts (HAVA and the NVRA), enacted under the Elections Clause, feature limited regulation of States' voter registration practices and leave covered States with considerable discretion about how to implement Congress's mandates. *See* 52 U.S.C. § 20507(a)(3)(4) (NVRA); 52 U.S.C.

2

§ 21083(a)(2)(B) (HAVA). States are entitled to "determine whether the information provided by an individual is sufficient . . . in accordance with State law." *Id.* § 21083(5)(A)(iii). And "[t]he specific choices on the methods of complying with" HAVA are "left to the discretion of the State[s]." *Id.* § 21085.

Neither statute empowers US DOJ to audit a State's voter registration list. US DOJ's only enforcement tool is "a civil action" for "declaratory and injunctive relief." *Id.* § 20510 (NVRA); *id.* § 21111 (HAVA).

And Wisconsin is one of a few States that is exempt both from the NVRA and from HAVA's list maintenance provisions. *See id.* §§ 20503(b); *Pub. Int. Legal Found., Inc. v. Wolfe*, 2024 WL 4891940, at *2 (W.D. Wis. 2024). US DOJ argues that Wisconsin is not exempt from those HAVA provisions, (Dkt. 71:9 n.3), but the case it relies on, *Colón–Marrero v. Vélez,* 813 F.3d 1, 13–14 (1st Cir. 2016), just emphasizes Wisconsin's point.

In *Colón–Marrero*, Puerto Rico argued that it was exempt from HAVA's list maintenance provisions because, as a territory, it did not meet the definition of "State" under the NVRA. The First Circuit disagreed, explaining that the HAVA exemption for list maintenance requirements turned not on the definition of "state" in the NVRA, but rather the specific exemption in NVRA section 4(b):

> States "described in section 4(b)" of NVRA" are those "that either have no registration requirements for voting in federal elections or allow 'all voters in the State' to "register to vote at the polling place

3

> at the time of voting in a general election for Federal office." *Id.* § 20503(b). Puerto Rico would not be such a state even if it were included within NVRA's definition of "State." Indeed, this litigation would be unnecessary if that description applied to Puerto Rico.

*Id.* at 13. As applied to Wisconsin, the court's explanation compels the opposite conclusion. Unlike Puerto Rico, Wisconsin *is* a State described in section 4(b) of the NVRA, and it is explicitly exempted from HAVA's list maintenance provisions by HAVA's plain language.[1]

Given Wisconsin's exemption, on top of US DOJ's lack of authority to investigate or audit under HAVA or the NVRA, there are no HAVA list maintenance requirements for US DOJ to audit and enforce against Wisconsin.

US DOJ complains that there is a "need for federal scrutiny" of States' list maintenance efforts, (Dkt. 71:20 n.8), and one amicus speculates that federal agencies like the IRS, Social Security Administration, and Department of Education could be helpful in removing voters from the voter rolls who have died or moved, (Dkt. 73-1:8). But current law does not provide for the federal government to play that role.[2] Congress could pass a new law under its

---

[1] Wisconsin does not claim to be exempt from 52 U.S.C. § 21083(a)(5)(A)(i), but that provision is not a list maintenance provision. Instead, section 21083(a)(5)(A) regulates how state elections officials should process registration applications *in the first instance*. (*See* Dkt. 58:21–2.) US DOJ fails to respond to that point.

[2] As discussed in Wisconsin's principal brief, Wisconsin extensively explained to US DOJ its 11 meticulous list maintenance processes. (Dkt. 58:13; *see also* Dkt. 3-1:15–17 (Commission response to Neff).) Neither US DOJ nor the amici identify *any* failure of Wisconsin to maintain its voter list diligently and effectively.

4

Elections Clause authority regulating States' list maintenance efforts differently than HAVA and the NRVA do. But Congress would have to act; the federal executive cannot take power that Congress has chosen not to confer.

### B. The Civil Rights Act provides no authority for US DOJ to obtain documents for HAVA list maintenance inquiries.

Locating nothing in HAVA that allows it to obtain the unredacted voter database it seeks (or to conduct the audit process it envisions), US DOJ toggles to a different statute, the Civil Rights Act of 1960, passed under Congress's Fifteenth Amendment power. But the Fifteenth Amendment and Civil Rights Act empower the federal government to investigate and enforce race discrimination in voting. Title III, the chapter giving US DOJ the ability to obtain certain documents and investigate civil rights violations, exists to further that purpose. It is not a HAVA evaluation tool.

The Civil Rights Act's text and statutory history demonstrate that Title III is a tool for protecting individual Americans against race discrimination, including the right to vote. The 1959 Civil Rights Commission report to the President and Congress provided examples of state and local officials' destroying or limiting access to voting registration records and applications to stymie civil rights investigations and deny citizens their civil rights. (*See* Dkt. 58:24–25 (providing examples from report).) Consistently, the Congressional Record describes the 1960 Civil Rights Act's purpose as

5

"to provide a more effective protection of the right of all qualified citizens to vote without discrimination on account of race." H.R. Rep. No. 86-956 at 7 (1959), 1959 WL 3581 at *1945.

US DOJ's expressed purpose of evaluating "Wisconsin's list maintenance practices under [HAVA]" is unrelated to protecting Wisconsinites from race discrimination. (Dkt. 71:7.) The federal executive's powers under the Civil Rights Act do not extend to that project.

Two federal courts have held that the federal government's desire to evaluate a State's HAVA or NVRA list maintenance is not a valid purpose for a Title III request. In *United States v. Oregon*, the district court held that a demand for records under Title III "must relate to a purpose of investigating violations of individuals' voting rights." No. 25-CV-01666-MTK, 2026 WL 318402, at *10 (D. Ore. Feb. 5, 2026) (unpublished). The Court determined that US DOJ's desire to investigate Oregon's list maintenance procedures was an impermissible purpose under the Civil Rights Act. *Id.* And in *United States v. Weber*, the district court held that US DOJ's purported purpose for requesting California's unredacted voter list—to determine whether its list maintenance program complies with the NVRA—was not a valid purpose under Title III: "Title III was not passed as a tool for NVRA compliance." No. 25-CV-09149-DOC-ADS, 2026 WL 118807, at *9 (C.D. Cal. Jan 15, 2026) (unpublished).

6

One district court has disagreed,[3] but that court ignored the text of the Civil Rights Act and the conflict between so construing the Civil Rights Act and US DOJ's lack of such powers under HAVA. *United States v. Benson*, No. 25-CV-1148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026) (unpublished).

*Benson* relied on the premise that Title III says nothing about race discrimination, *id.* at *8, But Title III was enacted to supplement federal capacity to enforce previous civil rights laws, chief among them the Civil Rights Act of 1957. Substantively, that law aimed at combatting race-based violations of the right to vote. *See* 71 Stat 637–38. It could not have aimed at States' violations of HAVA or other federal laws imposing list maintenance obligations, which were not enacted until decades later. Title III, a tool for the investigation of such violations, spells out the documents States must retain so that the federal government can investigate such potential violations. There is no need for Title III to re-explain that the purpose of these obligations is to protect Americans from race discrimination in voting. *Benson* also failed to consider whether allowing US DOJ to utilize Title III to obtain documents it could not obtain under HAVA runs afoul of HAVA, which gives the federal

---

[3] As discussed below in Section II, that court dismissed the federal government's case on a different ground: that the list sought fell outside the type of documents Title III requires a State to preserve.

7

government no such power and confers discretion on the States about how to conduct list maintenance.

Aside from *Benson*, US DOJ's cited cases, (Dkt. 71:13), involved no question about the scope of Title III. *State of Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 855 (N.D. Ala. 1960), for example, described the statute's scope as "clear and unambiguous," but the statutory purpose was not at issue there.

US DOJ points to a 2001 report on election reform, where a committee encouraged States to use driver's license information and SSN data to increase accuracy. (Dkt. 71:19.) But that has nothing to do with race discrimination or the Civil Rights Act. To the contrary, those suggestions are reflected in HAVA, where Congress made different choices about how to regulate the States.

Two of the amici attempt to expand the reach of the Fifteenth Amendment, as well as the Civil Rights Act, arguing that they protect not just against race discrimination, but any state action that makes a voter's vote less effective. (Dkt. 73-1:3, 7 n.2, 9–10; 67-1:12–13.) But that effort runs afoul of the plain language of the Fifteenth Amendment, which protects Americans from race discrimination, not vote dilution. It provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."

8

U.S. Const. art. XV, § 1. It is *that* right, not just an interest in the efficacy of a person's vote, that Congress legislated to protect. U.S. Const. art. XV, § 2.

## II. Even if the Civil Rights Act could be supersized in the way US DOJ urges, the database it seeks is not a record States must preserve under that statute.

Even if the Civil Rights Act did empower US DOJ to seek documents from States for purposes of enforcing other laws (including laws where US DOJ has no such investigatory authority), Wisconsin's unredacted voter database would fall outside the type of documents that Title III requires States to retain and preserve.

Title III applies only to "records and papers which come into [an official's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting." 52 U.S.C. § 20701. The official must preserve such documents, unaltered, for 22 months after a federal election. 52 U.S.C. § 20701. As discussed in Wisconsin's principal brief, (Dkt. 58:29–31), standard reference tools read the phrase "come into possession" as things received or acquired from an outside source. That reading is also consistent with Title III's examples of covered records, an "application, registration, [or] payment of poll tax"—things elections officials receive from an external source—as well as other federal statutes employing the phrase "come into possession." (Dkt. 58:31 (giving examples of such statutes).)

9

Wisconsin's unredacted voter list is not such a record because it did not "come into" the Commission's possession. The Wisconsin voter list is generated and maintained by the Commission, with extensive assistance from local and county elections officials. (*See* Dkt. 3-1:15–18.)[4]

So held the district court in *Benson*, which concluded that Michigan's voter list was not a record that Title III requires election officials to maintain. 2026 WL 362789, at *9. The court reasoned that the phrase "'comes into [their] possession' naturally refers to a process by which someone *acquires* an item from an external source," and pointed out that Congress frequently uses the phrase "to refer to items that a person *obtains* rather than *creates*." *Id.* (brackets and emphasis in original). The court interpreted the phrase as "referring to only those documents that state election officials receive from prospective voters." *Id.* The court supported its interpretation with the types of records listed in the statutes—records that election officials receive, rather than create—and events surrounding the passage of the Civil Rights Act, when the federal government had been frustrated in its efforts to protect Black citizens by officials' destruction of voter registration applications. *Id.*

---

[4] Wisconsin law separately requires elections officials to preserve electronic and paper registration applications that they receive. Wis. Stat. §§ 6.30(5), 6.35(3). These are the types of documents covered by the Civil Rights Act.

US DOJ cites no precedent to the contrary. It says that "no other federal court has adopted" *Benson*'s construction of the retention obligation in Title III. (R. 71:25.) True enough, but US DOJ has never tried to utilize the Civil Rights Act in this way until now, so federal courts have not previously needed to answer this question. *Gallion*, which US DOJ describes as denying "a similar effort to impede the Attorney General's enforcement of federal election laws," (Dkt. 71:20; *see also* Dkt. 71:25), was a challenge to the constitutionality of Title III; there was no dispute about whether the records sought fell within the reach of the statute. *Gallion*, 187 F. Supp. at 855.[5] *Kennedy v. Lynd* similarly involved no dispute about the scope of documents sought. 306 F.2d 222, 225 (5th Cir. 1962).

US DOJ relies on *Judicial Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425, 434 (D. Md. 2019), but this case undercuts rather than supports its argument. That case involved a request for a voting list under the NVRA; the different statutory definition there illustrates what's missing from the Civil Rights Act. The NVRA requires States to maintain "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters."

---

[5] US DOJ also suggests that *Gallion* rejects Wisconsin's position that Wisconsin state law prohibits production of private information in the voter database. (Dkt. 71:25.) *Gallion* said nothing about the production of voter information protected as private under a state law.

11

*Id.* at 436 (quoting 52 U.S.C. § 20507(i)). That language says nothing about "comes into possession," and refers explicitly to documents concerning a State's implementation of the NVRA and activities relating to list maintenance. The district court granted the plaintiffs' request for a voter list under the NVRA based on statutory language that Title III does not include. *Id.* at 446.[6]

Beyond its caselaw citations, US DOJ posits that "comes into possession" relates not to whether an agency acquired documents from an outside source, but rather to when the agency made the acquisition. (Dkt. 71:27–28.) But regardless of whether a statute is discussing a time period, the triggering moment of "comes into possession" is when an agency *acquires* or *receives* the relevant thing. (Dkt. 71:28.) US DOJ can't avoid the "comes into" language of the statute—even in its own argument, it says that the focus is on how an individual "gains" possession of a record or "acquire[s]" it (Dkt. 71:28)—verbs synonymous with "comes into" here. The term means things received from elsewhere, not created internally.[7]

---

[6] Not all courts agree that even the NVRA covers a voter list. *See United States v. Benson*, No. 25-cv-1148, 2026 WL 362789 at *6 (W.D. Mich. Feb. 10, 2026) (unpublished) (collecting cases).

[7] US DOJ points to two consent decrees in Texas and Georgia, where those States agreed to provide certain voting information. (71:29.) Such agreements are irrelevant to whether US DOJ states a claim here.

US DOJ also suggests that Title III's description of the official with the maintenance obligation, a "person having custody, possession, or control of such record or paper," expands the scope of documents covered. (Dkt. 71:29 (quoting 52 U.S.C. § 20701).) The provision does no such work: it just cross-references the covered records, requiring persons who have "*such* record or paper," 52 U.S.C. § 20701, to maintain it.

## III. Even if the Civil Rights Act covered efforts to investigate violations of other statutes, US DOJ provides no basis for its demand.

US DOJ's claim also fails because it provided no basis for its request. *See* 52 U.S.C. § 20703 (requiring federal government to provide both the purpose and "basis" for its demand). The parties disagree about whether the basis can merely be "a reference to the statutory basis," (US DOJ brief, Dkt. 71:23), or whether the agency must meet an articulable suspicion standard, (Defendants brief, Dkt. 58:31–32 (citing *In re Sealed Case*, 42 F.3d 1412, 1417 (D.C. Cir. 1994)).[8] But that disagreement need not be resolved given the

---

[8] If this case proceeds beyond the motion to dismiss stage, Wisconsin will be entitled to discovery to ascertain whether US DOJ's request is a pretext to develop a nationwide voter database. (*See* Dkt. 58:46.) On February 26, US DOJ sued five additional States, bringing the current count to 30. *See Justice Department Sues Five Additional States for Failure to Produce Voter Rolls*, U.S. Dep't of Just. Off. of Pub. Affs., https://www.justice.gov/opa/pr/justice-department-sues-five-additional-states-failure-produce-voter-rolls (Feb. 26, 2026). The sheer quantity of litigation casts doubt on the notion that US DOJ is investigating particular federal law violations. Indeed, US DOJ's press release describes the lawsuits' goal in different terms: "[a]ccurate, well-maintained voter rolls . . . a requisite for the election integrity that the American people deserve." *Id.*

13

request at issue: US DOJ's demand did not satisfy even the low standard it proposes for itself. The demand did not allege that HAVA was its basis, and HAVA cannot serve as a lawful basis, in any case, since it does not impose list maintenance obligations on Wisconsin.

That failure is a separate reason why DOJ's case should be dismissed.

### IV. Production would violate Wisconsin law restrictions on disclosing voters' personally identifiable information.

US DOJ's demand fails to state a claim for a final, independent reason. Wisconsin law requires redaction of certain private information, including driver's license and social security numbers, and providing US DOJ with an unredacted list would violate that law.

US DOJ's response neither contests what Wisconsin law provides nor argues that state law is preempted. Instead, it says it will do a good job of keeping the information confidential. (Dkt. 71:31.) But that assurance is not a statutory exception under Wisconsin law. Having failed to brief the question of whether those state laws are preempted, US DOJ has forfeited that argument. And as the Commission has already offered to provide a redacted list, forfeiting that issue leaves US DOJ with no basis to claim judicial redress.

### V. DOJ's case is subject to judicial review and dismissal.

US DOJ's asserts that this Court can review none of the failings of its case on the theory that Title III doesn't "provide any process" to Wisconsin and

14

"motions to dismiss are inapplicable." (Dkt. 71:15, 11; *see also* 71:12–17, 21–24.) That view is unsupported by any authority US DOJ offers up.

As the cases dismissing claims against other States for their unredacted voting lists illustrate, courts uniformly consider challenges to document demands from US DOJ and dismiss cases where the demand falls outside Title III. *See Oregon*, 2026 WL 318402, at *13 (dismissing case against Oregon without leave to amend); *Weber*, 2026 WL 118807, at *20 (dismissing case against California, with prejudice); *Benson*, 2026 WL 362789, at *11 (dismissing case against Michigan).

The 1960s cases relied on by US DOJ are not to the contrary. *Gallion* considered a constitutional challenge to the statute on the merits. *See* 187 F. Supp. at 853. And *Lynd* noted that disputes about whether records fell within Title III's definition of records "would, of course, be open for determination." 306 F.3d at 226.[9]

Analogizing Title III to an "administrative subpoena," (Dkt. 71:14), gets US DOJ no further. To enforce an administrative subpoena, an agency must establish that the subpoena (i) "seeks reasonably relevant information," (ii) "is not too indefinite," (iii) "relates to an investigation within the agency's

---

[9] US DOJ's discussion, (Dkt. 71:11), of *Becker v. United States*, 451 U.S. 1306 (1981), is puzzling. The Commission did not cite *Becker*, and as US DOJ acknowledges, it was a one-Justice in-chambers decision on a temporary stay that was later vacated.

authority," (iv) "has not been made for an illegitimate purpose," and (iv) is not "excessively burdensome." *E.E.O.C. v. Quad/Graphics, Inc.*, 63 F.3d 642, 645 (7th Cir. 1995); (*see also* Dkt. 58:32–33 (discussing additional cases)). US DOJ has not tried to satisfy that standard.

* * * * *

US DOJ's demand should be dismissed for failure to state a claim. It finds authority in neither HAVA nor the Civil Rights Act, seeks records not covered by the terms of Title III, fails to assert a basis for its demand, and would violate state privacy laws.

## CONCLUSION

The Court should grant the Defendants' motion to dismiss, with prejudice.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

s/Charlotte Gibson
CHARLOTTE GIBSON
Assistant Attorney General
State Bar #1038845

SAMUEL T. WARD-PACKARD
Assistant Attorney General
State Bar #1128890

Attorneys for Wisconsin Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 957-5218 (CG)
(608) 267-8938 (SWP)
(608) 294-2907 (Fax)
Charlie.gibson@wisdoj.gov
Samuel.ward-packard@wisdoj.gov